1  SEYFARTH SHAW LLP
   Robert S. Niemann (SBN 087973)
2  rniemann@seyfarth.com
   560 Mission Street, Suite 3100
3  San Francisco, California 94105
   Telephone: (415) 397-2823
4  Facsimile: (415) 397-8549

5  GEORGE H. GERSTMAN
   *Appearing (Pro Hac Vice)*
6  ggerstman@Seyfarth.com
   SEYFARTH SHAW LLP
7  131 S. Dearborn Street, Suite 2400
   Chicago, Illinois 60603
8  Telephone: (312) 460-5000
   Facsimile: (312) 460-7000
9  E-Mail: ggerstman@seyfarth.com

10 BRIAN L. MICHAELIS
   *Appearing (Pro Hac Vice)*
11 bmicaelis@seyfarth.com
   SEYFARTH SHAW LLP
12 Two Seaport Lane, Suite 300
   Boston, Massachusetts 02210
13 Telephone: (617) 946-4800
   Facsimile: (617) 946-4801
14 E-Mail: bmichaelis@seyfarth.com

15 Attorneys for Defendant
   NITEK International, LLC.
16

17
                    UNITED STATES DISTRICT COURT
18
              IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA
19

20 NETWORK VIDEO TECHNOLOGIES, INC., )  Case No. C 08 2208 MHP
                                     )
21          Plaintiff,               )  **DECLARATION OF GEORGE H.**
                                     )  **GERSTMAN IN SUPPORT OF**
22      v.                           )  **DEFENDANT NITEK**
                                     )  **INTERNATIONAL, LLC's NOTICE OF**
23 NITEK INTERNATIONAL, LLC and DOES 1- )  **MOTION AND MOTION TO DISMISS**
   10                                )  **COMPLAINT FOR LACK OF**
24          Defendant.               )  **SUBJECT MATTER JURISDICTION**
                                     )  **UNDER F.R.C.P. 12(B)(1)**
25 _____)
                                        Date:   July 28, 2008
26                                      Time:   2:00 p.m.
                                        Place:  Courtroom 15, 18th Fl.
27

28

_____
Decl. of Gerstman ISO Def's Mtn to Dismiss - Case No. C 08-2208 MHP

I, George H. Gerstman declare as follows:

1.    I am a partner in the law firm of Seyfarth Shaw, LLP, 131 South Dearborn Street, Chicago, Illinois 60603. I have been admitted to practice before various District Courts throughout the United States, various Courts of Appeals including the United States Court of the Appeals for the Federal Circuit, and the United States Supreme Court. I am registered to practice before the United States Patent and Trademark Office.

2.    Exhibit 1 hereto is a true copy of FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT OF PATENT NON-INFRINGEMENT, INVALIDITY AND UNENFORCEABILITY in the first Declaratory Judgment action ("first DJ action") filed by NVT against NITEK.

3.    Exhibit 2 hereto is a true copy of the Reporter's Transcript Of Proceedings, for the Hearing on NITEK's Motion To Dismiss in the first DJ action.

4.    Exhibit 3 hereto is a true copy of Docket Sheets for the appeal of the dismissal of the first DJ action, filed by NVT in the Court of Appeals for the Federal Circuit ("CAFC") on April 14, 2008.

5.    Exhibit 4 hereto is a true copy of the Complaint filed in the instant action.

6.    Exhibit 5 hereto is a true copy of the Declaration of Edward L. Polanek submitted in the first DJ action.

7.    Exhibit 6 hereto is a true copy of United States Patent No. 7,193,149 ("the '149 Patent"), owned by NITEK.

8.    Exhibit 7 hereto is a true copy of the unpublished case Bridgelux, Inc. v. Cree, Inc., 2007 U.S. Dist. LEXIS 53137 (N.D. Cal. 2007).

9.    Exhibit 8A hereto is a true copy of NVT's redacted, designated as "Highly Confidential" Declaration of Dan Nitzan submitted in Opposition to Defendant's Motion to Dismiss in the first DJ action.[1]

---

[1] NVT designated large portions of its Opposition as Highly Confidential, including large portions of the Declaration of Dan Nitzan, despite NITEK's vehement objections. Accordingly, in the instant Motion To Dismiss NITEK must submit both a Highly Confidential sealed version and a Non-Confidential (highly redacted) version of NVT's Declaration of Dan Nitzan in Opposition to Defendant NITEK's Motion to Dismiss in the first DJ action.

---

1       10.    Exhibit 8B, filed under seal, is a true copy of NVT's unredacted, designated as

2   "Highly Confidential" Declaration of Dan Nitzan submitted in Opposition to Defendant's

3   Motion to Dismiss in the first DJ action.

4       11.    Exhibit 9 hereto is a true copy of the Declaration of Chad Szekeres submitted in

5   the first DJ action.

6       12.    Exhibit 10 hereto is a true copy of the Declaration of Carl Palash submitted in the

7   first DJ action.

8       13.    Exhibit 11 hereto is a true copy of the Second Declaration of Edward L. Polanek

9   submitted in the first DJ action.

10      14.    Exhibit 12 hereto is a true copy of the Letter from George H. Gerstman of August

11  24, 2007 to NVT Counsel Gary A. Hecker.

12      15.    Exhibit 13 hereto is a true copy of NVT Counsel Gary A. Hecker's August 24,

13  2007 letter to NITEK Counsel George Gerstman.

14      16.    Exhibit 14 hereto is a true copy of the unpublished case Geisha v. Tuccillo, 2007

15  U.S. Dist. LEXIS 65348 (N.D. Ill. 2007).

16      I declare that the foregoing is true under the penalty of perjury under California law and

17  any other applicable law.

18

19  Date: _June 9, 2008_  _____

20                      George H. Gerstman

21  SF1 28325548.1 / 25663-100200

22

23

24

25

26

27

28

EXHIBIT 1

Case 3:08-cv-02208-MHP     Document 15     Filed 06/09/2008     Page 5 of 29
Case 2:07-cv-04789-AHM-RZ     Document 12-3     Filed 11/09/2007     Page 1 of 4
Case 2:07-cv-04789-AHM-RZ     Document 10     Filed 11/01/2007     Page 1 of 4

1   Gary A. Hecker, Esq. (State Bar No. 099008)
    James M. Slominski, Esq. (State Bar No. 166357)
2   **THE HECKER LAW GROUP, PLC**
    1925 Century Park East, Suite 2300
3   Los Angeles, California 90067
    Telephone:   (310) 286-0377
4   Facsimile:   (310) 286-0488
    Email:       ghecker@hh.com
5                jslominski@hh.com

6   Attorneys for Plaintiff
    Network Video Technologies, Inc.
7

8

9               IN THE UNITED STATES DISTRICT COURT

10                 CENTRAL DISTRICT OF CALIFORNIA

11

12  NETWORK VIDEO                    Civil Action No. CV-07-4789 AHM (RZx)
13  TECHNOLOGIES, INC.,

14                     Plaintiff,    **FIRST AMENDED COMPLAINT FOR
                                     DECLARATORY JUDGMENT OF
15          v.                       PATENT NON-INFRINGEMENT,
                                     INVALIDITY AND
16  NITEK INTERNATIONAL, LLC;        UNEFORCEABILITY**
    and DOES 1-10,
17                                   **DEMAND FOR JURY TRIAL**
                       Defendants.
18

19

20

21

22      Plaintiff, NETWORK VIDEO TECHNOLOGIES, INC., by and through its

23  undersigned counsel, brings this action against Defendants NITEK

24  INTERNATIONAL, LLC and DOES 1-10 and complains upon information and belief

25  alleges as follows:

26

27

28

Case 3:08-cv-02208-MHP    Document 15    Filed 06/09/2008    Page 6 of 29
Case 2:07-cv-04789-AHM-RZ    Document 12-3    Filed 11/09/2007    Page 2 of 4
Case 2:07-cv-04789-AHM-RZ    Document 10    Filed 11/01/2007    Page 2 of 4

## JURISDICTION AND VENUE

1.    This is an action for Declaratory Judgment of Non-Infringement, Invalidity and Unenforceability of United States Patent No. 7,193,149.

2.    This Court has jurisdiction pursuant to 28 U.S.C. § 2201 et. seq. and 28 U.S.C. §1338(a) et. seq.

3.    Venue is proper pursuant to 28 U.S.C. §§ 1391(b), (c) and/or 1400(b).

## THE PARTIES

4.    Plaintiff, NETWORK VIDEO TECHNOLOGIES, INC. ("NVT"), is a California Corporation in good standing with its principal place of business at 4005 Bohannon Drive, Menlo Park, California.

5.    Defendant, NITEK INTERNATIONAL, LLC ("NITEK"), is an Illinois limited liability with its principal office at 5410 Newport Drive, Ste. 24, Rolling Meadow, Illinois, doing business in the County of Los Angeles, State of California.

6.    Defendants DOES 1-10 are currently unknown to Plaintiff. Plaintiff will amend this Complaint to assert their true names and capacities when ascertained.

7.    Defendants, and each of them, are, and at all terms herein were, the alter ego, principal, agent, employee, employer, partner, joint venturer, and/or otherwise affiliated with one another so as to be liable in such capacity for the acts and injuries alleged herein.

## FIRST CAUSE OF ACTION
## DECLARATORY JUDGMENT

8.    Plaintiff incorporates by reference paragraphs 1-7 as though fully set forth herein.

9.    Defendant NITEK asserts that it is the assignee and owner of United States Patent No. 7,193,149 entitled "System Handling Video, Control Signals and Power" (the '149 Patent). The '149 Patent issued on March 20, 2007.

10.    Plaintiff is a manufacturer and supplier of products, including video systems.

2

Case 3:08-cv-02208-MHP    Document 15    Filed 06/09/2008    Page 7 of 29
Case 2:07-cv-04789-AHM-RZ    Document 12-3    Filed 11/09/2007    Page 3 of 4
Case 2:07-cv-04789-AHM-RZ    Document 10    Filed 11/01/2007    Page 3 of 4

11.    Defendants intend to assert their rights under the '149 Patent against Plaintiff, and others, to preclude Plaintiff, and others, from manufacturing and selling their products, including video systems.

12.    Plaintiff denies infringement of the '149 Patent and asserts it has the right to manufacturer and sell its products.

13.    Plaintiff further asserts the '149 Patent is invalid under Title 35 of the United States Code.

14.    Plaintiff further asserts that the '149 Patent is unenforceable due to inequitable conduct by the applicants and/or their representatives and/or agents during the prosecution of the application for the '149 Patent. That inequitable conduct includes making knowingly false statements about prior art to obtain allowance of the '149 Patent claims. Specifically, false statements were included in, at least, ¶¶ 7 and 8 of the Declaration of William C. Curran ("Curran Declaration") dated November 30, 2006 and on pages 11 and 12 in the Remarks section of the papers submitted to the Patent Office with the Curran Declaration.

15.    As a result of the foregoing, and in light of all the relevant circumstances, there is an immediate, real, and substantial controversy between Plaintiff and Defendants as to Defendants' rights under the '149 Patent, and as to the validity, enforceability, and scope of the '149 Patent, and as to whether any of Plaintiff's products infringe any valid claims of the '149 Patent.

[continued on the next page]

3

## DEMAND FOR RELIEF

**WHEREFORE,** Plaintiff asks this Court to:

  a.   Enter judgment for Plaintiff that the '149 Patent is invalid and/or unenforceable;

  b.   Enter judgment for Plaintiff of non-infringement;

  c.   Award Plaintiff its reasonable attorneys' fees and costs; and

  d.   Award Plaintiff such other and further relief as is just and proper.


Respectfully submitted,

DATED: November /, 2007    **THE HECKER LAW GROUP, PLC**

By: _____
Gary A. Hecker, Esq.
James M. Slominski, Esq.

Attorneys for Plaintiff
Network Video Technologies, Inc.


## DEMAND FOR TRIAL BY JURY

Pursuant to FRCP 38, Plaintiff hereby demands a trial by jury.


Respectfully submitted,

DATED: November /, 2007    **THE HECKER LAW GROUP, PLC**

By: _____
Gary A. Hecker, Esq.
James M. Slominski, Esq.

Attorneys for Plaintiff
Network Video Technologies, Inc.

4

EXHIBIT 2

1

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3    HONORABLE A. HOWARD MATZ, U.S. DISTRICT JUDGE

4    - - - -

5

6

# CERTIFIED COPY

7                                      )
NETWORK VIDEO TECHNOLOGIES, INC.,     )
8                                      )
            PLAINTIFF,                 )
9                                      )
        vs.                            )  No. CV07-4789-AHM(RZx)
10                                     )
NITEK INTERNATIONAL, LLC, ET AL.,     )
11                                     )
            DEFENDANTS.               )
12  _____)

13

14

15    REPORTER'S TRANSCRIPT OF PROCEEDINGS

16    LOS ANGELES, CALIFORNIA

17    MONDAY, FEBRUARY 25, 2008

18

19

20

21

22    _____

23    CINDY L. NIRENBERG, CSR 5059
      U.S. Official Court Reporter
24    312 North Spring Street, #438
      Los Angeles, California 90012
25    *www.cindynirenberg.com*

2

```
 1   APPEARANCES OF COUNSEL:

 2

 3   FOR THE PLAINTIFF:
                         HECKER LAW GROUP
 4                       BY: GARY A. HECKER, ATTORNEY AT LAW
                             JAMES M. SLOMINSKI, ATTORNEY AT LAW
 5                           ANDREA L. MAST, ATTORNEY AT LAW
                         1925 CENTURY PARK EAST
 6                       SUITE 2300
                         LOS ANGELES, CA 90067
 7                       310-286-0377

 8

 9

10   FOR THE DEFENDANTS:
                         SEYFARTH SHAW
11                       BY: GEORGE H. GERSTMAN, ATTORNEY AT LAW
                         131 SOUTH DEARBORN STREET
12                       SUITE 2400
                         CHICAGO, IL 60603
13                       312-460-5000

14                       SEYFARTH SHAW
                         BY: KENNETH L. WILTON, ATTORNEY AT LAW
15                       2029 CENTURY PARK EAST
                         SUITE 3300
16                       LOS ANGELES, CA 90067
                         310-277-7200

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

3

| | |
|---|---|
| 1 | LOS ANGELES, CALIFORNIA; MONDAY, FEBRUARY 25, 2008 |
| 2 | 10:27 A.M. |
| 3 | - - - - - |
| 4 | THE CLERK:  Calling Item Number 2, CV07-4789, Network |
| 5 | Video Technologies, Inc. versus Nitek International, LLC, et |
| 6 | al. |
| 7 | Counsel, state your appearances, please. |
| 8 | MR. GERSTMAN:  Good morning, Your Honor.  George |
| 9 | Gerstman representing Nitek.  With me is my partner Ken Wilton |
| 10 | also representing Nitek. |
| 11 | THE COURT:  Okay.  Good morning. |
| 12 | MR. GERSTMAN:  Good morning. |
| 13 | MR. HECKER:  Good morning, Your Honor.  Gary Hecker, |
| 14 | Jim Slominski and Andrea Mast representing NVT. |
| 15 | THE COURT:  Okay.  Please be seated everyone.  Good |
| 16 | morning to all of you. |
| 17 | We have a motion to dismiss for lack of jurisdiction |
| 18 | subject matter or personal jurisdiction or in the alternative |
| 19 | to transfer venue. |
| 20 | I assume that I have subject matter jurisdiction.  I |
| 21 | think that the MedImmune decision and Sony Electronics and |
| 22 | SanDisk make that the correct conclusion.  But I intend, unless |
| 23 | I am talked out of it at this hearing, to exercise my |
| 24 | discretion under the Declaratory Judgment Act to dismiss |
| 25 | without prejudice, the Declaratory Judgment Action that the |

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

4

1    plaintiffs have filed.

2        I'm applying the principles in EMC Corp., Wilton and

3    in Sony Electronics as to what standards should govern a

4    court's determination as to whether or not in the exercise of

5    discretion it would be appropriate to dismiss without prejudice

6    the complaint, and here are my reasons for doing so.  I do not

7    intend to issue a written order, but the -- and these are not

8    necessarily in the order of weight or importance, but there is

9    a basis to start with to think that the filing of this action

10   was a measure designed to achieve a tactical advantage.

11       I don't say that in a way that's meant to slap

12   anyone's wrist or suggest that there was misconduct because I

13   don't find that there was.  But filing the suit in this forum,

14   which is a very dubious forum, very attractive to the

15   plaintiffs because that's where their skillful lawyers are, and

16   quite iffy as to whether or not venue lies here.  I suggest

17   that there was a forum shopping motive that was at least part

18   of what was going on.

19       Shortly after the suit was filed, the plaintiffs

20   sought a covenant not to sue.  That's consistent with the claim

21   that there is some perceived exposure, some actual conflict,

22   some risk of functioning in limbo while you're still in

23   business.  But it also is consistent with the view that we will

24   go to court, we'll slap the defendant with a complaint, we'll

25   get our forum that we want, we'll get the tactical advantage of

1    moving first, and then we'll squeeze them and get basically

2    immunity.  So it's not an unequivocal showing, but it is a

3    consideration that I think is relevant to the standard relating

4    to whether or not the declaratory judgment filing is a tactical

5    measure.

6            And although the events can be looked at more than

7    one way and there is a little bit of dispute about what

8    triggered what, I think it's very clear, and I make the finding

9    that once the plaintiff obtained the advantage of suing first

10   and doing so in this forum, it expressed at the very least a

11   receptivity to evaluating the license proposal that by virtue

12   of the filing it was able to extract from the defendant, and

13   that suggests that although negotiations are stalled, there may

14   be a realistic possibility of this marginally actual

15   controversy being resolved short of full-fledged litigation.

16           That leads to the second factor about what, if any,

17   policies and practices -- not practices, but policies and

18   purposes of the Declaratory Judgment Act are implicated here.

19           Before the case was filed, there were no threats that

20   the defendant had directly issued at all.  The press release

21   and the statement to the world was kind of innocuous and not

22   focused on this plaintiff at all.

23           The plaintiff has -- excuse me, the defendant has

24   made initial assurances that it had no intent to sue, and in

25   its latest representation has indicated that it hasn't focused

6

1    on any factors that has led it to change that intent.  The

2    declaration that Nitzan filed doesn't speak in any persuasive

3    manner about the existence of an actual controversy.  He

4    doesn't identify who said what to whom.  Neither the speaker

5    nor the listener at the Las Vegas convention is identified.  It

6    is pretty weak authority for the notion that there is an actual

7    controversy.

8             And the fact is that the showing of business

9    disruption caused by the weak factor that the plaintiff pointed

10   to is limited.  There's no evidence that somebody has refused

11   to do business.  Someone has expressed a concern about what

12   might happen if the business were maintained.

13            There is no actual indication in any part of the

14   record that I'm familiar with that the -- whatever legitimate

15   factors that the plaintiff is in a position to pursue have

16   actually been undermined or compromised.

17            The plaintiff did not specify at the time the

18   complaint was filed what products were at stake or which of its

19   package of products was implicated by the press release.  It

20   did so only in response to developments that came after the

21   filing of the complaint.

22            It seems to me to be premature, and it would be

23   correspondingly very misguided for this Court to permit the

24   case to proceed with all that it would entail in terms of

25   considerations of judicial economy and I think litigant

1    economy.

2         Now, I might condition this ruling, Mr. Gerstman, on

3    some kind of assurance by you that if a complaint is later

4    filed by the plaintiff in this district -- well, let me put it

5    differently.  This is a little bit tricky.  But I don't want

6    the defendant to go out and seize its own favorable forum in

7    the northern district of Illinois or otherwise and point to

8    pretty much the same panoply of supposed facts that the

9    plaintiff points to as warranting the filing of a declaratory

10   judgment action by the defendant.

11        Now, are you prepared to assure that your client

12   won't do that?

13        MR. GERSTMAN:  I can.  In fact, we --

14        THE COURT:  Please stand because that's the practice

15   in this district.

16        MR. GERSTMAN:  Thank you.

17        Yes, we really have no controversy with NVT at this

18   time, and as far as we know, there's really no problem with

19   NVT.  We're competitors.  I can't say we're friendly

20   competitors, but we have no problem.  And I don't think there

21   is any actual controversy at all.

22        THE COURT:  I have erred on the side of finding that

23   there is, and there probably is for purposes of post-MedImmune

24   analysis.

25        MR. GERSTMAN:  But we have never said they even need

1    a license.

2                    THE COURT:  But it's weak.

3            MR. GERSTMAN:  But I can say that we have no plans to

4    file a lawsuit against NVT at this time.

5                    THE COURT:  Well, I would authorize the plaintiff, if

6    you ever did file a declaratory judgment action that was

7    arguably preempted and designed to attain the same kind of

8    tactical or strategic advantage that I think is reflected in

9    what's happened in this court, I would expect and hope that the

10   plaintiffs would notify me, and in any event feel free to tell

11   whoever became the judge in the forum that you seized -- and I

12   accept your representation that you are not planning to do

13   so -- that you and your client are guilty of game playing, and

14   maybe that would invite briefing as to whether sanctions should

15   be imposed.

16           MR. GERSTMAN:  No, we are really not trying to play

17   any games, and I really appreciate what you are saying.  I

18   understand completely what you are saying and I appreciate it.

19                   THE COURT:  Okay.  Do you want to be heard,

20   Mr. Hecker?

21           MR. HECKER:  I would like to, Your Honor, yes.  Thank

22   you.

23                   THE COURT:  Go ahead.

24           MR. HECKER:  I would like to go through some of the

25   facts, but before I do so --

1    THE COURT:  Well, don't go through the facts that you

2    can I hope already tell I am already familiar with.  I have

3    read the papers.

4    MR. HECKER:  Thank you, Your Honor.

5    THE COURT:  You can go through my characterization or

6    analysis.

7    MR. HECKER:  Will do.  Your Honor, Sony versus

8    Guardian, the Sony case you cited, 497 F.3d 1271, which is a

9    2007 Fed. Cir. case --

10    THE COURT:  Yeah, which I read by the way.  I have it

11    right here, but go ahead.

12    MR. HECKER:  Okay.  It appears, Your Honor, that Sony

13    overrules EMC, at least in part.  And that goes directly to the

14    MedImmune issue saying that a declaratory judgment plaintiff

15    does not need to establish a reasonable apprehension.

16    And I think that Your Honor indicates that there is

17    subject matter jurisdiction, at least on the facts, based on

18    MedImmune.  But Your Honor seems to be indicating that based on

19    the choice of forum that has been selected, namely, this one,

20    which is an appropriate forum, that there is forum shopping.

21    Now, I would submit, Your Honor, that if the Court --

22    well, I do submit that this is a proper forum for venue and for

23    personal jurisdiction.  It was stated by the opponent that they

24    didn't do business here, but there's maximum contacts here, not

25    minimum, and, of course, the Court hasn't addressed that point,

10

1   but there's certainly jurisdiction.  And as far as venue goes,

2   it's proper.

3           But if we had filed this case in Illinois, it seems

4   what Your Honor is saying is that in that case, subject matter

5   jurisdiction in the case would then have been accepted.

6           What we had asked the opponent for was nothing more

7   than an enforceable promise not to sue.  All the opponent has

8   said today is that they have no plans at this time to file a

9   declaratory judgment of their own.

10          What we have been looking for was an enforceable

11  promise after an entire locus collection of facts had really

12  directed us to nothing short of being fearful that an action

13  was imminent.  We did have customers contact us, and that's in

14  the declaration of our client, indicating that he had been

15  contacted by customers.  The press, they had never written

16  before to --

17          THE COURT:  Why is it an abuse of discretion?

18          You seem to be pressing points that get to the

19  question of whether or not I could exercise jurisdiction

20  because it exists.  And I have already for purpose of my

21  analysis said I find that there is subject matter jurisdiction,

22  so I don't think it behooves you to press that point already.

23  So address the factors that I did recite, please.

24          MR. HECKER:  Well, Your Honor, one of the things that

25  you said is that in the complaint, the products aren't

1   specifically identified.  Now, that would go more toward a

2   motion for a more definite statement.

3          There is a factual controversy here.  The opponent

4   says it never analyzed NTV's products when, in fact, there is a

5   license agreement that they submitted that identifies with

6   particularity the accused infringing products and identifies

7   them as products covered by the patent, so there is

8   specificity.  So, for example, Your Honor --

9          THE COURT:  That you managed to provoke the other

10  side into providing in a good faith effort to avoid litigation.

11         MR. HECKER:  Well, we actually specifically did not

12  ask for a license agreement and weren't looking for one.

13         We had had discussions with Anixter, who is a

14  co-owner of the patent, and declined any desire to have a

15  license.  What we wanted was a promise not to sue and nothing

16  more.

17         And the argument that was set forth in the opponent's

18  brief says that we actually asked for a license, and that's

19  not -- well, that's incorrect.  I do agree with Mr. Gerstman's

20  declaration which actually specifies that we did not ask them

21  for a license and did not want one.  It was something that they

22  offered up to us.  We were not seeking to provoke a license.

23  We were seeking to get a promise not to sue.

24         And based on the license agreement that exists that

25  they have sent to us today, as you say, there would be subject

12

1    matter jurisdiction based on the facts.

2         Separate and apart from that, the facts that you say

3    are loose concerning the conversations that were had at the

4    trade show, the opponent here says that no employee talked to

5    Nitek, but that it was actually at a rep meeting in which they

6    were contacted.  The co-owner of the patent itself was

7    extremely worried that Nitek was going to sue us.

8         So the purpose of filing this action, Your Honor,

9    just for purposes of the points that the Court seems to be

10   intimating is that this action was filed exclusively for the

11   purpose of gaining a tactical advantage.  If this case was

12   moved to Illinois, it would be all the same to us.  This is a

13   proper forum, we submit.  But we need to be -- we need to have

14   it put to bed that they are not going to sue us for patent

15   infringement.

16        There is a cloud, and it's precisely that.  If you

17   look at the footnote in the Teva case, Your Honor, I think it's

18   a good indication of the issue that concerns us in particular

19   and the problem that we face.

20        And if I may just cite it to the Court so that it's

21   in the record.  If you will just bear with me a brief moment.

22        In the footnote in Teva, one of the cases we rely

23   on --

24        THE COURT:  Which I have right before me.  What

25   footnote do you want me to look at?

13

1          MR. HECKER:  That's at Page 5, Your Honor, and it's

2     footnote Number 2.

3          THE COURT:  Okay.

4          MR. HECKER:  Okay.  And there it states:

5          "Before the declaratory judgment provisions,

6          competitors were victimized by patent owners who

7          engaged in extra-judicial patent enforcement with

8          scare-the-customer-and-run tactics that infect the

9          competitive environment of the business community

10         with uncertainty and insecurity."

11         And both our reps and our customers have expressed

12    that to us and have indicated that to us.

13         And it goes on to say, quote, "After --

14         THE REPORTER:  Counsel, slow down if you're going to

15    read, please.

16         MR. HECKER:  Sure.  It says, quote:

17         "After enactment of these provisions, competitors

18         were no longer restricted to the hard choice between

19         incurrence of a growing potential liability for

20         patent infringement and abandonment of their

21         enterprises.  They could clear the air by suing for a

22         declaratory judgment."

23         Now, Your Honor, for purpose of investment, for

24    purpose of sales, for purpose of competition in the marketplace

25    by two competitors that admit they are arch rivals, it's

14

1  important that our client know that this patent which the

2  opponent states covers the identical technology that they

3  compete on, that they are not facing or are not at risk of

4  patent infringement.

5        That cloud is a significant risk to our client and is

6  the reason that this action was brought and for no other, not

7  for forum shopping purposes.

8        And so if this case ended up in another court, that

9  would be all the same.  It would not, we believe, be

10 appropriate because all things are equal on the balance on

11 venue.  But our client needs a promise and a resolution.

12       THE COURT:  Why did your client sue in this district

13 rather than in the northern district?

14       MR. HECKER:  Because its lawyers are here and there

15 is venue here, and they decided that they would like to have us

16 sue here, and so that is the reason.

17       All of the facts being equal, they do business here,

18 of course.  The documents are in California, and it's a proper

19 choice of forum.

20       THE COURT:  Well, whose documents?

21       MR. HECKER:  Our clients' documents are in

22 California.  Our clients do a lot of business in Los Angeles,

23 but they chose this judicial district because we are here.

24       THE COURT:  The principal place of business is in the

25 northern district, right?

1          MR. HECKER:  That's correct, Your Honor, it is in the

2    northern district.  And that also is a proper venue for this

3    case, and we would just as soon move there if that was

4    appropriate.

5          It was going to be less expensive for our client to

6    be here because its lawyers would not have to travel and so

7    that was going to be cheaper for them.

8          But, Your Honor, I have to express that this is a

9    significant and genuine concern.  Loose statements that, well,

10   we don't -- you know, when your behavior does one thing, but

11   your statements are another, and there is no promise, and then

12   you get a 10 percent license agreement in the mail, that's a

13   far cry from, "You don't have a problem, and we are never going

14   to" -- you know, if they said, "We are never going to sue you,"

15   even in a letter that said, "We promise we will not sue you,"

16   this would be over.  We would not be initiating an action.

17         We wanted some legally enforceable way to know that

18   this arch rival is not going to be out there letting the

19   community believe that we are at risk from this patent that

20   they believe is dead on.  They never wrote to us before.

21         And when I asked the opponent in the deposition --

22         THE COURT:  Who believes which patent is dead on?

23         MR. HECKER:  The opponents' products and technology

24   that they say in their press release are the covered products,

25   are the identical match-for-match products that we sell in the

1    marketplace.  They sent those emails to us, our clients' reps

2    and our customers.  When they said -- they admitted at

3    deposition they have never, ever written to us before for any

4    reason, but they sent us this one email this time.

5        And I asked, "Why did you send this to us this time?"

6    And counsel for the opponent instructed the witness not to

7    answer the question, that it was privileged.

8        And I asked the opponent also at the deposition, "Did

9    you talk to Anixter about NVT's exposure," because Anixter, the

10   co-owner, said we were at risk, and they were concerned for us.

11   And, again, they instructed the witness not to answer questions

12   about communications with Anixter on this very subject.

13       The cloud is there, and it's the cloud that we seek

14   to eliminate.  So I would ask that the Court exercise -- I do

15   believe that the matter ultimately could be resolved.  But the

16   issue for us is having a resolution, not just loose statements

17   from the opponent that, "We're not going to file declaratory

18   judgment or we are not going to sue you now."

19       That's the resolution that we seek, Your Honor.

20       MR. GERSTMAN:  May I respond, Your Honor?

21       THE COURT:  Yes.

22       MR. GERSTMAN:  When my client was asked for a

23   covenant not to sue, in effect, they're saying we would like a

24   20-year license, a royalty-free perpetual license as long as

25   this patent is in existence.

17

```
 1          Now, what competitor is going to give another
 2   competitor a 20-year, royalty-free perpetual license?  That's
 3   exactly what they're asking for.
 4          So just because -- so what's happening here?  Because
 5   we didn't want to give them a 20-year perpetual license, they
 6   are saying there must be a controversy, so they are making up a
 7   controversy.
 8          Even the license agreement that was --
 9          THE COURT:  What would happen if you learned that
10   representatives of the plaintiff were telling the world that
11   the patent that you had announced and obtained was invalid?
12          MR. GERSTMAN:  If they want to do that, we wouldn't
13   sue them for anything.  They could file a re-examination at the
14   patent office.  They shouldn't be in court if they want to say
15   it's invalid.  Why don't they file a re-examination action?
16   There's a statute for that.
17          THE COURT:  Well, the reason I asked that
18   hypothetical is a covenant not to sue, depending on just what
19   language it encompassed, and I'm not sure that a precise
20   proposal was ever submitted to your client, could require the
21   covenantor to box themself into a position of paralysis no
22   matter what the provocation was.
23          MR. GERSTMAN:  That's true, and that's the problem.
24   What's happening is -- well, let's think about it.  If what
25   Mr. Hecker says that his client can now file a declaratory
```

1  judgment suit against Nitek because Nitek obtained a patent,

2  any competitor could file a declaratory judgment suit against

3  its competitor because it obtained a patent.

4          THE COURT:  Well, that's overstating what he's doing

5  here.  He didn't just turn around and challenge the issuance of

6  the patent by filing this lawsuit.

7          He pointed to other facts that demonstrated to me

8  a modicum of actual controversy that would warrant invocation

9  of a Declaratory Judgment Act.

10         MR. GERSTMAN:  Well, we really have no intent to file

11 a suit against this plaintiff.  And the only reason I said at

12 present is 15 years from now, they may change their policy.  I

13 don't know.

14         We can't give them a covenant not to sue.  It's

15 ridiculous for any competitor to even think that they could

16 push another competitor into giving them a covenant not to -- a

17 perpetual license forever, and then they could just file a suit

18 because we didn't do that.

19         There has never been a case in history that allowed

20 anyone to just file a declaratory judgment suit merely because

21 the competitor wouldn't give them a perpetual license, and

22 that's what Mr. Hecker's trying to do.

23         THE COURT:  Okay.  Well, I have made my ruling, and

24 it's reflected in my comments.  I don't have the time to

25 incorporate it into a further analysis.  And we will see what

1    happens.

2         MR. GERSTMAN:  Thank you very much.

3         THE COURT:  Okay.  Thank you, counsel.

4    (Proceedings concluded.)

5                   --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          CERTIFICATE

 2

 3       I hereby certify that pursuant to Section 753,

 4   Title 28, United States Code, the foregoing is a true and

 5   correct transcript of the stenographically reported

 6   proceedings held in the above-entitled matter and that the

 7   transcript page format is in conformance with the

 8   regulations of the Judicial Conference of the United States.

 9

10   Date: March 11, 2008

11

12               Cindy L. Nirenberg

13               Cindy L. Nirenberg, CSR No. 5059

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 3

*(CV 07- 4789 - AHM (RZ))*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## <u>NOTICE OF DOCKETING</u>

### 2008-1287 - NETWORK VIDEO V NITEK INTL

```
RECEIVED
CLERK, U.S. DISTRICT COURT

APR 1 4 2008

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY
```

**Date of docketing:** 04/10/2008

**Appeal from:** United States District Court / Central District of California
case no. 07-CV-4789

**Appellant(s):** Network Video Technologies, Inc.

**Critical dates include:**
- Date of docketing. See Fed. Cir. R. 12.
- Entry of appearance. See Fed. Cir. R. 47.3.
- Certificate of interest. See Fed. Cir. R. 47.4.
- Docketing statement. *(Due within 14 days of the date of docketing, or within 30 days if the United States or its officer or agency is a party in the appeal.)* See the en banc order dated September 18, 2006. [Counsel can download a copy of the order and guidelines at www.cafc.uscourts.gov.]
- Requests for extensions of time. See Fed. Cir. R. 26 and 27. **N.B. Delayed requests are not favored by the court.**
- Briefs. See Fed. Cir. R. 31. **N.B. You will not receive a separate briefing schedule from the Clerk's Office.**
- Settlement discussions. See Fed. Cir. R. 33.
- Oral argument schedule conflicts. See Practice Note following Fed. Cir. R. 34.

Pro se parties should refer to the <u>Guide for Pro Se Petitioners and Appellants</u>.

**Attachments:**
- Official caption to all.
- Docketing Statement. (Only in cases where all parties are represented by counsel.)
- Rules of Practice to pro se parties. [Counsel can download the rules from www.cafc.uscourts.gov or call 202.633.6550.]
- Entry of appearance form to all.
- Informal brief form to pro se parties.
- Transcript Purchase Order form to appellants.
- Motion and Affidavit for Leave to Proceed in Forma Pauperis form to appellants owing the docketing fee.

Jan Horbaly
Clerk

cc: US District Court, Central District of California
   George H. Gerstman
   Gary Alan Hecker

*(40)*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

<u>Official Caption</u>[1]

2008-1287

NETWORK VIDEO TECHNOLOGIES, INC.,

Plaintiff-Appellant,

v.

NITEK INTERNATIONAL, LLC,

Defendant-Appellee.

Appeal from the United States District Court for the Central District of California in case no. 07-CV-4789, Judge A. Howard Matz.

<u>Authorized Abbreviated Caption</u>[2]

NETWORK VIDEO v NITEK INTL, 2008-1287

---

[1] Required for use on petitions, formal briefs and appendices, court opinions, and court orders. FRAP 12(a); 32(a).

[2] Authorized for use only on items not requiring the Official Caption as listed in note 1.

EXHIBIT 4

1  Gary A. Hecker, Esq. (State Bar No. 099008)
   James M. Slominski, Esq. (State Bar No. 166357)
2  **THE HECKER LAW GROUP, PLC**
   1925 Century Park East, Suite 2300
3  Los Angeles, California 90067
   Telephone:  (310) 286-0377
4  Facsimile:  (310) 286-0488
   Email:    ghecker@hh.com
5            jslominski@hh.com

6  Attorneys for Plaintiff
   Network Video Technologies, Inc.                    **E-filing**
7

8

9                **IN THE UNITED STATES DISTRICT COURT**

10                **NORTHERN DISTRICT OF CALIFORNIA**

11                  CV   08        2208

12                                Civil Action No.
13 NETWORK VIDEO
   TECHNOLOGIES, INC.,
14                    Plaintiff,    **COMPLAINT FOR DECLARATORY**
                                    **JUDGMENT OF PATENT NON-**
15          v.                      **INFRINGEMENT, INVALIDITY AND**
                                    **UNENFORCEABILITY**
16 NITEK INTERNATIONAL, LLC;
   and DOES 1-10,                   **DEMAND FOR JURY TRIAL**
17
                    Defendants.
18

19

20

21      Plaintiff, NETWORK VIDEO TECHNOLOGIES, INC., by and through its

22 undersigned counsel, brings this action against Defendants NITEK

23 INTERNATIONAL, LLC and DOES 1-10 and complains and alleges upon

24 information and belief as follows:

25

26

27

28

## JURISDICTION AND VENUE

1.    This is an action for declaratory judgment of non-infringement, invalidity and unenforceability of United States Patent No. 7,193,149.

2.    This Court has jurisdiction pursuant to 28 U.S.C. § 2201 et. seq. and 28 U.S.C. §1338(a) et. seq.

3.    Venue is proper pursuant to 28 U.S.C. §§ 1391(b), (c) and/or 1400(b).

## THE PARTIES

4.    Plaintiff, NETWORK VIDEO TECHNOLOGIES, INC. ("NVT"), is a California Corporation in good standing with its principal place of business in this Judicial District at 4005 Bohannon Drive, Menlo Park, California.

5.    Defendant, NITEK INTERNATIONAL, LLC ("Nitek"), is an Illinois limited liability doing business in this Judicial District and having its principal place of business at 5410 Newport Drive, Ste. 24, Rolling Meadow, Illinois.

6.    Nitek's contacts with the State of California are significant and pervasive.   The State of California is a large and important market for the sale of Nitek's products.  Nitek has sales representatives and numerous dealers and distributors located in the State of California that market, promote and sell Nitek's products, including those products Nitek claims are covered by the '149 Patent. Nitek has conducted business continuously and systematically in the State of California and in this judicial district for years, and continues that business actively today.

7.    Defendants DOES 1-10 are currently unknown to Plaintiff.  Plaintiff will amend this Complaint to assert their true names and capacities when ascertained.

8.    Defendants, and each of them, are, and at all terms herein were, the alter ego, principal, agent, employee, employer, partner, joint venturer, and/or otherwise affiliated with one another so as to be liable in such capacity for the acts and injuries alleged herein.

# FIRST CAUSE OF ACTION
## DECLARATORY JUDGMENT

9.     NVT incorporates by reference paragraphs 1-8 as though fully set forth herein.

10.     Nitek is the owner of record of United States Patent No. 7,193,149 entitled "System Handling Video, Control Signals and Power" (the '149 Patent). The '149 Patent issued on March 20, 2007.

11.     NVT designs, manufactures and sells products for transmitting closed circuit television ("CCTV") over unshielded, twisted pair ("UTP") wire in structured cabling networks, such as those that are commonly used in office buildings for telephone systems and computer networks. NVT's products enable the use of UTP wire in structured cabling systems for video security cameras and security camera system applications ("CCTV systems"). They enable electric power, video signals and data signals to be transmitted over UTP wire. NVT is considered the premier supplier of "power/video/data" twisted pair solutions (PVD$^{tm}$) for the CCTV industry.

12.     Like NVT, Nitek sells products for transmitting CCTV over UTP cabling, which include those products Nitek sells under the name "UTPLinks". NVT and Nitek are direct competitors.

13.     Nitek broadly claims the '149 Patent covers the use of UTP structured cabling for CCTV applications. Nitek also claims that the '149 Patent covers the "core technology" of its UPTLinks products, which are the products that Nitek sells in competition with NVT's products.

14.     Prior to the issuance of the '149 Patent, Nitek did not correspond or communicate directly with NVT, by email or otherwise. However, after the '149 Patent issued, Nitek immediately e-mailed NVT about Nitek's newly issued '149 patent. That e-mail, written by Nitek's president and founder and presented as a patent news release, included notice about Nitek's '149 Patent and alleged that the '149 Patent covered the use of structured cabling for CCTV, for which NVT and

3

1    Nitek are direct competitors. Nitek also sent that same e-mail including the same

2    patent news release directly to NVT's customers and sales representatives.

3        15.    Nitek's statements about the '149 Patent and its alleged sweeping scope

4    caused NVT's customers and sales force to become worried about the legal risks

5    associated with selling NVT's products and product solutions. Anixter, Inc., an

6    important customer of NVT and the co-owner of the '149 patent when it issued, also

7    expressed its concern that NVT might face a claim patent infringement by Nitek.

8        16.    Nitek, through its agents, also told NVT sales representatives that Nitek

9    intended to enforce the '149 Patent against competitors and intimated that NVT was a

10    target.

11        17.    Nitek also then attempted to extract royalties from NVT in exchange for

12    a license to the '149 patent.

13        18.    By its actions and statements that the '149 Patent covered the technology

14    in NVT's competing products, product solutions, and product uses, Nitek sought to,

15    and did, create a cloud on the competitive environment and the business community,

16    including with NVT's customers and sales representatives.

17        19.    Nitek also presented an onerous written patent license agreement to NVT

18    for the '149 Patent. Under that license agreement, Nitek sought to severely restrict

19    NVT's competing business and to provide Nitek with a competitive advantage over

20    NVT.

21        20.    According to Nitek, the NVT products that are at-issue include, but are

22    not limited to, NV-16PS13-PVD, NV-16PS10-PVD, NV-8PS13-PVD, NV-704J-

23    PVD, NV-716J-PVD, NV-216A-PV and NV-218A-PVD) and all "combiners" that

24    combine power, video and data and all "distributors" which handle power and video.

25        21.    NVT believes that the '149 patent is invalid, unenforceable and not

26    infringed, and that NVT does not require a license to the '149 patent.

27        22.    NVT denies infringing '149 Patent and asserts it has the right to

28    manufacture and sell its products, including those described above.

4

23.    NVT further asserts the '149 Patent is invalid under Title 35 of the United States Code.

24.    NVT further asserts that the '149 Patent is unenforceable due to inequitable conduct by the applicants and/or their representatives and/or agents during the prosecution of the application for the '149 Patent. That inequitable conduct includes making knowingly false statements about prior art to obtain allowance of the '149 Patent claims. Specifically, false statements were included in, at least ¶¶ 7 and 8 of the Declaration of William C. Curran ("Curran Declaration") dated November 30, 2006 and on pages 11 and 12 in the Remarks section of the papers submitted to the Patent Office with the Curran Declaration.

25.    As a result of the all of the foregoing, and in light of all the relevant circumstances, there is a substantial controversy of sufficient immediacy and reality between NVT and Defendants as to: (1) Defendants' rights under the '149 Patent; (2) the validity, enforceability, and scope of the '149 Patent; and (3) whether any of NVT's products infringe any valid claims of the '149 Patent, so as to warrant the issuance of a declaratory judgment by this Court.[1]

26.    The court should exercise its broad discretion to adjudicate this action under the Declaratory Judgment Act. There is no better or more effective remedy for resolving the present controversy. Such an adjudication will serve the underlying purposes behind the Declaratory Judgment Act, including clarifying the parties legal relations and settling the controversy between the parties with certainty and finality.

## DEMAND FOR RELIEF

**WHEREFORE,** Plaintiff asks this Court to:

a.    Enter judgment for Plaintiff that the '149 Patent is invalid and unenforceable;

---

[1]    Plaintiff originally sued in the United States District Court for the Central District of California, Case No. CV-07-4789 AHM (RZx). While the District Court determined that there was a controversy sufficient to warrant declaratory relief, the Court dismissed the case without prejudice on discretionary grounds believing that venue in the Central District was tenuous.

5

b.    Enter judgment for Plaintiff of non-infringement;

c.    Award Plaintiff its reasonable attorneys' fees and costs; and

d.    Award Plaintiff such other and further relief as is just and proper.

DATED: April 2⅛, 2008

Respectfully submitted,

**THE HECKER LAW GROUP, PLC**

By: _____
Gary A. Hecker, Esq.
James M. Slominski, Esq.

Attorneys for Plaintiff
Network Video Technologies, Inc.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to FRCP 38, Plaintiff hereby demands a trial by jury.

DATED: April 2⅛, 2008

Respectfully submitted,

**THE HECKER LAW GROUP, PLC**

By: _____
Gary A. Hecker, Esq.
James M. Slominski, Esq.

Attorneys for Plaintiff
Network Video Technologies, Inc.

HRL

✎ JS 44 (Rev. 12/07) (cand rev 1-16-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS

Network Video Technologies, Inc.

## DEFENDANTS

Nitek International, LLC and DOES 1-10

**(b)** County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**ADR**

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Gary A. Hecker, James M. Slominski
The Hecker Law Group, PLC
1925 Century Park East, Suite 2300
Los Angeles, California 90067

Attorneys (If Known)

**E-filing**

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                            and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☒ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | & Disclosure Act | | ☐ 892 Economic Stabilization Act |
| | | | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | Act |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | ☐ 900 Appeal of Fee |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities— | ☐ 540 Mandamus & Other | **IMMIGRATION** | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | to Justice |
| | ☐ 446 Amer. w/Disabilities— | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus – | | ☐ 950 Constitutionality of |
| | Other | | Alien Detainee | | State Statutes |
| | ☐ 440 Other Civil Rights | | ☐ 465 Other Immigration | | |
| | | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. § 2201 et seq.

Brief description of cause:
Declaratory Judgment of Non-Infringement, Invalidity and Unenforceability of U.S. Patent No. 7,193,149

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE". CV 07-4789 AHM(RZx), Central District of California, Honorable A. Howard Matz

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2) (PLACE AND "X" IN ONE BOX ONLY)

☒ SAN FRANCISCO/OAKLAND    ☐ SAN JOSE

DATE 4/28/08

SIGNATURE OF ATTORNEY OF RECORD

EXHIBIT 5

1 | Kenneth L. Wilton (SBN 126557)
SEYFARTH SHAW LLP
2 | 2029 Century Park East, Suite 3300
Los Angeles, California 90067-3063
3 | Telephone:  (310) 277-7200
Facsimile:   (310) 201-5219
4 | E-Mail:    kwilton@seyfarth.com

5 | George H. Gerstman (Pro Hac Vice)
SEYFARTH SHAW LLP
6 | 131 S. Dearborn Street,
Suite 2400
7 | Chicago, Illinois 60603
Telephone: (312) 460-5000
8 | Facsimile: (312) 460-7000
E-Mail:    ggerstman@seyfarth.com
9 |
Attorneys for Defendant
10 | NITEK International, LLC.

11 | **UNITED STATES DISTRICT COURT**

12 | **CENTRAL DISTRICT OF CALIFORNIA**

13 |

14 | NETWORK VIDEO TECHNOLOGIES, INC.                          ) Case No. CV-07-4789 AHM (RZx)

15 |                         Plaintiff,   ) **DECLARATION OF**
                                        ) **EDWARD L. POLANEK**
16 | v.                                   )
                                        ) Date:    January 28, 2008
17 | NITEK INTERNATIONAL, LLC and         ) Time:   10:00 a.m.
DOES 1-10,                            ) Place:  Hon. A. Howard Matz
18 |                                      )           Courtroom 14
                        Defendants.     )
19 |                                      )
                                        )
20 |                                      )
                                        )
21 |                                      )
                                        )
22 | _____ )

23 | ///

24 | ///

25 | ///

26 | ///

27 | ///

28 | ///

**DECLARATION OF EDWARD L. POLANEK**

1    ///

2    ///

3

4            Edward L. Polanek declares as follows:

5        1.    I reside in Richmond, Illinois and I am Managing Member of

6    Defendant NITEK International, LLC ("NITEK"). NITEK is a limited liability

7    company of Illinois, having its only place of business at 5410 Newport Drive,

8    Rolling Meadows, Illinois.

9        2.    NITEK has approximately 25 employees. All of NITEK employees

10   are located at NITEK's only place of business in Rolling Meadows, Illinois.

11       3.    NITEK sells products for the security industry, primarily used in

12   closed circuit video and control system applications. NITEK's products are

13   typically designed to provide video links, data links, and power over twisted pair

14   cables and leased telephone lines.

15       4.    Prior to May 2002, I and four other individuals developed a closed

16   circuit television system for interfacing with a structured cabling system of a

17   building. On May 15, 2003, a non-provisional patent application was filed with

18   the U.S. Patent and Trademark Office concerning this invention, Application No.

19   10/438,712.

20       5.    Two of the inventors (including myself) were employed by Northern

21   Information Technology, Inc. and three of the inventors were employed by

22   Anixter, Inc., of Glenview, Illinois. Four of the inventors (including myself)

23   resided in Illinois and one of the inventors resided in Hammond, Indiana. It was

24   decided that the application and resulting patent would be owned jointly by

25   Northern Information Technology, Inc. and Anixter, Inc., or their successors.

26       6.    In 2006 Northern Information Technology, Inc. transferred its assets,

27   including its patent applications, to NITEK. On March 20, 2007, the '712 patent

28   application issued as U.S. Patent No. 7,193,149 ("the '149 patent") and at that time
     was jointly owned by NITEK and Anixter, Inc.

                                         2

7.     On October 5, 2007, Anixter assigned to NITEK all of Anixter's rights in the '149 patent. The '149 patent is now solely owned by NITEK and Anixter has a non-exclusive license.

8.     NITEK conducts its business in Illinois. NITEK does not conduct its business in California. NITEK pays no tax in California and is not registered to do business in California.

9.     NITEK has no manufacturing facilities in California, has no bank accounts, telephones or telephone listings in California. As stated above, NITEK has no employees in California nor does NITEK have any offices in California. NITEK has never owned any asset in California.

10.     All of NITEK's records, equipment and personnel have been maintained in Illinois. NITEK's attorneys, including the registered patent attorneys who prepared and prosecuted the application that issued to the '149 patent, reside in Illinois.

11.     NITEK has independent manufacturer representatives ("reps") throughout the country, none of which are employees of NITEK but are instead unrelated companies and individuals having numerous manufacturers that they represent. When NITEK's independent reps obtain orders for NITEK products, acceptance of the order takes place at NITEK's office in Rolling Meadows, Illinois.

12.     Having customers throughout the United States, NITEK's sales attributed to customers located in California are only less than ten percent of NITEK's total sales and only about five percent of NITEK's total shipments. The majority of such sales are solicited and obtained by NITEK's regional sales manager who resides in Illinois and is located in NITEK's Rolling Meadows, Illinois office.

13.     The plaintiff, NVT, is a business competitor of NITEK.

1      14.    Attached as Exhibit A is a true and correct copy of the first page of

2    NVT's website, which refers to NVT as a "security industry leader in twisted pair

3    based video transmission technology."

4      15.    Attached as Exhibit B is a true a correct copy of another page from

5    NVT's website, which identifies the "NVT Sales Staff." It is my understanding,

6    based on one of the phone numbers listed in Exhibit B, that NVT's District Sales

7    Manager for the Western Region of the United States is based in Northbrook,

8    Illinois.

9      16.    Attached as Exhibit C is a true and correct copy of an August 8, 2007

10   email and fax notice sent to me from NVT's attorney, Gary A. Hecker, stating that

11   NVT filed this declaratory judgment action against NITEK.

12     17.    NVT's email and fax notice came as a surprise because neither I nor

13   anyone else at NITEK had ever communicated with NVT concerning NITEK's

14   patent, other than a press release concerning issuance of NITEK's patent, which

15   was placed on NITEK's website and was sent to hundreds of companies, including

16   customers, competitors and trade publications. A true and correct copy of this

17   press release is attached as Exhibit D.

18     18.    NITEK has never filed a lawsuit for infringement of the '149 patent or

19   for any patent that NITEK has ever owned. NITEK has never been involved in a

20   patent infringement lawsuit either as a plaintiff or a defendant until NVT brought

21   this declaratory judgment action.

22

23      I declare that the foregoing is true under penalty of perjury.

24

25

26   Date: November 8, 2007    _____

27

28                                          Edward L. Polanek

                                    4

International Sites    Select Your Region →

Home | Products & Applications | Learning Center | Sales | About Us | What's New | Contact Us

**Network Video Technologies**



☑ What's New at NVT

**Digital EQ   Receiver Hub**

NPS
NEW PRODUCT SHOWCASE

☑ NVT Consolidated Brochure 2007

☑ NVT On The Road

Find out where our sales
representatives will be next. **More...**

Project Registration
Distributors Register Here
Dealers/Integrators Register Here

# Security Industry Leader
*in twisted pair based*

**Network Video Technologies** develops and markets an award winning line of video transceivers and hub systems for the transport of quality full-motion, color video and audio over ordinary, unshielded telephone wire.

As a security industry leader in twisted pair based video transmission technology, NVT continues to innovate and produce leading edge video transmission equipment featuring unsurpassed performance backed up by excellent customer support. Contact NVT for more information and join the UTP CCTV Revolution.

☑ Product Information

Find instant access to information and technical specifications for our products. **More...** or, use product quick find below.

Quick Find Your NVT Product

☑ Product Applications

Find out which NVT products are best suited for your CCTV and Multimedia applications. **More...**

☑ Downloads

Download NVT product images, NVT logos, data sheets, brochures and more.

**Network Video Technologies**
4005 Bohannon Drive
Menlo Park, CA 94025 USA
(800) 959 9870 or
(+1) 650 462 8100

© 2003 NVT
All rights reserved

info@nvt.com

FAX +(62) (2) 2626 8790

Joyce, Oon — Office Manager
Office + (65) 6235 2661
FAX + (65) 6235 2369

SE Asia

# NVT Sales Staff

NVT Sales Staff

**Mike Mahan** — Vice President of Sales
Office 800.959.9870 x 248
Mobile 650.533.6960
FAX 650.326.1940

United States, Latin America and Asia Pacific

## DISTRICT SALES MANAGERS

**Dawn Mickelson** — Northeastern District Sales Manager
Office 610.868.9199
Mobile 610.217.6711
FAX 610.814.6188

Northeastern United States

**David Dunlap** — Southeastern District Sales Manager
Mobile 201.615.2865

Southeastern United States

**Brian Echtenkamp** — Central District Sales Manager
Office 303.467.0581
Mobile 303.345.1469

Central United States

**Steve Proctor** — Director of Sales UK/EMEA
Office +44.208.977.6614
FAX +44.208.973.1855

UK and EMEA

**Jeff Leite** — Pacific District Sales Manager
Office 303.284.8293
Mobile 303.995.5182
FAX 650.326.1940

Pacific US

**Rafael Madrigal** — International Sales Manager
Office 462.8100 ext 215
Mobile 650.465.2059
FAX 650.326.1940

Latin America and Asia

**Antonio Perez** — Regional Sales and Marketing Manager
Office 650.462.8100 ext. 216
FAX 650.326.1940

South America

**George Wojtan** — Datacom Sales Manager, Western Region
Office 847.562.0145
Mobile 847.867.1863
FAX 847.562.1464

Western United States

*Patents, Trademarks, Copyrights,*
*Entertainment, Internet and Other*
*Intellectual Property Matters*

**THE HECKER LAW GROUP**

*A Professional Law Corporation*

1925 CENTURY PARK EAST
SUITE 2300
LOS ANGELES, CA  90067

*Founded 1988*

TEL: (310) 286-0377
FAX: (310) 286-0488

E-MAIL. *ghecker@hh com*

August 8, 2007

*Via Email and Facsimile*

Mr. Edward L. Polanek
Nitek International, LLC
5410 Newport Drive
Suite 24
Rolling Meadows, Illinois 60008-3722

RE:  Network Video Technologies v. Nitek International
USDC (Central District of California Western Division)
Case Number:      CV-07-4789 AHM (RZx)
Our File Number:   63040.986

Dear Mr. Polanek:

We represent Network Video Technologies, Inc. ("NVT") in intellectual property matters including patent matters.

NVT has learned that Nitek intends to enforce US patent number 7,193,149 against third parties, including NVT. NVT believes there is not a proper basis for Nitek to enforce the '149 patent against NVT. Therefore, NVT must obtain a legal determination on the '149 patent unless Nitek provides formal assurances that it will not enforce the '149 patent, or any related patents, against NVT.

NVT has filed a declaratory judgment action against Nitek. I have included a copy of the Complaint in that action along with this letter, which is entitled *"Complaint for Declaratory Judgment for Patent Non-Infringement, Invalidity, and Unenforceability relating to United States Patent No. 7,193,149 entitled "System Handling Video, Control Signals and Power"*. That lawsuit was filed in the United States District Court for the Central District of California.

We understand that the patent includes inventors from Nitek and Anixter. We also understand the patent is jointly owned by Nitek and Anixter. Anixter, therefore, is also named in the suit as a necessary party to the action. Thus, the defendant's in the action are Nitek International, LLC ("Nitek") and Anixter, Inc. (joined as a necessary party).

NVT has not yet served the Complaint. To resolve the matter in the mutual interests of the parties, NVT will need to obtain the formal assurances of the defendants that they will not seek to enforce the '149 patent or any related

**THE HECKER LAW GROUP**
*A Professional Law Corporation*

Mr. Edward L. Polanek
Nitek International, LLC
August 8, 2007
Page 2

patents against NVT (such as in the form a covenant not to sue). In return, NVT will dismiss the action against both defendants.

NVT is withholding service of process of the Complaint until Friday, August 15, 2007 so that the parties may attempt to reach an amicable resolution without the necessity of full scale federal litigation.

Thank you.

Very Truly Yours,

THE HECKER LAW GROUP, PLC

Gary A. Hecker

GAH/JMS/mk
Enclosure

**Subject:** FW: Nitek UTP Patent Issued



**NITEK**
Twisted Pair Video & Data Systems


Tel. 800-528-4343
Web. http://www.nitek.net

**NITEK** NEWS

## NITEK AWARDED PATENT FOR SYSTEM HANDLING VIDEO, CONTROL SIGNALS & POWER

March 20, 2007

**Rolling Meadows, IL** - Nitek, a world leader in the design, manufacture and marketing of video and data transmission systems, has been awarded a U.S. Patent for its "System for Handling Video, Control Signals and Power", the core technology of its UTPLinks®. structured cabling compliant CCTV system and other proprietary Nitek products. Nitek U.S. patent Number 7,193,149 covers the use of structured cabling networks to deliver power, video and data for control (PVD) to cameras and PTZ units in a CCTV system.



According to James Hertrich, one of the principals of Nitek and an inventor of the system, "The granting of this patent not only protects our intellectual property, but validates the technological leadership and product innovation that Nitek has continually demonstrated in the area of video transmission and control. The Nitek UTP transmission system for delivery of video, power and data within a structured cabling network enables a transition from traditional Closed Circuit Video that requires three separate, home-run cables for video, power and control, to a convergence of CCTV into the network cabling environment. The same cabling infrastructure used by the data and telecommunication systems. UTPLinks is a complete, comprehensive system that combines all of these CCTV functions into a single integrated solution".

The UTPLinks system for video, control and power is designed as a fully scalable, true hybrid infrastructure which supports any analog CCTV application and allows for upgrades to IP cameras utilizing the same cabling infrastructure.

Nitek, a Rolling Meadows, Illinois company has been developing and marketing unique, high performance products in the area of video security for over twenty years. The Company markets a complete line of equipment for UTP transmission of video, data and power. All Nitek products are manufactured in the U.S.A.

For more information contact Nitek, 5410 Newport Drive, Suite 24, Rolling Meadows, IL 60008 (800) 528-4343, Fax (847) 259-1300; web site information: www.nitek.net

**NITEK**                                                        http://www.nitek.net

We value your interest in our products. If you no longer want to be made aware of special email offers and announcements from Nitek simply **click to unsubscribe**.

Postal Unsubscribe Request:
Nitek
Attn: Marketing Coordinator
5410 Newport Drive
Rolling Meadows, IL 60008

EXHIBIT 6

(12) **United States Patent**
Polanek et al.

(10) **Patent No.:** **US 7,193,149 B2**
(45) **Date of Patent:** **Mar. 20, 2007**

(54) **SYSTEM HANDLING VIDEO, CONTROL SIGNALS AND POWER**

(75) Inventors: **Edward L. Polanek**, Richmond, IL (US); **James P. Hertrich**, Arlington Heights, IL (US); **Peter D. Lockhart**, Third Lake, IL (US); **Andrew C. Jimenez**, Chicago, IL (US); **Lawrence J. Roberts**, Hammond, IN (US)

(73) Assignees: **Northern Information Technology, Inc.**, Rolling Meadows, IL (US); **Anixter, Inc.**, Glenview, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 588 days.

(21) Appl. No.: **10/438,712**

(22) Filed: **May 15, 2003**

(65) **Prior Publication Data**

US 2003/0217364 A1    Nov. 20, 2003

**Related U.S. Application Data**

(60) Provisional application No. 60/381,906, filed on May 17, 2002.

(51) **Int. Cl.**
**H01B 7/34**    (2006.01)
(52) **U.S. Cl.** .................................................. **174/36**
(58) **Field of Classification Search** ................. 174/36, 174/110 R, 113 R, 74 R, 77 R, 88 R
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,992,774 A * 2/1991 McCullough ............... 345/204
5,268,676 A * 12/1993 Asprey et al. .............. 345/169
5,353,409 A * 10/1994 Asprey et al. .............. 375/296
5,528,286 A * 6/1996 Goolcharan .............. 348/14.15
5,828,293 A * 10/1998 Rickard ...................... 375/257
5,884,086 A * 3/1999 Amoni et al. .............. 713/300
6,111,595 A 8/2000 Hertrich
6,115,468 A * 9/2000 De Nicolo ................. 379/413
6,310,286 B1 * 10/2001 Troxel et al. ............... 174/36
6,473,608 B1 * 10/2002 Lehr et al. ................. 455/402
2002/0007432 A1 * 1/2002 Ahern ...................... 710/305
2002/0049879 A1 * 4/2002 Eyer ....................... 710/305
2002/0177357 A1 * 11/2002 Inui ......................... 439/502

FOREIGN PATENT DOCUMENTS

EP    0 726 673 A * 2/1996

OTHER PUBLICATIONS

Network Video Technologies, Inc., CCTV Applications Booklet (1997).

(Continued)

*Primary Examiner*—William H. Mayo, III
(74) *Attorney, Agent, or Firm*—George H. Gerstman; Seyfarth Shaw LLP

(57) **ABSTRACT**

The system integrates a CCTV system including one or more video source units into the structured cabling system ("SCS") of a building by combining video signals, control signals and power for each video source unit over a single multipair cable made up of plural twisted pairs of insulated copper conductors, so that one twisted pair of the cable carries the video signals, one pair carries the control signals and one or two pairs carry the power. The system includes combiners and distributors which can interface with the SCS cable through standard modular, multi-pin plug and jack connectors.

**11 Claims, 4 Drawing Sheets**



US 7,193,149 B2

Page 2

OTHER PUBLICATIONS

Network Video Technologies, Inc. brochure on NVT transceivers (prior to May 2002).

Network Video Technologies, Inc. brochure on Campus Wide UTP/CCTV Solutions (prior to May 2000).

PI Manufacturing Corp. flyer for Perfect Security Solution ( prior to May 2002).

PI Manufacturing Corp. catalog for Security Solutions - Video Balun (2000).

NITEK brochure for Twisted Pair Video and Data (prior to May 2002).

* cited by examiner



FIG. 1

**U.S. Patent**    Mar. 20, 2007    Sheet 2 of 4    US 7,193,149 B2



FIG. 2

Case 3:08-cv-02208-MHP    Document 15-2    Filed 06/09/2008    Page 27 of 45
Case 2:07-cv-04789-AHM-RZ    Document 12-5    Filed 11/09/2007    Page 5 of 14



FIG. 3

**U.S. Patent**          Mar. 20, 2007          Sheet 4 of 4          US 7,193,149 B2



FIG. 4



FIG. 5



FIG. 6

US 7,193,149 B2

**1**

## SYSTEM HANDLING VIDEO, CONTROL SIGNALS AND POWER

### RELATED APPLICATION

This application claims the benefit of the filing date of co-pending U.S. Provisional Application No. 60/381,906, filed May 17, 2002.

### BACKGROUND

This application relates to communications systems, particularly video systems. The application relates in particular to interconnection apparatus and methods for handling all of the electrical requirements of video systems, such as Closed Circuit TV ("CCTV") systems, including those of the types used in video security systems.

In the past, buildings would have several cabling systems, respectively for different types of communications systems. For example, telephone wiring was used for voice, coaxial cable for data networks, multipair cabling for RS232/RS422 control data, etc. With all of the separate costs involved, this became a very inefficient and costly way to install these systems. A solution was to install a standard cable and connector system throughout a building which could, with some additional equipment, be used to support all or most of the different types of communication systems in use in the building. This standard cable and connector system is called a "Structured Cabling System" ("SCS").

The SCS is a set of cabling and connectivity products that integrates voice, data, video and various building management systems ("BMS"), such as safety alarms, security access, energy systems, etc. Characteristics of an SCS include an open architecture, standardized media and layout, standard connection interfaces, adherence to national and international standards, and total system design and installation. Typically, SCS cable is a multipair cable made up of unshielded twisted pairs ("UTP") of insulated copper conductors. A typical SCS cable includes four such twisted pairs. A typical building has a plurality of SCS cables, perhaps dozens or even hundreds, extending throughout the building. Apart from the SCS, the voice, data, video and BMS have nothing in common, except for similar transmission characteristics (analog or digital data signals) and delivery methods (conduit, cable, tray, raceway, etc.) that support and protect the cabling.

Although it has existed in the SCS in various configurations, CCTV has not been integrated as a complete system into the SCS, since systems equipment has not existed that would provide the means to conveniently interface all of the various types of CCTV cameras, Pan/Tilt/Zoom ("PTZ") systems, monitoring equipment and switching equipment into the SCS. A CCTV system typically has three different types of electrical requirements, viz., control signals which must be sent to each camera and/or PTZ device to control its operation, video data which is sent from each camera to a receiver, and AC power for powering the camera and associated equipment, such as a PTZ unit. The control signals, which are typically in accordance with the RS422 standard, but could also be RS232 or RS485 (bidirectional), have historically been handled over a cabling system distinct from the SCS, and have not been transmitted over UTP cables.

Sending video over UTP cable has been done using the unbalanced-to-balanced line technique (video baluns) for 20 years or more. Baluns are typically passive devices that match impedance and provide common mode rejection. Northern International Technology ("NITEK") has

**2**

improved on this basic technology by introducing unique, adjustable, active receivers that provide improved common mode rejection and longer distances for transmission of video while maintaining signal integrity and video quality. Previously, transmitting video signals over one twisted pair of SCS cable required the user to provide his own connector and interface equipment. NITEK provides an integrated system for transmitting video signals over one pair of an SCS cable, but the AC power and control signals must still be separately provided. In the security industry, UTP for transmission of video has become increasingly popular over the past five years, as more dealers have been willing to use it in CCTV installations. Problems with earlier systems using technology that was prone to drifting and, in some cases, susceptible to voltage surges, made dealers wary of the technology. Greater acceptance of this technique has come about recently due to lower cost balun devices and the convenience and size advantages of using UTP cable, as opposed to coax cable, for multiple cameras. This has resulted in larger camera projects (hundreds of cameras) using UTP. In response to these larger system requirements, NITEK introduced rack mounted systems that could accept as many as 40 inputs per rack. Such systems are currently primarily targeted for sale through the security system installer/dealer. The systems are typically stand-alone CCTV systems, either connected to existing communication cables or using new UTP cables (mostly CAT 5) installed specifically for the CCTV System.

Some CCTV cameras are provided with local power, i.e., a power supply adapted to be plugged into the 120-volt AC system at the camera location. But many multi-camera video systems power the cameras from a central fused power supply, power from which has, heretofore, been provided independently of the SCS.

### SUMMARY

This application discloses a system for handling all the electrical requirements of a video system, which avoids the disadvantages of prior arrangements while affording additional structural and operating advantages.

Applicants have developed a complete CCTV interface system which combines video, control signals (data) and power (hereinafter "Combined Video system"), that is designed to easily integrate into an SCS. The Combined Video system provides the delivery of twisted pair video and RS422 signals for control functions. In addition, the Combined Video system delivers 24 VAC power for all video cameras and PTZ and focus systems, as well as other remote controlled CCTV equipment throughout the SCS. The Combined Video system is designed to operate within SCS standards and coexists within the SCS using cables, connectors and patch panels that are dedicated to the CCTV system. The Combined Video system is not a part of, nor does it connect to, the data network.

The Combined Video system is a unique system that provides a complete solution for integrating CCTV into an SCS. The CCTV system becomes a "self-contained" system within the SCS in that every piece of equipment is powered by the Combined Video system, either from a telecommunication closet (TC) or from the equipment room. In addition, all of the RS422 control signals are distributed to equipment in the CCTV system throughout the SCS, either from a TC or from the equipment room. In this way, the Combined Video system provides the means to connect closed circuit video data, control (RS422) signals, and power to the SCS. Using the SCS, the Combined Video

US 7,193,149 B2

3

system acts as a distribution interface, providing all of the equipment needed to connect video security cameras and/or PTZ equipment to the security head-end equipment (located in the equipment room). Modular multi-pin plug and jack connectors, such as RJ-45 connectors, are used throughout. The four twisted pairs of each Category 5 SCS cable are dedicated to a given camera: 1 pair for video, 1 pair for RS422 control and 2 pairs for 24 VAC supply voltage (connected in parallel). In this way a single CAT 5 cable provides power to the cameras (and domes) and distributes RS422 control signals to any PTZ domes or other remote control equipment in the system.

An aspect is the provision of a system to interconnect all of the equipment of a video system over copper cabling.

Another aspect is the provision of a system of the type set forth, which is a self-contained system, but can easily be integrated in an SCS.

A still further aspect is the use of a single UTP cable for delivering fused power to a video camera and associated equipment and delivering video signals from the video camera.

A still further aspect is the use of a single UTP cable for delivering control signals to a video camera and associated equipment and delivering video signals from the video camera.

Another aspect is the use of a single UTP cable for delivering fused power and control signals to a video camera and associated equipment using modular multi-pin plug and jack connectors.

Another aspect is the use of a single multi-pair cable for delivering power and control signals to a camera and associated equipment and delivering video signals from the camera.

A still further aspect is the provision of unique equipment for interfacing a multi-camera video systems with an SCS.

Yet another aspect is the provision of a video system which can be incorporated in an SCS utilizing standard connectors.

Certain ones of these and other aspects may be attained by providing a system for operating a video source unit having a video data signal output adapted for coupling to a video receiving unit and a control signal input adapted for coupling to a control unit, the system comprising: a cable, including plural unshielded twisted pairs of conductors, first coupling means at a first end of the cable for coupling a first twisted pair to the video data signal output and a second twisted pair to the control signal input, and second coupling means at a second end of the cable for coupling the first twisted pair to an associated video receiving unit and the second twisted pair to an associated control unit.

Other aspects may be attained by providing a system for operating a video source unit having a video data signal output of the type set forth and a power input adapted for coupling to a fused power source, the first coupling means coupling a selected twisted pair to the power input, and the second coupling means at a second end of the cable for coupling the selected twisted pair to an associated fused power source, each of the first and second coupling means including, for each coupled twisted pair, a modular multi-pin plug and jack connector.

## BRIEF DESCRIPTION OF THE DRAWINGS

For the purpose of facilitating an understanding of the subject matter sought to be protected, there are illustrated in the accompanying drawings embodiments thereof, from an inspection of which, when considered in connection with the

4

following description and claims, the subject matter sought to be protected, its construction and operation, and many of its advantages should be readily understood and appreciated.

FIG. 1 is a simplified functional, block diagrammatic illustration of a single-camera application of a Combined Video system;

FIG. 2 is a block diagrammatic illustration of incorporation of a Combined Video system including multiple cameras into an SCS of a building;

FIG. 3 is a block diagrammatic illustration of a combiner device of the systems of FIGS. 1 and 2;

FIG. 4 is a block diagrammatic illustration of one type of distributor unit used in the system of FIG. 2;

FIG. 5 is a block diagrammatic illustration of another type of distributor unit in the system of FIG. 2; and

FIG. 6 is a diagrammatic illustration of the pin arrangement in a standard RJ-45 connector.

## DETAILED DESCRIPTION

Referring to FIG. 1, there is illustrated a simplified Combined Video system, generally designated by the numeral 10, illustrating the concepts of the system as applied to a single video source unit, such as a video camera. The system utilizes a copper, multipair communication cable 11, which is Category 3 or better, and will typically be an existing 4-pair SCS cable at the site where the system is to be installed. While the cable 11 typically includes four unshielded twisted pairs, all of the pairs may or may not be used, depending upon the particular application. At one end of the cable 11, which may be at a central location, such as a telecommunications closet, the cable 11 is connected, by a single multi-circuit connector, to one end of a combiner device 12, the other end of which may be connected to a suitable fused power supply 13, a differential video receiver 14 and a control unit 15. The power supply 13 will, in turn, be connected to a suitable primary power source, the output of the differential video receiver 14 will be a composite video signal connected to the input of apparatus, such as monitoring or recording equipment, and the input of the control unit 15 will be connected to a source of data signals, which may be in accordance with RS232, RS422 or other suitable standards.

The other end of the cable 11, which may be at a remote location, is connected by a suitable multi-circuit connector to one end of a distributor device 16, the other end of which is connected to a video source unit which includes a fused power input 17, a composite (NTSC or baseband) video output 18 of a video source, such as a CCTV camera, and a data input 19 of a controlled device, such as a PTZ unit, associated with the video source.

Significantly, the system 10 delivers power, control signals and video signals simultaneously over a single SCS multipair cable, and connects to that cable with standard connectors. In this arrangement, the video signal will be transmitted over one twisted pair of the cable 11, the control signals will be transmitted over another twisted pair, and one or two twisted pairs will be used for power, depending upon the power requirements.

While, in the illustrated embodiment, the combiner device 12 is connected to only a single multi-pair cable 11 for connecting a single video source with a single video receiver, it is an aspect of the system, as will be explained more fully below, that the combiner device 12 could be connected to multiple cables 11 for connecting multiple video sources at a plurality of remote sites to plural video receivers at a central location.

US 7,193,149 B2

| 5 | 6 |

Referring now to FIG. 2, there is illustrated a typical building installation 20 incorporating specific embodiments of the combined video system 10 in an overall arrangement incorporating multiple video sources and multiple receivers. The video system 10, in all of its various application modes, may incorporate a number of different types of components, some of which are specially designed for the system and some of which have been pre-existing, descriptions of such components being set forth in Appendix 1. While not all of these component variations are incorporated in the installation of FIG. 2, that figure will illustrate the underlying principles.

The building installation 20 will typically include a central equipment room 21, which may be connected, as via cabling 22, to the copper campus backbone, if the building is one of a number of buildings in a campus arrangement, and is also connected, as by a copper riser backbone cabling 23, to one or more telecommunications closets 30, 30A, 30B etc. These telecommunications closets may be located on different floors of a multi-story building, or a single floor of a building may have multiple telecommunications closets, depending upon the size of the floor. Disposed in the equipment room 21 may be one or more video receivers 24, which may be in the nature of receiver module cards, two types of which, respectively designated VM562 and VM564, are described in Appendix 1, and a plurality of which may be mounted in a single multi-module powered rack of the type designated RK500 and described in Appendix 1. The equipment room 21 could house receivers simply for the building in which it is located, or could house receivers associated with video sources in other buildings of a campus arrangement. Also disposed in the equipment room 21 is a control module 25, which may also be in the form of a rack-mounted module card, of the type designated DM424 and described in Appendix 1. In the event the facility is provided with a fiber network, the equipment room 21 may also include a fiber receiver 26, which may be coupled by cabling 27, to a fiber campus backbone, and also to a fiber riser backbone 28 of the local building, which backbone may, in turn, be connected to one or more telecommunication stations.

Disposed in each of the telecommunications closets is a combiner device (see 12 in FIG. 1), two general types of which, 40 and 40A, are shown in FIG. 2 and described in Appendix 1. Thus, the telecommunications closet 30 is shown as housing a combiner 40 (designated CX522 in Appendix 1). The combiner 40 is connected by a control cable 31 to the control module 25, and is also connected by video cables 32 to one or more of the video receivers 24, only one such connection being illustrated in FIG. 2. The cables 31 and 32 may terminate at a patch panel or the like in the telecommunications closet 30. Also connected to the combiner 40 is a power supply 33, which may be of the type designated PS510 in Appendix 1, which is a 10-amp supply providing 24 VAC power for up to eight video sources and associated PTZ units. The combiner 40 is also connected, via horizontal cabling 35, to one or more of the video sources described in connection with FIG. 1, two such sources being illustrated in FIG. 2, each being in the nature of a moveable camera 36 and associated PTZ unit 37. The illustrated horizontal cabling 35 includes two cables, each of which is a multi-pair cable, which may be a 4-pair SCS cable 11, each

of which is connected to its associated video source through a suitable interface corresponding to the distributor device 16 of FIG. 1. Two different types of such distributor devices, respectively designated WM101 and CM103, are described in Appendix 1 and are, respectively, designated 50 and 60 in FIG. 2.

Referring now also to FIG. 3, the combiner 40 includes a multi-pin connector 41, such as a 50-pin Telco connector, which is adapted to be connected to the copper riser backbone 23. The pins of the connector are arranged in pairs, respectively connected to output jacks 42 by video lines 43. Each of the jacks 42 may be a standard RJ-45 jack adapted for connecting to a standard 4-pair cable. One pair of pins of the connector 41 is reserved for control signals and is connected by a line 44 to a control signal (RS422) distribution unit 45, which is in turn connected to each of the jacks 42. AC input power from the power supply 33 is applied to a fuse block 46, which includes multiple fuses respectively connected in parallel to the output jacks 42. Thus, it can be seen, that each of the jacks 42 has one pair of its terminals connected by a video line 43 to the connector 41, one pair connected to the control signal distribution unit 45, and at least one pair connected to AC power through a fuse of the fuse block 46. Each jack 42 may have two of its terminal pairs connected to the fuse block 46, depending upon the power needs. It will be appreciated that FIG. 3 is functional diagram and the combiner 40 may be embodied in a PC board.

It will be appreciated that the control module 25 is connected through the connector 41 to the data line 44, one or more video receivers 24 are connected through the connector 41, respectively to video lines 43, and AC power is connected to all of the fuses of the block 46. Each of the jacks 42 is connectable to a multi-pair cable 11 (see FIG. 1), which may be a 4-pair SCS cable, the other end of which is connected to a distributor device. The connector 41 may be connected by suitable jumper cable to the patch panel at which the cables 31 and 32 are terminated. Also, it will be appreciated that the horizontal cabling 35 on the building floor will, in accordance with applicable telecommunications cabling standards, typically be terminated at suitable jacks. Thus, a short jumper cable, terminated with compatible plugs, may be utilized to connect each of the jacks 42 of the combiner 40 with the associated multi-pair cable 11.

Referring also to FIG. 4, a distributor device, in the nature of a camera interface 50 (of the type designated WM 101 in Appendix 1), is illustrated. The distributor unit or camera interface 50 has a jack connector 51 at one end thereof, which may be a standard RJ-45 connector, and is connected to the remote end of a multi-pair cable 11 (FIG. 1). It will be appreciated that there will be one distributor unit or camera interface for each of the jacks 42 of the combiner 40 which is being used in the system. One pair of terminals of the jack 51 is connected to a video balun device 52, which is in turn connected to a composite video jack 53, which may be a standard coaxial BNC connector, adapted to receive a plug from the associated camera 36 (FIG. 1). A second pair of terminals of the jack 51 are connected to a control (RS422) jack 54, which may be in turn connected to the PTZ device 37 for the video camera. The final two pairs of terminals of the jack 51 are connected to a power jack 55, which is

US 7,193,149 B2

7

connected to the PTZ device 37, which is in turn connected to the camera 36. The camera interface 50 is a wall-mountable unit adapted to be mounted at the location of the camera 36. It will be appreciated that the camera interface 50 may be embodied in a printed circuit board. Also, it will be understood that a suitable plug-terminated jumper cable may be utilized to connect the jack 51 to a wall jack in which the associated multi-pair cable 11 is terminated.

Referring to FIG. 5., there is illustrated an alternative form of camera interface 60 (of the type designated CM 103 in Appendix 1), which may be embodied in a cable. The interface 60 includes a plug connector 61, which may be an RJ-45 connector and is adapted to plug into a counterpart jack, which could be a wall-mounted jack terminating one of the multi-pair SCS cables 11 of the building horizontal cabling 35. The jack 61 is, in turn, connected to a single multi-pair cable 62, which may be an SCS 4-pair cable, which has built therein a PCB 63 in which one twisted pair of the cable 62 is connected to a video balun device 64, which is in turn connected to a composite video jack 65. The remaining twisted pairs of the cable 62 are "passed through" the PCB 63 for connecting directly to control input terminals of a PTZ unit 37, and power input terminals of the associated camera 36 and/or PTZ unit 37, as at screw terminals.

The telecommunications closet 30A is similar to the closet 30, except that it includes a combiner device 40A, which is of the type designated CX 516 in Appendix 1, and is essentially the same as the combiner 40 illustrated in FIG. 3, except that it does not include the control signal distribution unit 45. Thus, this type of combiner combines only video and power and is adapted for handling video sources, such as fixed cameras 66, which do not have an associated PTZ unit and, therefore, do not require the associated control signals. In this case, the power to the combiner 40A is provided by a power supply 33A, which may be of the type designated PS 505 in Appendix 1, providing a 5-amp, 24 VAC supply for up to 16 fixed cameras.

The telecommunications closet 30B is similar to the closet 30, described above, except that in this case the combiner 40 is connected, via video and control signal lines, to a video balun hub 67, such as that designated VH160 in Appendix 1 which is, in turn, connected through a fiber multiplexer 68 to the fiber riser backbone 28.

Because the video system 10 is completely separate from any data network in the associated building, it is unconstrained by the typical "100 meter rule" applied to horizontal runs of computer cabling in SCS installations.

In connecting the circuitry to the standard RJ-45 connectors, the system 10 and the building installation 20 utilize a unique pin assignment arrangement. FIG. 6 illustrates the pin designations for a standard RJ-45 connector. As can be seen, the connector includes eight pins, respectively designated 1 through 8. Certain connectors of the system 10 and the building installation 20, such as the wall plate-type distributor devices WM101, may be difficult to distinguish from a standard wall plate for a common computer jack. Also, the systems disclosed herein may commonly be used in association with network arrangements, such as Ethernet, in a building SCS and, therefore, it is possible that Ethernet devices might accidentally be plugged into a jack of the Combined Video system. Certain pin assignment arrange-

8

ments of the RJ-45 connectors could result in damage to certain Ethernet devices which were accidentally plugged into the Combined Video system. Accordingly, applicants have devised a unique pin assignment for their connectors. Ethernet networks typically use a common pin assignment arrangement, designated "T-568B." This arrangement is set forth in Table I. In this arrangement, two of the pairs of terminals in the connector are typically unused, but could be used for a second Ethernet line or for other purposes. Also set forth in Table I is applicants' pin assignments for the same type of connector. It has been found that these pin assignments will not harm Ethernet devices which are connected thereto.

TABLE I

| Pin | T568B Assignment | Applicants' Assignment |
|---|---|---|
| 1 | TxData + | Video + |
| 2 | TxData − | Video − |
| 3 | RecvData+ | 24 VAC Common |
| 4 | | RS422 − |
| 5 | | RS422 + |
| 6 | RecvData − | 24VAC Live |
| 7 | | 24VAC Common |
| 8 | | 24VAC Live |

In the illustrated embodiments, the combiners and distributor devices utilize standard RJ-45 connectors for convenience in connecting and disconnecting the Combined Video system to a building SCS. However, it will be appreciated that other types of connectors could be utilized. For example, insulation displacement connectors, such as the type commonly referred to as "punch down blocks," could be utilized. While this would not offer the same convenience and ease of installation as the use of plug-and-socket connectors, it may be desirable in connection with certain cabling codes or standards.

While the disclosed embodiments are in the context of a CCTV system, it will be appreciated that the principles of the system would also be applicable to "IP" or digital, computer-based cameras, in which digital data is communicated to and from the camera. In such an application, one pair of a multi-pair cable would be used for data in one direction and another pair for data in the direction. Also, while the distributor device 16 has been disclosed as a separate interface device 50 or 60, it will be appreciated that it would also be possible to build it into the associated video source.

While particular embodiments have been shown and described, it will be apparent to those skilled in the art that changes and modifications may be made without departing from the principles of the Combined Video system in its broader aspects. The matter set forth in the foregoing description and accompanying drawings is offered by way of illustration only and not as a limitation.

US 7,193,149 B2

11                                                    12

- • PS505 Power Supply - 5 Amp; provides 24VAC power for 16 cameras; connects to the CX516 for distribution of power by means of RJ-45 connectors.

- • PS510 Power Supply - 10 Amp; provides 24VAC power for 4 cameras and P/T/Z units; connects to the CX522 for distribution of power by means of RJ-45 connectors.

Camera Interface Equipment

- • WM101 Camera Interface - Wall Module; connects to the CX516 or CX522; contains a video balun transceiver that transmits to the VH160, VM164 or VM162; connects power to the camera, receiver/driver and P/T/Z unit and RS422 to the receiver/driver via RJ-45 connector.

- • CM103 Camera Interface - In-Line Cable Module; features same as VM101, except does not connect via RJ-45 connector.

US 7,193,149 B2

9       10

## APPENDIX I

**Combined Video System Components**

Eleven basic components (building blocks) can be used to complete a Combined Video system. All eleven components will not be used in smaller systems, but it is possible to use all of the basic components in a larger system. The components are listed by their location in the SCS system.

Equipment Room - Head End Equipment. The Combined Video head-end equipment consists of a multi-channel rack mounted receiver system for receiving video over a copper riser backbone, from within a facility or a copper campus backbone, from other facilities.

- RK500 Powered Rack - accepts up to 10 in any combination of VM564, VM562, DM424.

- VM564 Quad Active Receiver Module Card - Inserts into the RK500 card cage - Receives video from WM101 or CM103. Operates up to 3,000 feet over Category 3 or better cable. With 8 cards, provides up to 32 video inputs.

- VM562 Dual Active Receiver Module Card - Inserts into the RK500 card cage - Receives video from WM101 or CM103. Operates up to 3,000 feet over Category 3 or better cable. With 8 cards, provides up to 16 video inputs.

- DM424 Data Module Card - Distributes RS422 to up to 16 Pan/Tilt/Zoom units. RK500 will accept 2 DM424 cards for a total of 32 Pan/Tilt/Zoom units.

Telecommunication Closet (TC) Equipment

- CX522 Crossover Interface-with RS422 capability

  - Provides means to connect horizontal runs to the copper backbone directly or to a VH160 video hub which provides an interface to a fiber transmitter for connection to a fiber backbone.

  - RJ-45 connectors (one for each camera) connect to the WM101 or CM103 to deliver video to the copper backbone or VH160, RS422 to the PTZ receiver/driver and power to the camera, receiver/driver and PTZ unit.

- CX516 Crossover Interface - Same as CX522, except does not provide RS422 distribution.

- VH160 Video Balun Hub

  - Passive 16 port unit, receives video from WM101 or CM103; base band video output interfaces with fiber transmission equipment for connection to a fiber riser backbone

US 7,193,149 B2

13

What is claimed is:

1. A CCTV system for interfacing with a structured cabling system (SCS) of a building, which comprises:

a plurality of video cameras, each having an analog video signal output;

a video receiver, for receiving video from each of said video cameras;

a control device for movement of each of said video cameras;

a control unit for providing signals for each control device whereby movement of one or more of the video cameras as determined;

each of said video cameras having a power input;

a fused power supply for providing power to each power input;

a multipair cable for each of said video cameras;

a combiner with connectors for coupling the multipair cables; said connectors compatible with a structured cabling system of the building;

for each of said multipair cables, a first twisted pair coupled from said combiner to the analog video signal of said video camera;

said combiner for coupling said analog video signals from the first twisted pairs of said multipair cables to said video receivers;

for each of said multipair cables, a second twisted pair coupled from said combiner to said control device;

said combiner including a control signal distribution unit having a data input and multiple data outputs for feeding data, from said control unit coupled to the data input, to a plurality of control devices coupled to the multiple data outputs via said multipair cables;

for each of said multipair cables, a third twisted pair coupled from said combiner to said power input;

said combiner for coupling a plurality of said third twisted pairs from said multipair cables to said fused power supply.

2. A CCTV system for interfacing with a structured cabling system of a building, as defined by claim 1, in which said fused power supply includes AC power from an external power supply located outside of said combiner.

3. A CCTV system for interfacing with a structured cabling system (SCS) of a building, which comprises:

a plurality of video cameras, each having an analog video signal output;

a video receiver for receiving video from each of said video cameras;

each of said video cameras having a power input;

a fused AC power supply for providing power to each power input;

a multipair cable for each of said video cameras;

a combiner with connectors for coupling the multipair cables; said connectors compatible with a structured cabling system of the building;

for each of said multipair cables, a first twisted pair coupled from said combiner to the analog video signal of said video camera;

said combiner for coupling said analog video signals from the first twisted pairs of said multipair cables to said video receivers;

for each of said multipair cables, a second twisted pair coupled from said combiner to said power input; and

said combiner for coupling a plurality of said second twisted pairs from said multipair cables to said fused AC power supply.

14

4. A CCTV system for interfacing with a structured cabling system of a building as defined by claim 3, in which said fused AC power supply is located outside of said combiner.

5. A CCTV system for interfacing with a structured cabling system (SCS) of a building, which comprises:

a plurality of video cameras, each having an analog video signal output;

a video receiver, for receiving video from each of said video cameras;

a control device for movement of each of said video cameras;

a control unit for providing signals for each control device whereby movement of one or more of the video cameras is determined;

each of said video cameras having a power input;

a fused power supply for providing power to each power input;

a multipair cable for each of said video cameras;

each of said multipair cables having a modular connector usable in a structured cabling system of building;

for each of said multipair cables, a first twisted pair coupled from a combiner to the video signal of said video camera;

said combiner including at least one multi-pin connector, said multi-pin connector having pins for receiving a twisted pair from each of said video receivers, said combiner adapted for coupling said video receivers via said multi-pin connector to said analog video signals from the first twisted pairs of said multipair cables;

for each of said multipair cables, a second twisted pair coupled from said combiner to said control device;

said combiner including a control signal distribution unit having a data input and multiple data outputs for feeding data, from said control unit coupled to the input, to a plurality of control devices coupled to the multiple data outputs via said multipair cables;

for each of said multipair cables, a third twisted pair coupled from said combiner to said power input;

said combiner for coupling a plurality of said third twisted pairs from said multipair cables to said fused power supply.

6. A CCTV system for interfacing with a structured cabling system of a building, as defined by claim 5, in which said fused power supply includes AC power from an external power supply located outside of said combiner.

7. A CCTV system for interfacing with a structured cabling system (SCS) of a building, which comprises:

a plurality of video cameras, each having an analog video signal output;

a video receiver for receiving video from each of said video cameras;

each of said video cameras having a power input;

a fused AC power supply for providing power to each power input;

a multipair cable for each of said video cameras;

each of said multipair cables having a modular connector usable in a structured cabling system of the building;

for each of said multipair cables, a first twisted pair coupled from a combiner to the analog video signal of said video camera;

for each of said multipair cables, a second twisted pair coupled from said combiner to said power input;

said combiner including at least one multipin connector, said multipin connector having pins for receiving a twisted pair from each of said video receivers, said combiner adapted for coupling said video receivers via

US 7,193,149 B2

15

said multipin connector to said analog video signals from the first twisted pairs of said multipair cables; and

said combiner for coupling a plurality of said second twisted pairs from said multipair cables said fused AC power supply.

8. A CCTV system for interfacing with a structured cabling system of a building as defined by claim 7, in which said fused AC power supply is located outside of said combiner.

9. A CCTV system for interfacing with a structured cabling system (SCS) of a building, which comprises:

a video camera, having an analog video signal output;

a video receiver, for receiving video from said video camera;

a control device for movement of said video camera;

a control unit for providing signals for said control device, whereby movement of the video camera is determined;

said video camera having a power input;

a fused power supply for providing power to said power input;

a multipair cable for said video camera, said multipair cable having a first end and a second end;

a distributor with a connector for coupling to the multipair cable, located at the first end of the multipair cable;

said connector compatible with a structured cabling system of the building;

said analog video signal from said video camera coupled to said distributor;

said distributor having a balun for coupling said analog video signal to a first wire pair of said multipair cable via said connector;

said distributor coupling said control device to a second wire pair of said multipair cable via said connector;

said distributor coupling said power input of said video camera to a third wire pair of said multipair cable via said connector;

said first pair of multipair wire coupled to said video receiver located at the second end of the multipair cable;

16

said second pair of the multipair cable coupled to said control unit located at the second end of the multipair cable;

said third pair of multipair cable coupled to said fused power supply located at the second end of the multipair cable.

10. A CCTV system for interfacing with a structured cabling system of a building, as defined by claim 9, in which said fused power supply is an AC power supply.

11. A CCTV system for interfacing with a structured cabling system (SCS) of a building, which comprises:

a video camera, having an analog video signal output;

a video receiver for receiving video from said video camera;

said video camera having a power input;

a fused AC power supply for providing power to said power input;

a multipair cable for said video camera, said multipair cable having a first end and a second end;

a distributor with a connector for coupling to the multipair cable, located at the first end of multipair cable;

said connector compatible with a structured cabling system of the building;

said analog video signal from said video camera coupled to said distributor;

said distributor having a balun for coupling said analog video signal to a first wire pair of said multipair cable via said connector;

said distributor coupling said power input of said video camera to a second wire pair of said multipair cable via said connector;

said first pair of multipair wire coupled to said video receiver located at the second end of the multipair cable;

said second pair of the multipair cable coupled to said fused AC power supply located at the second end of the multipair cable.

* * * * *

EXHIBIT 7

LEXSEE 2007 U.S. DIST. LEXIS 53137



Positive
As of: Jun 06, 2008

**BRIDGELUX, INC., Plaintiff, v. CREE, INC., et al., Defendants.**

**No. C 06-6495 PJH**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
CALIFORNIA**

*2007 U.S. Dist. LEXIS 53137*

**July 9, 2007, Decided
July 9, 2007, Filed**

**PRIOR HISTORY:** *Bridgelux, Inc. v. Cree, Inc., 2007
U.S. Dist. LEXIS 14472 (N.D. Cal., Feb. 15, 2007)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants, a corporation
and the trustees of a university, moved to dismiss a suit
in which plaintiff corporation sought a declaratory judg-
ment of noninfringement as to six patents and invalidity
as to two of those patents.

**OVERVIEW:** The parties were involved in litigation
concerning four of the patents in three judicial districts.
Denying the motion to dismiss as to patents one and two,
which were pending in North Carolina, the court found it
likely that the court in North Carolina would dismiss the
entire action for lack of personal jurisdiction; thus, the
court would retain jurisdiction over the claims involving
patents one and two. Granting the motion as to patents
three and four, the court found that they were first filed
in Texas and that the Texas court had already ruled that
the claims regarding those two patents should remain
there. The remaining two patents, patents five and six,
were not at issue in any other litigation; however, plain-
tiff asserted that suit was imminent. The court rejected
that argument and dismissed the claims involving patents
five and six because plaintiff could not show the exis-
tence of an actual controversy regarding those patents.
Plaintiff did not provide admissible evidence of an actual
and imminent injury caused by defendants that could be
redressed by judicial relief and that was of sufficient

immediacy and reality to warrant the issuance of a de-
claratory judgment.

**OUTCOME:** The court granted dismissal as to claims
involving four of the patents but denied dismissal as to
the claims involving the remaining two patents.

**CORE TERMS:** patent, customer, declaratory judg-
ment, declaration, causes of action, unidentified, chips,
actual controversy, lighting, infringement, imminent,
counterclaim, infringed, subject matter jurisdiction, non-
infringement, invalidity, infringing, hearsay, personal
jurisdiction, potential customers, noninfringement, ap-
prehension, asserting, lawsuit, manager, patent cases,
present action, declaratory, immediacy, issuance

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Subject Matter Juris-
diction > General Overview*
[HN1] Subject matter jurisdiction is fundamental and
cannot be waived. Federal courts can adjudicate only
those cases which the Constitution and Congress author-
ize them to adjudicate -- those involving diversity of
citizenship or a federal question, or those to which the
United States is a party. The burden of establishing that a
cause lies within this limited jurisdiction rests upon the
party asserting jurisdiction.

***Civil Procedure > Declaratory Judgment Actions > Federal Judgments > Scope***
[HN2] The Declaratory Judgment Act authorizes a court to declare the rights and other legal relations of any interested party seeking such declaration when there is an actual controversy. *28 U.S.C.S. § 2201(a).*

***Patent Law > Remedies > Declaratory Relief***
[HN3] In patent cases, declaratory judgment is usually sought by a party who, rather than waiting to be sued for patent infringement, seeks a legally binding affirmation that it is not infringing on another party's patent. Federal Circuit law controls such actions.

***Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > Concurrent Jurisdiction***
***Civil Procedure > Declaratory Judgment Actions > Federal Judgments > General Overview***
***Constitutional Law > The Judiciary > Case or Controversy > General Overview***
***Patent Law > Remedies > Declaratory Relief***
[HN4] The sole requirement for federal court jurisdiction under U.S. Const. art. III and the Declaratory Judgment Act is an "actual controversy." Whether an actual controversy exists under the Declaratory Judgment Act in a patent case is a question of law for the court to decide.

***Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview***
***Civil Procedure > Declaratory Judgment Actions > Federal Judgments > General Overview***
***Constitutional Law > The Judiciary > Case or Controversy > General Overview***
[HN5] The "actual controversy" requirement of the Declaratory Judgment Act demands only that the dispute be definite and concrete, touching the legal relations of parties having adverse legal interests; that it be real and substantial and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. The question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. A declaratory judgment plaintiff is required only to satisfy U.S. Const. art. III, which includes standing and ripeness, by showing, under "all the circumstances," an actual or imminent injury caused by the defendant that can be redressed by judicial relief, and that is of sufficient

immediacy and reality to warrant the issuance of a declaratory judgment.

***Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview***
***Governments > Courts > Judicial Comity***
[HN6] The "first-to-file" rule is a generally recognized doctrine of federal comity which permits a district court to decline jurisdiction over an action when a complaint involving the same parties and issues has already been filed in another district. The U.S. Court of Appeals for the Federal Circuit applies the general rule that as a principle of sound judicial administration, the first suit should have priority, absent special circumstances. Courts apply the general rule favoring the forum of the first-filed case unless considerations of judicial and litigant economy, and the just and effective dispositions of disputes, requires otherwise. Exceptions are not rare, but there must be sound reason that would make it unjust or inefficient to continue the first-filed action.

***Governments > Courts > Judicial Comity***
***Patent Law > Jurisdiction & Review > Subject Matter Jurisdiction > Declaratory Judgment Actions***
***Patent Law > Remedies > Declaratory Relief***
[HN7] In considering the first-to-file rule, a court may consider whether a party filed a declaratory judgment action in an attempt to preempt another's infringement suit. Other factors include the convenience and availability of witnesses; the absence of jurisdiction over all necessary or desirable parties; and the possibility of consolidation with related litigation. Courts in the Ninth Circuit look at three threshold factors: the chronology of the two actions; the similarity of the parties, and the similarity of the issues. If the first-to-file rule does apply to a suit, the court in which the second suit was filed may transfer, stay or dismiss the proceeding in order to allow the court in which the first suit was filed to decide whether to try the case.

***Civil Procedure > Declaratory Judgment Actions > Federal Judgments > Scope***
[HN8] A declaratory judgment plaintiff is required to show an actual and imminent injury caused by the defendant that can be redressed by judicial relief, and that is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

**COUNSEL:** [*1] For Bridgelux, Inc., a California corporation, Plaintiff: Constance Faye Ramos, LEAD ATTORNEY, Howrey Simon Arnold & White, LLP, San Francisco, CA; Henry C. Bunsow, Korula T. Che-

rian, Robert F. Kramer, LEAD ATTORNEYS, Amy Christine Dachtler, Howrey LLP, San Francisco, CA.

For Cree, Inc., a North Carolina corporation, Cree Lighting Company, a California corporation, Trustees of Boston University, Defendants: Christopher J. Cox, Matthew D. Powers, LEAD ATTORNEYS, Weil Gotshal & Manges, Redwood Shores, CA.

JUDGES: PHYLLIS J. HAMILTON, United States District Judge.

OPINION BY: PHYLLIS J. HAMILTON

OPINION

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS IN PART AND DENYING IT IN PART

Before the court is defendants' motion to dismiss the above-entitled action. Having read the parties' papers and carefully considered their arguments, and good cause appearing, the court hereby GRANTS the motion in part and DENIES it in part.

BACKGROUND

Plaintiff BridgeLux, Inc. ("BridgeLux"), a California corporation based in Sunnyvale, California, manufactures LED (light-emitting diode) chips. Defendant Cree, Inc. ("Cree"), a North Carolina corporation headquartered in Durham, North Carolina, manufactures and sells various semiconductor products, [*2] including LEDs, which it sells to lighting companies. Defendant Cree Lighting Company was formerly a subsidiary of Cree but was merged into its parent company in 2003 and no longer exists as a separate entity. Defendant Trustees of Boston University ("BU") is the governing body of Boston University, a non-profit educational institution located in Boston, Massachusetts.

Cree owns *U.S. Patent Nos. 6,657,236 ("the '236 patent"); 6,614,056 ("the '056 patent"); 6,885,036 ("the '036 patent"); and 6,600,175 ("the '175 patent").* Boston University owns, and Cree exclusively licenses, *U.S. Patent Nos. 5,686,738 ("the '738 patent"); and 6,953,703 ("the '703 patent").* All six patents relate to LED devices and materials. BridgeLux, Cree, and BU are presently involved in litigation involving some of these patents, in three separate judicial districts.

On September 11, 2006, Cree and BU filed suit against BridgeLux in the Middle District of North Carolina, alleging that BridgeLux had infringed Cree's *'236 patent* and BU's *'738 patent (Cree v. BridgeLux, Case No. 06-cv-0761-NCT-RAE (M.D.N.C.)).*

On October 17, 2006, BridgeLux did three things. First, it filed a motion to dismiss the North Carolina case [*3] for lack of personal jurisdiction and improper venue. Second, it filed suit against Cree in the Eastern District of Texas, alleging that Cree had infringed *U.S. Patent No. 6,869,812 ("the '812 patent"),* owned by BridgeLux (*BridgeLux v. Cree,* Case No. 06-cv-0240-RHC (E.D. Tex.)). Third, it filed the present action, seeking a declaratory judgment of noninfringement and invalidity as to the *'236* and *'738 patents,* and seeking a declaratory judgment of noninfringement as to the *'175* and *'703 patents.*

In the North Carolina case, the court granted defendants' motion for additional time to respond to the motion to dismiss, and also granted their request for leave to conduct jurisdictional discovery. The motion to dismiss was fully briefed as of April 13, 2007. On July 5, 2007, Magistrate Judge Russell A. Eliason issued a report and recommendation, recommending that the motion be granted.

In the Texas case, Cree and BU filed an answer and counterclaims, seeking a judicial declaration of noninfringement, invalidity, and unenforceability as to the *'812 patent* (first through third counterclaims); and a judicial declaration of infringement as to the *'236, '738, '056,* and *'036 patents* (fourth [*4] counterclaim).

Shortly after filing their answer, defendants informally requested BridgeLux to agree to consolidate all the pending actions in the Eastern District of Texas. BridgeLux rejected this request. On December 4, 2004, defendants' counsel sent BridgeLux a letter on behalf of defendants, formally requesting that BridgeLux consider consolidating the three actions into the Texas case, to "serve the convenience of the parties" and "promote the just and efficient conduct issues involving the various patents." Counsel for BridgeLux declined, stating that "we see no recognizable efficiencies achieved by consolidating the parties' claims into a single action in Texas."

On December 28, 2006, BridgeLux moved in the Texas action for an order severing the fourth counterclaim. BridgeLux argued that the '238, '738, '056, and '036 patents were related to each other, and were distinct from and BridgeLux's '812 patent, the subject of the complaint. On January 16, 2007, Cree filed a motion for summary judgment of invalidity of the '812 patent. That motion has been fully briefed, but a decision has not yet been issued.

On February 5, 2007, the Texas court granted the motion to sever the fourth [*5] counterclaim in part and denied it in part, finding that the claims relating to the '236 and '738 patents were first filed in North Carolina, second filed in California, and third filed in Texas; and

Case 3:08-cv-02208-MHP    Document 15-2    Filed 06/09/2008    Page 41 of 45

2007 U.S. Dist. LEXIS 53137, *                                           Page 4

that the claims relating to the '056 and '036 *patents* were first filed in Texas and second filed in California.

The court severed the counterclaim as to the '236 and '738 *patents*, and dismissed that portion of the counterclaim, "to be dealt with by the court in which a suit involving these patents was first filed." At present, that court is the Middle District of North Carolina, where, however, BridgeLux claims it is not subject to suit. The court denied the motion to sever the counterclaim as to the '056 and '036 *patents*, on the basis that the claims regarding those patents were first filed in Texas.

In the present case, BridgeLux amended the complaint on November 28, 2006, adding counts for declaratory judgment of noninfringement as to the '056 and '036 *patents*. Defendants filed a motion to dismiss the entire action, to which BridgeLux filed an opposition. Bridge-Lux also requested leave to conduct jurisdictional discovery in order to oppose defendants' motion to dismiss BU for lack of [*6] personal jurisdiction, and to oppose the motion to dismiss the seventh and eighth causes of action for lack of subject matter jurisdiction. The court denied that request in an order issued on February 15, 2007.

## DISCUSSION

### A. Legal Standards

#### 1. Subject Matter Jurisdiction

[HN1] Subject matter jurisdiction is fundamental and cannot be waived. *Billingsly v. C.I.R., 868 F.2d 1081, 1085 (9th Cir. 1989).* Federal courts can adjudicate only those cases which the Constitution and Congress authorize them to adjudicate -- those involving diversity of citizenship or a federal question, or those to which the United States is a party. *Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 377, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994).* The burden of establishing that a cause lies within this limited jurisdiction rests upon the party asserting jurisdiction. *Id.; see also Tosco Corp. v. Communities for a Better Env't, 236 F.3d 495, 499 (9th Cir. 2001).*

#### 2. Declaratory Judgment Act

[HN2] The Declaratory Judgment Act authorizes the court to "declare the rights and other legal relations of any interested party seeking such declaration" when there is an "actual controversy." *28 U.S.C. § 2201(a).* [HN3] In patent cases, declaratory judgment is usually sought [*7] by a party who, rather than waiting to be sued for patent infringement, seeks a legally binding affirmation that it is not infringing on another party's patent. *See, e.g., BP Chems. Ltd. v. Union Carbide Corp., 4 F.3d 975 (Fed. Cir. 1993).* Federal Circuit law controls such actions.

*Shell Oil Co. v. Amoco Corp., 970 F.2d 885, 888 (Fed. Cir. 1992).*

[HN4] The sole requirement for federal court jurisdiction under Article III of the U.S. Constitution and the Declaratory Judgment Act is an "actual controversy." *Teva Pharm. USA, Inc. v. Novartis Pharm. Corp., 482 F.3d 1330, 1338 (Fed. Cir. 2007) ("Novartis")* (citing *Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 239-41, 57 S. Ct. 461, 81 L. Ed. 617 (1937)).* Whether an actual controversy exists under the Declaratory Judgment Act in a patent case is a question of law for the court to decide. *Id. at 1336.*

The Federal Circuit formerly employed a two-part test for determining the existence of an actual controversy -- the defendant's conduct must have created in the plaintiff an objectively reasonable apprehension that the defendant will initiate suit if the plaintiff continues the allegedly infringing activity, and the plaintiff must either have produced the infringing device or [*8] have prepared to produce it. *See Teva Pharms. USA, Inc. v. Pfizer, Inc., 395 F.3d 1324, 1332-33 (Fed. Cir. 2005).*

However, the Federal Circuit has now discarded that standard in the wake of the decision in *MedImmune, Inc. v. Genentech, Inc., U.S. , 127 S.Ct. 764, 166 L. Ed. 2d 604 (2007),* a patent licensing dispute. In that case, the Supreme Court stated, in dicta, that the Federal Circuit's two-prong "reasonable apprehension of imminent suit" test conflicted with and "would contradict" several cases in which the Supreme Court had found that a declaratory judgment plaintiff had a justiciable controversy. *See id., 127 S.Ct. at 774 n.11; see also Novartis, 482 F.3d at 1340; SanDisk Corp. v. STMicroelectronics, Inc., 480 F.3d 1372, 1379 (Fed. Cir. 2007).* The Court stated that [HN5] the "actual controversy" requirement of the Declaratory Judgment Act demands only

> that the dispute be definite and concrete, touching the legal relations of parties having adverse legal interests; that it be real and substantial and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. . . . The question in each case [*9] is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

*MedImmune, 127 S.Ct. at 771-72* (citations and quotations omitted).

In response to *MedImmune*, the Federal Circuit has adopted the "all circumstances" test in place of the discredited "reasonable apprehension of imminent suit" test. Under the *MedImmune* approach, a declaratory judgment plaintiff is required only to satisfy Article III, which includes standing and ripeness, by showing, under "all the circumstances," an actual or imminent injury caused by the defendant that can be redressed by judicial relief, and that is of "sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Novartis, 482 F.3d at 1338* (quoting *MedImmune, 127 U.S. at 771*).

B. Defendants' Motion to Dismiss

Defendants make two main arguments. First, they assert that the first, second, third, fourth, seventh, and eighth causes of action for declaratory relief should be dismissed under the first-to-file rule because those claims were at issue in previously-filed [*10] lawsuits at the time this action was filed, and because BridgeLux has improperly used the Declaratory Judgment Act to forum-shop.

Second, they argue that the court lacks subject matter jurisdiction over the fifth and sixth causes of action for declaratory relief, because no actual and justiciable controversy existed between BridgeLux and defendants concerning the *'175* and *'703 patents* at the time that BridgeLux filed this action. [1]

> 1 Defendants originally also moved for an order dismissing BU for lack of personal jurisdiction, but BU subsequently consented to personal jurisdiction in this district for purposes of the present litigation only.

1. First, second, third, fourth, seventh, and eighth causes of action

BridgeLux's first and second causes of action seek a judicial declaration of non-infringement and invalidity of the *'236 patent*. The third and fourth causes of action seek a declaration of non-infringement and invalidity of the *'738 patent*. The seventh cause of action seeks a declaration of non-infringement of the *'056 patent*. The eighth cause of action seeks a declaration of non-infringement of the *'036 patent*.

Defendants argue that the court should decline to exercise jurisdiction [*11] over these six causes of action because they are duplicative of Cree's first-filed claims in North Carolina and Texas. [HN6] The "first-to-file" rule is a generally recognized doctrine of federal comity which permits a district court to decline jurisdiction over an action when a complaint involving the same

parties and issues has already been filed in another district. *Pacesetter Systems, Inc. v. Medtronic, Inc., 678 F.2d 93, 94-5 (9th Cir. 1982)*. The Federal Circuit applies the general rule that "'as a principle of sound judicial administration, the first suit should have priority,' absent special circumstances." *Kahn v. Gen'l Motors Corp., 889 F.2d 1078, 1081 (Fed. Cir. 1989)* (citations omitted).

> We apply the general rule favoring the forum of the first-filed case unless considerations of judicial and litigant economy, and the just and effective disposition of disputes, requires otherwise. Exceptions are not rare, but we have explained that there must be sound reason that would make it unjust or inefficient to continue the first-filed action.

*Electronics for Imaging, Inc. v. Coyle, 394 F.3d 1341, 1347 (Fed. Cir. 2005)* (citation and quotation omitted).

In looking at this question, [HN7] the court [*12] may consider whether a party filed a declaratory judgment action in an attempt to preempt another's infringement suit. Other factors include the convenience and availability of witnesses; the absence of jurisdiction over all necessary or desirable parties; and the possibility of consolidation with related litigation. *Id. at 1347-48*.

The Federal Circuit has not provided much additional guidance with regard to the application of the first-to-file rule. Courts in the Ninth Circuit look at three threshold factors: the chronology of the two actions; the similarity of the parties, and the similarity of the issues. *Alltrade, Inc. v. Uniweld Prods., Inc., 946 F.2d 622, 625-26 (9th Cir. 1991); Pacesetter, 678 F.2d at 95; Z-Line Designs, Inc. v. Bell'O Int'l, LLC, 218 F.R.D. 663, 665 (N.D. Cal. 2003)*. If the first-to-file rule does apply to a suit, the court in which the second suit was filed may transfer, stay or dismiss the proceeding in order to allow the court in which the first suit was filed to decide whether to try the case. *Alltrade, 946 F.2d at 625*. Defendants contend that all three of the above-cited factors are met with regard to the *'236 and '738 patents*, and also with regard to the [*13] *'056 and '036 patents*.

The court finds that the motion must be DENIED as to the *'236 and '738 patents*, and GRANTED as to the *'056 and '036 patents*. It is undisputed that the case involving the *'236 and '738 patents* was filed first in North Carolina, then in California; and that the case involving the *'056 and '036 patents* was filed first in Texas, then in California. [2] As it appears likely that the North Carolina court will dismiss the entire action pending before it for lack of personal jurisdiction over BridgeLux, this court

will retain jurisdiction over the first through fourth causes of action. [1] However, because the Texas court has already ruled that the claims regarding the '056 and '036 patents should remain there, this court will dismiss the seventh and eighth causes of action under the first-to-file rule.

> 2 Some months ago, the parties so agreed in the Texas action. *See* Order on Plaintiff's Motion to Sever, *BridgeLux v. Cree*, 06-CV-240, *2007 U.S. Dist. LEXIS 95476 (E.D. Tex., Feb. 5, 2007).*
> 3 The court will reconsider this decision if the North Carolina court does *not* dismiss for lack of jurisdiction over BridgeLux, as the claims regarding the '236 and '738 patents were first filed in that district.

### 2. Fifth [*14] and sixth causes of action

Defendants argue that the fifth and sixth causes of action, seeking a declaration of non-infringement as to the '175 and '703 patents, should be dismissed for lack of subject matter jurisdiction because BridgeLux cannot show the existence of an actual controversy regarding those patents.

As discussed above, under the *MedImmune* test, [HN8] a declaratory judgment plaintiff is required to show an actual and imminent injury caused by the defendant that can be redressed by judicial relief, and that is of "sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Novartis, 482 F.3d at 1338* (quoting *MedImmune, 127 U.S. at 771*).

The *MedImmune* decision was issued on January 9, 2007, and the hearing on the present motion occurred on January 31, 2007. In general, the arguments made by the parties in their briefs applied the old, pre-MedImmune Federal Circuit standard for determining subject matter jurisdiction over a declaratory judgment claim in a patent action. At the hearing, the court asked for supplemental briefing on the question of the effect, if any, of the *MedImmune* decision on the issues raised by defendants' motion.

Defendants asserted that [*15] because the specific holding in *MedImmune* (a patent licensing case) has no application to the facts here, and because the Supreme Court's comments regarding the Federal Circuit's "reasonable apprehension of imminent suit" test were dicta, the decision should be read narrowly, and this court should not assume that the Court had rejected the Federal Circuit's long-standing test. BridgeLux, on the other hand, argued that the *MedImmune* test should be broadly applied, but also asserted that in any event, BridgeLux could meet either test.

The parties completed their supplemental briefing in late February 2007. Approximately a month later, the Federal Circuit issued its decisions in *SanDisk* and *Novartis*, in which it concluded that the Supreme Court had essentially rejected the "reasonable apprehension of imminent suit" test for determining declaratory judgment jurisdiction in patent cases, and that the broader general rules governing declaratory judgment jurisdiction also apply in patent cases.

BridgeLux argues that there is an actual and imminent injury that justified the filing of the present action for declaratory relief as to the '175 and '703 patents. Based on the Declaration of its Chief [*16] Executive Officer Robert C. Walker, BridgeLux asserts that it has an Asian-based customer (identified only as the "customer") who purchases LED chips from BridgeLux for use in its high-power LED products. BridgeLux is a major supplier of LED chips to this customer. Walker states that on April 23-27, 2006, the customer sponsored a booth at one of the major annual lighting trade shows, the Light & Building Frankfort 2006, in Germany. At that trade show, the customer displayed lighting products that incorporated BridgeLux's LED chips.

Walker asserts, on information and belief, that unidentified Cree management personnel approached the same Asian-based customer's booth at the trade show, and advised the customer's representative that if the customer was not using Cree's LED chips in its lighting products, then it was infringing certain of Cree's LED patents. Walker believes that the products to which the Cree representative directed its allegations of infringement all incorporated BridgeLux LED chips, and not Cree LEDs. However, Walker does not assert that the Cree representative indicated that he knew the products incorporated BridgeLux LED chips, or that the Cree representative ever mentioned [*17] BridgeLux.

Subsequently, in June 2006, the customer allegedly told Walker that Cree had sent it a warning letter asserting four U.S. patents directed to LED technologies and threatening that the customer's lighting products infringed those patents. According to Walker, the customer stated that Cree's letter was directed at the customer's products that incorporate BridgeLux's LED chips, and that the letter specifically named Cree's '738, '236, '703, and '175 patents. Upon receipt of the letter, the customer contacted BridgeLux and requested a meeting to discuss the patents and BridgeLux's position regarding potential infringement.

The customer did not provide BridgeLux with a copy of the letter, and BridgeLux does not have a copy of the letter. Nevertheless, based on the customer's report of the comments by the Cree representative at the April 2005 trade show, and also based on the June 2006 letter,

. Case 3:08-cv-02208-MHP   Document 15-2   Filed 06/09/2008   Page 44 of 45

2007 U.S. Dist. LEXIS 53137, *                                    Page 7

Walker asserts that BridgeLux became concerned that Cree might eventually assert those four patents against BridgeLux.

In September 2006, Cree did file suit in the Middle District of North Carolina, asserting infringement as to two of the four patents (the '738 and '236 patents) that had allegedly [*18] been identified in the June 2006 letter to the Asian-based customer. Thus, according to Walker, BridgeLux reasonably believed that another lawsuit asserting the other two patents (the '703 and '175 patents) was imminent.

Walker states further that he is informed that Cree has made "comments" to other customers or potential customers regarding the competition that BridgeLux is presenting to Cree in the LED market. According to Walker, a BridgeLux sales manager was told by a potential customer that in 2006, Cree management personnel told the potential customer that Cree considered Bridge-Lux to be a major supplier of InGaN power LEDs in the market, and that Cree's sales performance on certain of its products was affected by competition presented by BridgeLux's LED chips.

Walker also claims that "some current and potential customers" have told BridgeLux that they are apprehensive of using BridgeLux LEDs in their lighting products because they fear being sued by Cree. Walker asserts that this has caused BridgeLux to be concerned and to feel threatened that Cree will assert its LED patents directly against BridgeLux.

In 2004, Walker served as the co-chair of Blue 2004, a lighting conference [*19] held in Taiwan and attended by major participants in the lighting field including BridgeLux customers and potential customers who make and sell lighting products that use LED chips. Walker states that at that conference, a Cree senior manager (unidentified) addressed the attendees, and projected a copy of Cree's '175 patent during his presentation.

According to Walker, the Cree manager discussed various products (tennis shoes, flashlights) which he had purchased in North Carolina and which incorporated LEDs, and stated his opinion that the products infringed Cree's '175 patent because they did not use the Cree LED die and did not have a license with Cree. The Cree manager stated that the '175 patent had broad coverage, and indicated that Cree would bring lawsuits to enforce its patent.

Walker states further that he is aware the Cree and BU have in the past filed patent infringement lawsuits. He also attaches to his declaration copies of Cree press releases dated May 19, 2005, December 8, 2005, May 9, 2006, and September 28, 2006, announcing Cree's licensing of its '175 patent to various companies located in Japan, Hong Kong, Korea, and Taiwan. Walker asserts that these press releases [*20] promote the '175 patent and explain Cree's intention to defend its technology.

Defendants, on the other hand, argue that at the time the present action was filed, no actual controversy existed between the parties regarding the '175 and '703 patents, and contend that BridgeLux has not met its burden of showing that an actual controversy in fact existed. Based on the declaration of John F. Imbergamo, BU's Senior Associate Vice President of Financial Affairs, defendants contend that no employee of BU has ever told BridgeLux or a third party that BridgeLux has infringed the '703 patent, and that no employee of BU has ever threatened BridgeLux with suit on the '703 patent. BridgeLux does not dispute this claim.

Defendants assert further, based on the declaration of Scott S. Schwab, Vice-President and General Manager of Optoelectronics at Cree, that while Cree has offered to license the '703 patent on behalf of BU to other companies, neither Cree nor BU has ever brought suit on the '703 patent against any company. Schwab also claims, on information and belief, that no employee of Cree has ever told BridgeLux or a third party that BridgeLux has infringed either the '703 patent or the '175 patent, [*21] and that no employee of Cree has ever threatened BridgeLux with suit on either of those patents.

Defendants contend that BridgeLux has not met its burden of showing the existence of an actual controversy regarding the '175 or '703 patents at the time this action was filed, because the evidence on which BridgeLux relies is inadmissible. Defendants assert that the only evidence provided is the declaration of Robert Walker, BridgeLux's CEO. Defendants argue that the Walker declaration is based primarily on inadmissible hearsay and rumors, noting in particular that the assertions concerning Cree's supposed allegations of infringement are based on several layers of hearsay.

For example, defendants point to Walker's statement that an unidentified Cree representative allegedly approached an unidentified Asian-based customer of BridgeLux at an April 2004 trade show in Germany, and advised this customer that if it was not using Cree LED chips, it was infringing certain of Cree's patents. Similarly, defendants note Walker's claim that an unidentified representative of the unidentified Asian-based customer stated in June 2006 that an unidentified representative of Cree had sent the customer a warning [*22] letter asserting four patents directed to LED technologies and threatening that the Asian-based customer's lighting products infringed those patents.

Defendants note that Walker concedes that Bridge-Lux was never provided with a copy of the letter and was never able to verify the exact contents of Cree's purport-

edly threatening comments. Defendants assert that Walker's claims are based on an out-of-court statement by an unidentified representative of an unidentified Asian-based customer, which in turn was based on an out-of-court statement (the letter) by an unidentified representative of Cree. Defendants contend that, at best, this is double hearsay, although they also note that there is no way of knowing how many people the information about the letter passed through before reaching Walker.

Defendants also contend that Walker's statements are impermissibly vague about the source of his information and when he became aware of it. Defendants argue that the "evidence" provided by BridgeLux is inadmissible, and as such, cannot be used to establish that the court has subject matter jurisdiction because it does not constitute proof that Cree made actual threats of suit.

Defendants argue further [*23] that even if the statements in the Walker declaration were admissible and reliable, they would still not constitute evidence sufficient to show the existence of an actual controversy. They note that BridgeLux provides no evidence showing that either Cree or BU has ever sued anyone on these two patents; that either Cree or BU has ever threatened BridgeLux with suit; that the unidentified Cree representative at the trade show specifically alleged infringement of either the '175 or '703 patents, ever mentioned BridgeLux, or appeared to know whether the unidentified Asian customer's products contained BridgeLux chips; or that the letter supposedly sent by Cree to the unidentified Asian customer ever mentioned BridgeLux.

The court finds that BridgeLux has not met its burden of providing admissible evidence of an actual and imminent injury caused by Cree and BU that can be redressed by judicial relief, and that is of "sufficient immediacy and reality to warrant the issuance of a declaratory judgment."

It is undisputed that neither defendant had filed any lawsuit alleging infringement of the '175 or '703 patents,

and that neither defendant has ever accused BridgeLux of infringing the patents. [*24] The statements in the Walker declaration are hearsay or double hearsay, and cannot be admitted into evidence to support BridgeLux's claim that an "actual controversy" existed with regard to the '175 or '703 patents at the time the present action was filed.

Moreover, even if the statements in the Walker declaration were not hearsay, they are not sufficiently "definite and concrete" to warrant a conclusion that defendants had inflicted an "actual and imminent injury" on BridgeLux. There is no indication that anyone from Cree ever specifically identified BridgeLux as having infringed the '175 or '703 patents, even in complaints to third parties. The fact that Cree stated publicly in press releases or at industry meetings that it would defend its patents is unremarkable. The same could be said of many patent-holders.

## CONCLUSION

In accordance with the foregoing, the court DENIES the motion to dismiss the first through fourth causes of action, seeking a declaratory judgment of noninfringement and invalidity involving the '236 and '738 patents; and GRANTS the motion to dismiss the fifth through eighth causes of action, seeking a declaratory judgment of noninfringement as to the '175, '703, '056, [*25] and '036 patents.

The court will conduct a case management conference in this case on Thursday, August 16, 2007, at 2:30 p.m.

**IT IS SO ORDERED.**

Dated: July 9, 2007

PHYLLIS J. HAMILTON

United States District Judge

EXHIBIT 8A

# DECLARATION OF DAN NITZAN

1.    I, Dan Nitzan, make this declaration of my own personal knowledge and am competent to testify to the matters stated herein.

2.    I am the President of Network Video Technologies, Inc. ("NVT"). NVT maintains its principal place of business at 4005 Bohannon Drive, Menlo Park, California. NVT maintains its corporate documents in California. Los Angeles is a convenient forum for NVT to maintain the current litigation due to NVT's extensive business activities in Los Angeles County for over 15 years.

3.    I have a Bachelor of Science Degree in Electrical Engineering and Computer Science from University of California at Berkeley.

4.    NVT is a California Corporation founded in 1990. NVT designs and sells products for transmitting CCTV ("*closed circuit television*") over "*unshielded twisted pair*" ("UTP") wire in structured cabling networks commonly used in office buildings for telephone systems and computer networks.

5.    NVT's products enable the use of UTP in those structured cabling systems for, among other things, video security cameras and CCTV systems.

6.    NVT is considered a premier supplier of power/video/data ("PVD") twisted pair solutions for the CCTV industry, that is, solutions that enable transmitting power, video signals and data signals over UTP. PVD is a trademark of NVT.

7.    NVT has done, and continues to do, business in Los Angeles County.

8.    NVT is Nitek's primary competitor. Like NVT, Nitek sells products for transmitting CCTV over UTP cabling.

9.    In the past, NVT had not received product or patent literature, information or materials from Nitek by direct communication such as email.

10.    Nitek claims it is the owner of Patent No. 7,193,149 entitled "System Handling Video, Control Signals and Power" ("the '149 patent"). That '149 patent was issued on March 20, 2007. I personally reviewed that patent. When I did so, I observed that one of the owners was Anixter, Inc. ("Anixter").

1

CONTAINS HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY
INFORMATION



1    11.    Anixter is a customer of NVT and a former customer of Nitek. ▬▬▬

2    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ]

3    12.    In March 2007, NVT sales representatives received emails directly from

4    Nitek containing a patent news release concerning the '149 patent. Examples of

5    emails that were sent by Nitek to NVT sales representatives, Mr. Michael Murray, Mr.

6    Gordy Abbott, and Mr. Paul Walter are attached hereto as Exhibits 3-5, respectively.

7    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

8    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

9    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

10   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

11   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

12   ▬▬▬▬▬▬▬▬▬▬▬▬▬

13   14.    In March 2007, the International Security Conference ("ISC") was held

14   in Las Vegas, Nevada, which is generally considered to be the most important

15   tradeshow in the industry.

16   ▬▬▬  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

17   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

18   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

19   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

20   ▬▬▬▬▬▬▬▬▬▬▬▬ ]

21   ▬▬▬  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬

22   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

23   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

24   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

25   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

26   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

27

28   ¹    The information in "[]" is designated by NVT as Highly Confidential -
      Attorney's Eyes Only under the protective order.

2
CONTAINS HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY
INFORMATION



I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE
UNITED STATES OF AMERICA THAT THE FOREOING IS TRUE AND
CORRECT. EXECUTED THIS 4th DAY OF JANUARY 2008 AT MENLO PARK,
CA.

Dan Nitzan

3
CONTAINS HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY
INFORMATION

EXHIBIT 8B

**EXHIBIT 8B TO THE THIS GERSTMAN**

**DECLARATION IS THE DECLARATION OF DAN**

**NITZAN SUBMITTED IN THE FIRST DJ ACTION**

**AND IS NOT INCLUDED HEREWITH, BUT IS**

**BEING FILED IN THIS ACTION UNDER SEAL.**

**A REDACTED VERSION OF NITZAN**

**DECLARATION IS ATTACHED TO THIS**

**DECLARATION AS EXHIBIT 8A**

EXHIBIT 9

1  KENNETH L. WILTON (SBN 126557)
   SEYFARTH SHAW LLP
2  2029 Century Park East, Suite 3300
   Los Angeles, California 90067-3063
3  Telephone:   (310) 277-7200
   Facsimile:   (310) 201-5219
4  E-Mail:      kwilton@seyfarth.com

5  GEORGE H. GERSTMAN (*Pro Hac Vice*)
   SEYFARTH SHAW LLP
6  131 S. Dearborn Street, Suite 2400
   Chicago, Illinois 60603
7  Telephone:   (312) 460-5000
   Facsimile:   (312) 460-7000
8  E-Mail:      ggerstman@seyfarth.com

9  Attorneys for Defendant
   NITEK International, LLC.

10

11              UNITED STATES DISTRICT COURT

12            CENTRAL DISTRICT OF CALIFORNIA

13                   WESTERN DIVISION

14  NETWORK VIDEO TECHNOLOGIES, )    Case No. CV-07-4789 AHM (RZx)
    INC.,                       )
15                              )    **DECLARATION OF**
             Plaintiff,         )    **CHAD M. SZEKERES**
16                              )
         v.                     )    Date:   February 25, 2008
17                              )    Time:   10:00 a.m.
    NITEK INTERNATIONAL, LLC and )   Place:  Hon. A. Howard Matz
18  DOES 1-10,                  )            Courtroom 14
                                )
19           Defendants.        )
                                )
20

21

22

23

24

25

26

27

28

1  ///

2  ///

3

4      Chad M. Szekeres declares as follows:

5          1.      I reside in Huntley, Illinois and I am National Sales Manager of

6  Defendant NITEK International, LLC ("NITEK"), and have been National Sales

7  Manager since 2002.

8          2.      I am fully familiar with the products of NITEK and the markets into

9  which these products are sold.

10         3.      On or about March 28-30, 2007, in my capacity as NITEK's National

11  Sales Manager, I attended the International Security Conference ("ISC") in Las

12  Vegas, Nevada.

13         4.      I was accompanied to this show by two other NITEK employees: Carl

14  Palash, Nitek's Central Regional Sales Manager, and Edward L. Polanek, a

15  Managing Member of NITEK.

16         5.      No other NITEK employee, nor anyone with the capacity to act as an

17  employee, partner or agent of NITEK, was at that ISC show.

18         6.      In the course of that show, I spoke on only a single occasion with

19  Jeffrey Leite, a person whom I understood to be Pacific District Sales Manager of

20  Plaintiff, Network Video Technologies, Inc. ("NVT").

21         7.      My conversation with Mr. Liete did not address NITEK's U.S.Pat.

22  No. 7,193,149 nor did it address NITEK's plans for enforcement of any NITEK

23  intellectual property rights.

24         8.      At that show I did not speak with any other person that was, to my

25  knowledge, an employee or representative of NVT.

26         9.      At that show I did not make any statements to anyone regarding

27  NITEK's plans for enforcement of any NITEK intellectual property rights.

28

2

1      I declare that the foregoing is true under penalty of perjury under California

2  law and any other applicable law.

3

4  Date: _2-12-08_

5

6                    Chad Szekeres

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BOI 15904404.1

EXHIBIT 10

1  KENNETH L. WILTON (SBN 126557)
   SEYFARTH SHAW LLP
2  2029 Century Park East, Suite 3300
   Los Angeles, California 90067-3063
3  Telephone:  (310) 277-7200
   Facsimile:   (310) 201-5219
4  E-Mail:     kwilton@seyfarth.com

5  GEORGE H. GERSTMAN (*Pro Hac Vice*)
   SEYFARTH SHAW LLP
6  131 S. Dearborn Street, Suite 2400
   Chicago, Illinois 60603
7  Telephone:  (312) 460-5000
   Facsimile:   (312) 460-7000
8  E-Mail:     ggerstman@seyfarth.com

9  Attorneys for Defendant
   NITEK International, LLC.

10

11              UNITED STATES DISTRICT COURT

12            CENTRAL DISTRICT OF CALIFORNIA

13                  WESTERN DIVISION

14  NETWORK VIDEO TECHNOLOGIES,  )  Case No. CV-07-4789 AHM (RZx)
    INC.,                        )
15                               )  **DECLARATION OF**
                 Plaintiff,      )  **CARL PALASH**
16                               )
         v.                      )  Date:  February 25, 2008
17                               )  Time:  10:00 a.m.
    NITEK INTERNATIONAL, LLC and )  Place: Hon. A. Howard Matz
18  DOES 1-10,                   )         Courtroom 14
                                 )
19               Defendants.     )
                                 )
20

21

22

23

24

25

26

27

28

1    Carl R. Palash declares as follows:

2       1.    I reside in Carol Stream, Illinois and I am Central Regional Sales

3  Manager of Defendant NITEK International, LLC ("NITEK"), and have been in

4  that position since 2002.

5       2.    I am fully familiar with the products of NITEK and the markets into

6  which these products are sold.

7       3.    On or about March 28-30, 2007, in my capacity as NITEK's Central

8  Regional Sales Manager, I attended the International Security Conference ("ISC")

9  in Las Vegas, Nevada.

10       4.    I was accompanied to this show by two other NITEK employees:

11  Chad Szekeres, NITEK'S National Sales Manager, and Edward L. Polanek, a

12  Managing Member of NITEK.

13       5.    No other NITEK employee, nor anyone with the capacity to act as an

14  employee, partner or agent of NITEK, was at that ISC show.

15       6.    In the course of that show, I did not speak with any person that was, to

16  my knowledge, a representative or employee of Plaintiff, Network Video

17  Technologies, Inc.

18       7. At that show I did not make any statements to anyone regarding NITEK's

19  plans for enforcement of any NITEK intellectual property rights.

20

21       I declare that the foregoing is true under penalty of perjury under California

22  law and any other applicable law.

23

24  Date: 2-12-08                _Carl R Palash_

25                         Carl Palash

26

27

28

2

EXHIBIT 11

1    KENNETH L. WILTON (SBN 126557)
     SEYFARTH SHAW LLP
2    2029 Century Park East, Suite 3300
     Los Angeles, California 90067-3063
3    Telephone:    (310) 277-7200
     Facsimile:    (310) 201-5219
4    E-Mail:    kwilton@seyfarth.com

5    GEORGE H. GERSTMAN (*Pro Hac Vice*)
     SEYFARTH SHAW LLP
6    131 S. Dearborn Street, Suite 2400
     Chicago, Illinois 60603
7    Telephone:    (312) 460-5000
     Facsimile:    (312) 460-7000
8    E-Mail:    ggerstman@seyfarth.com

9    Attorneys for Defendant
     NITEK International, LLC.
10

11                UNITED STATES DISTRICT COURT

12               CENTRAL DISTRICT OF CALIFORNIA

13                      WESTERN DIVISION

14   NETWORK VIDEO TECHNOLOGIES, )    Case No. CV-07-4789 AHM (RZx)
     INC.,                        )
15                                )    **SECOND DECLARATION OF**
              Plaintiff,          )    **EDWARD L. POLANEK**
16                                )
         v.                       )    Date:    February 25, 2008
17                                )    Time:    10:00 a.m.
     NITEK INTERNATIONAL, LLC and )    Place:   Hon. A. Howard Matz
18   DOES 1-10,                   )             Courtroom 14
                                  )
19            Defendants.         )
                                  )
20
21
22
23
24
25
26
27
28

1   ///

2   ///

3

4          Edward L. Polanek declares as follows:

5          1.      I reside in Richmond, Illinois and I am Managing Member of
Defendant NITEK International, LLC ("NITEK").

6          2.      I am fully familiar with the products of NITEK and the markets into

7   which these products are sold.

8          3.      On or about March 28-30, 2007, in my capacity as a Managing

9   Member of NITEK, I attended the International Security Conference ("ISC") in

10  Las Vegas, Nevada.

11         4.      I was accompanied to this show by two other NITEK employees:

12  Chad Szekeres, NITEK'S National Sales Manager, and Carl Palash, Central

13  Regional Sales manager of NITEK.

14         5.      No other NITEK employee, nor anyone with the capacity to act as an

15  employee, partner or agent of NITEK, was at that ISC show.

16         6.      In the course of that show, I did not speak with any person that was, to

17  my knowledge, an employee or representative of Plaintiff, Network Video

18  Technologies, Inc.

19         7.      At that show I did not make any statements to anyone regarding

20  NITEK's plans for enforcement of any NITEK intellectual property rights.

21         8.      NITEK has made no evaluation of, nor reached any determination

22  that, a product of NVT is infringing any claim or claims of United States Patent

23  No. 7,193,149.

24         I declare that the foregoing is true under the penalty of perjury under

25  California law and any other applicable law.

26

27  Date:   2/12/08

28                                                      Edward L. Polanek

2

EXHIBIT 12



SEYFARTH
ATTORNEYS SHAW LLP

Writer's direct phone
(312) 460-5567

Writer's e-mail
ggerstman@seyfarth.com

131 South Dearborn Street
Suite 2400
Chicago, Illinois 60603
(312) 460-5000
fax (312) 460-7000
www.seyfarth.com

August 24, 2007

## RULE 408 OFFER TO COMPROMISE

**VIA E-MAIL**
Gary A. Hecker, Esq.
The Hecker Law Group
1925 Century Park East, Suite 2300
Los Angeles, CA 90067

Re:    Network Video Technologies v. NITEK International
       Case No. CV-07-4789

Dear Mr. Hecker:

As I told you in our telephone discussion, NITEK was surprised that NVT filed a declaratory judgment action against NITEK. NITEK has not charged NVT with patent infringement, nor has NITEK done anything that could give NVT a basis for filing a declaratory judgment suit.

In any event, as I told you, NITEK would like to settle this matter promptly. To that end, although NITEK was not planning to grant a license to NVT, in order to have this lawsuit dismissed and to accommodate NVT, NITEK is willing to grant a non-exclusive license on the basis of the attached proposed License Agreement. Please note that we do not represent Anixter and thus cannot speak for Anixter, but we are confident that this matter can be settled on the basis of this License Agreement.

Very truly yours,

SEYFARTH SHAW LLP

George H. Gerstman

GHG:ajw  CH1 11295340.1
Enclosure
Cc:    Mr. Edward Polanek



**CONFIDENTIAL**

Exhibit   6
Page      82

EXHIBIT 13

Patents, Trademarks, Copyrights,
Entertainment, Internet and Other
Intellectual Property Matters

Founded 1988

# THE HECKER LAW GROUP
*A Professional Law Corporation*

1925 CENTURY PARK EAST
SUITE 2300
LOS ANGELES, CA 90067

TEL: (310) 286-0377
FAX: (310) 286-0488

E-MAIL: ghecker@hh.com

August 24, 2007

*Via Email*

Mr. George Gerstman
SEYFARTH SHAW LLP
131 S. Dearborn Street
Suite 2400
Chicago, Il 60603

Re:    Network Video Technologies v. Nitek International
USDC (Central District of California - Western Division)
Case Number:    CV-07-4789 AHM (RZx)
<u>Our File Number:    63040.986</u>

Dear George:

As you know, we represent NVT in intellectual property matters. I am writing to confirm our conversation of last week concerning the above referenced case.

In our call, you stated that your client was interested in resolving the matter.

I inquired whether Nitek was willing to enter into a covenant not to sue NVT. You said Nitek would be unwilling to do that. I asked if your client would be willing to provide a promise or written assurances that it would not assert the patent-in-suit against NVT. You said your client would be unwilling to do that.

You said that Nitek was not planning to license the patent-in-suit, but that it might be willing to license it to NVT. You said that you would be forwarding a proposal in that regard to me shortly. I would also ask that Nitek reconsider the other options that I proposed.

Best regards.

Very truly yours,

THE HECKER LAW GROUP, PLC

*Gary A. Hecker* /mk

Gary A. Hecker

GAH/mk

EXHIBIT 14



9 of 34 DOCUMENTS

**GEISHA, LLC, d/b/a JAPONAIS, Plaintiff, v. ROY TUCCILLO, an individual, Defendant.**

**No. 05 C 5529**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2007 U.S. Dist. LEXIS 65348*

**September 4, 2007, Decided
September 4, 2007, Filed**

**COUNSEL:** [*1] For Geisha LLC., doing business as Japonais, Plaintiff: Joan L. Long, LEAD ATTORNEY, Aric Seth Jacover, Daniel Howard Shulman, Robert W. Unikel, Mayer Brown LLP, Chicago, IL.

For Roy Tuccillo, an individual, Defendant: Michael Joseph H. Baniak, LEAD ATTORNEY, McDonnell Boehnen Hulbert & Berghoff, Chicago, IL; Allison Michelle Dudley, Valauskas & Pine, Chicago, IL; Jeffrey A Pine, Valaukas & Pine LLC, Chicago, IL.

**JUDGES:** REBECCA R. PALLMEYER, United States District Judge.

**OPINION BY:** REBECCA R. PALLMEYER

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Plaintiff Geisha LLC ("Geisha") owns and operates the restaurant "Japonais" in Chicago, Illinois. Geisha has utilized a stylized rendering of the name "Japonais" in connection with the restaurant since its opening in September 2003, and asserts that it has thus acquired trademark rights in that design. In June 2004, Defendant Roy Tuccillo ("Tuccillo"), a New York resident who runs a frozen seafood company, filed a federal trademark application for a virtually identical design. Tucillo has further expressed his intent to use the mark in connection with a restaurant he plans to open in the New York area. Upon learning of Tuccillo's application in September 2005, Geisha filed a ten-count [*2] complaint, alleging trademark infringement under *15 U.S.C. § 1125(a)* and asserting common law claims including conversion and unfair competition. Count II of the complaint seeks a declaratory judgment that Tuccillo's intended use of the mark would constitute trademark infringement. Geisha now moves for summary judgment on that count only. For the reasons set forth below, Geisha's motion is denied for lack of jurisdiction.

**BACKGROUND**

> 1  Facts presented here are drawn from the parties' Local Rule 56.1 statements and attachments. Geisha's Updated Local Rule 56.1(a)(3) Statement of Material Facts is cited here as "Pl.'s 56.1." Roy Tuccillo's Response to Geisha's Updated Local Rule 56.1(a)(3) Statement of Material Facts and Roy Tuccillo's Statement of Material Facts Pursuant to Local Rule 56.1(b)(3) Supporting a Denial of Geisha's Motion are both cited as "Def.'s 56.1."

**A. Geisha and Japonais**

Geisha, a Delaware limited liability company, was formed in December 2001 for the purpose of opening a Chicago restaurant and lounge under the name "Japonais." [2] (Pl.'s 56.1 PP 1, 9.) The restaurant, which opened in September 2003 in Chicago's River North neighborhood, offers a fusion of modern Japanese [*3] and European cuisine. (*Id* PP 9, 11.) Geisha does business as "Japonais" and has registered that name with the State of Illinois, and further owns all intellectual property associated with the Japonais restaurant. (*Id* P 1.)

> 2  Rick Wahlstedt is a managing member of Geisha. (Wahlstedt Second Supp. Aff. P 1.) The record before the court does not reveal the names of the other members of the limited liability company, nor any of the members' citizenship.



In early 2003, Geisha hired an advertising and marketing firm, Vertis, Inc. ("Vertis"), to create a unique design for Japonais. (*Id.* P 10.) Vertis subsequently created a design using unique lettering and font ("the Japonais design"). [1] (*Id.*) Geisha did not file a trademark registration application for this design with the U.S. Patent and Trademark Office ("PTO"). From the time Japonais opened its doors to the public on September 23, 2003, however, the restaurant has displayed the Japonais design above its entrance and on its website, www.japonaischicago.com. (*Id.* PP 11-13.) Geisha further points to advertisements for the restaurant that appeared in September and November 2003 in two magazines, *Front Desk* and *Chicago Social*, which have monthly [*4] circulations of roughly 50,000 and 75,000 respectively. (*Id.* P 14.) These advertisements prominently feature the Japonais design. (Ex. 4 to Pl.'s 56.1, at Exs. A, B, & E.)

    3   The following image of the Japonais design appears in Geisha's briefs (without the vertical line on the left side, which the court has been unable to delete):

## JAPONAIS

Tuccillo purports to deny that the Japonais design was created with unique lettering or font. He cites a now-cancelled trademark registration, filed in 1993 for a retail store called "Japonaji," that he asserts utilizes the same font as Vertis' creation. (Def.'s 56.1 P 10 (citing Trademark Registration No. 1,905,174).) Tuccillo submitted no materials portraying the Japonaji mark. In any event, from viewing the image of that mark that appears on the PTO's website, the court is uncertain whether the Japonaji mark indeed utilizes the same font as the Japonais design. *See* TARR Status for Registration No. 1,905,174, http://www.uspto.gov/main/trademarks.htm (search performed).

Since its opening, Japonais has received a good deal of favorable press coverage in local and national newspapers and magazines. (Pl.'s 56.4 Mont. 513, 1 P 11.) The *Chicago Tribune* and the *Chicago* [*5] *Sun-Times* reviewed the restaurant in October 2003, and lengthy articles about Japonais appeared in December 2003 in CS magazine, which has a monthly circulation of roughly 75,000, and *Nation's Restaurant News*, which has a monthly circulation of roughly 80,000. (Ex. 4 to Pl.'s 56.1, at Exs. C, D, G, & H.) Japonais also received brief mention in the January 2004 issue of *Bon Appetit*, which has a monthly circulation of roughly 1,300,000. (*Id.* at Ex. I.) In May 2004, *Chicago* magazine (monthly circulation approximately 185,000) named Japonais one of Chicago's "Best New Restaurants," and *Conde Nast*

*Traveler* magazine (national monthly circulation of approximately 775,000) featured Japonais in a "Hot Tables" survey of 66 new restaurants worldwide. (*Id.* at Exs. J & K.) The June 14, 2004 issue of *Time* mentioned a dessert available at Japonais, and an extensive article about Japonais appeared in the June 2005 issue of *Culinary Trends* magazine. (*Id.* at Exs. O & R.) Brief mentions also appeared in 2005 in well-known magazines such as *Travel & Leisure, Us Weekly, People,* and *Food & Wine*, (*id.* at Exs. S, U, V, & Y), and a September 25, 2005 article in the *New York Times* referred to Japonais as an [*6] example of one of Chicago's "excellent fusion joints." (*Id.* at Ex. Z.) Significantly, however, the Japonais design appears in only one of the articles Geisha cites: a feature on the actress Jennifer Aniston, published in the August 29, 2005 issue of *People*, that displays a picture of the restaurant's entrance accompanied by a caption explaining that Ms. Aniston had been spotted there. (*Id.* at Ex. X.) *People* has a weekly circulation of roughly 3,600,000. (Wahlstedt Aff. P 6, Ex. 4 to Pl's 56.1.)

Following the success of the Chicago restaurant, Geisha made plans to open Japonais restaurants in New York and Las Vegas. (Pl.'s 56.1 PP 16-17.) Geisha executed a lease in March 2005 for property in New York's Flatiron District, and the New York Japonais restaurant opened on July 19, 2006. (*Id.* P 16.) The Japonais design is prominently displayed throughout the restaurant, including on the menus and on the entrance awning, and on the restaurant's website, www.japonaisnewyork.com. [4] (*Id.*) The New York Japonais has received significant publicity in newspapers and magazines, including the *New York Times,* the *New York Post,* and *New York* magazine. (*Id.;* Ex. A to Wahlstedt Second Supp. Aff.) As of [*7] the time the parties completed their summary judgment filings, a Las Vegas Japonais was under construction at the Mirage Hotel and Casino, and was scheduled to open on September 1, 2006. [5] (Pl.'s 56.1 P 17.)

    4   Tuccillo claims to lack "information to respond" to Geisha's assertion, but admits "for purposes of this motion only" that the New York Japonais opened in July 2006. (Def.'s 56.1 P 16.) As Geisha's assertions regarding the display of the Japonais design are supported by its citation to the affidavit of Rick Wahlstedt, a managing member of Geisha, (Wahlstedt Second Supp. Aff. PP 1, 3-4), and as Tuccillo fails to challenge these assertions with any specific reference to the record, the court deems those assertions admitted. *See* N.D. Ill. R. 56.1(b)(3)(B-C).

    5   The Las Vegas Japonais has since opened. *See* http://www.japonaislasvegas.com. The website's



design is identical to those of the New York and Chicago restaurants, and prominently displays the Japonais design. *Id.*

## B. Tuccillo's Registration of the Japonais Design

Defendant Tuccillo resides in New York state and operates Anchor Frozen Foods, a supplier of frozen seafood products. (Pl.'s 56.1 P 2.) On June 25, 2004--nine months after [*8] the opening of the Chicago Japonais, and nine months before Geisha obtained a lease for its New York restaurant--Tuccillo filed an intent-to-use trademark registration application with the PTO [6] (the "ITU Application") for a stylized rendering of the word "Japonais." (*Id.* P 18; Application for Service Mark Registration, Serial No. 76599761, Ex. 1 to Pl.'s 56.1.) It is undisputed that this mark is "virtually identical" to the Japonais design. (Def.'s 56.30 Kan. 1, 1 P 19.) The ITU Application states that Tuccillo has "a bona fide intention to use the mark" in connection with "restaurant and lounge services." (ITU Application, at 1.) The PTO issued a Notice of Allowance to Tuccillo on August 23, 2005. TARR Status for Serial No. 76599761, http://www.uspto.gov/main/trademarks.htm (search performed).

6  Under the Lanham Act, a person who has a bona fide, good faith intention of using a trademark in commerce may apply for registration of that trademark by filing an intent-to-use application with the PTO. *See 15 U.S.C. § 1051(b)(1); 37 C.F.R. § 2.34(b)(1).* The PTO examines the sufficiency of the application and publishes the mark for opposition; if there is no opposition, the applicant will receive a notice [*9] of allowance. *See 15 U.S.C. § 1063(a) & (b)(2).* The trademark will not be registered, however, until the applicant further files a verified statement that the mark is being used in commerce--a Statement of Use. *15 U.S.C. § 1051(d); see 37 C.F.R. § 2.88.* The Statement of Use must be filed within six months after issuance of a notice of allowance. *37 C.F.R. § 2.88(a).* An applicant may request a six-month extension during that time; the request must include a verified statement that the applicant "still has a bona fide intention to use the mark in commerce." *37 C.F.R. § 2.89(a)(3).* Successive extensions are available upon a showing of "good cause," which requires "a statement of the applicant's ongoing efforts to make use of the mark in commerce on or in connection with each of the relevant goods or services." *37 C.F.R. § 2.89(d).* The time requested may not extend beyond 36 months from the issuance of the notice of allowance, and the applicant may not request

any further extensions after that time. *See 37 C.F.R. § 2.89(e)(1).*

Tuccillo's motivation for filing the ITU Application is unclear. The court notes that in an answer to one of Geisha's interrogatories, Tuccillo stated that he had [*10] used the name "Japonais" in connection with his seafood business since early 2000, including using the name as a sign in the window of his "store," [7] and that in late 2000 he hired a company to hang a sign in the store that included a stylized rendering of the word. (Answer to Interrogatory No. 2, Ex. 2 to Pl.'s 56.1.) He further stated that he "decided" to open a Japanese restaurant named "Japonais" in 2002, and that in June 2002 he had purchased an existing Chinese restaurant in Baldwin, New York, [8] with the intent of converting it; instead, however, he decided in the summer of 2003 to lease that space to a Dunkin' Donuts and a Quizno's. (*Id.;* Tuccillo Dep., Ex. 3 to Pl.'s 56.1, at 63.) He then began to look for another location for his planned Japonais restaurant, (Answer to Interrogatory No. 2); his efforts in that regard are described below. According to Tuccillo, he filed the ITU Application in June 2004 "to protect the name and design." (*Id.*)

7  Tuccillo provides no other information about his "store"; the court notes that a website for Anchor Frozen Foods lists no physical address, only a post office box in Westbury, New York. *See* http://www.anchorfrozenfoods.com/.

8  Baldwin is [*11] on Long Island, approximately 30 miles east of Manhattan. *See* Google Maps, http://maps.google.com/maps.

Geisha asserts that it was unaware of Tuccillo's ITU Application until September 2005--after the PTO issued its Notice of Allowance to Tuccillo, and after the time period to oppose the application had expired. (Long Aff. P 2, Ex. 5 to Pl.'s 56.1.) On September 9, 2005, Geisha's attorney, Joan Long, sent a letter to Tuccillo's trademark attorney, Stewart Bellus, asserting that Geisha had established trademark rights to the Japonais design through actual use of that design; Long enclosed clippings of press coverage of the Chicago Japonais restaurant with the letter, which Long asserted demonstrated that the restaurant had received "nationwide publicity." (Letter from Long to Bellus of September 9, 2005, Pl.'s Ex. 5, at Ex. A.) Long asked, *inter alia,* that Tuccillo file a "voluntary abandonment" of his application with the PTO. (*Id.*) Bellus responded on September 14, 2005, denying that Long's enclosures demonstrated Geisha's first use of the Japonais design at all, nor any reputation outside of Chicago. (Letter from Bellus to Long of September 14, 2005, Pl.'s Ex. 5, at Ex. B.) Bellus [*12] further stated that because the PTO had "approved" Tuccillo's applica-





tion, "a registration ultimately will issue and my client will have nationwide rights in all areas of the United States other than those in which [Geisha] can establish rights that predate [Tuccillo's] filing date." (*Id.* (emphasis in original); Pl.'s 56.1 P 21.) Geisha responded by filing the present action on September 26, 2005.

## C. Tuccillo's Plans for Use of the Japonais Design

Tuccillo has not yet opened a restaurant using the name "Japonais"; indeed, it is undisputed that Tuccillo has never used the name "Japonais" or the Japonais design in connection with the provision of restaurant and lounge services. (Pl.'s 56.1 P 21; Def.'s 56.1 P 26.) It is further undisputed, however, that Tuccillo "has a firm intent" to do so. (Pl.'s 56.1 P 24; Def.'s 56.1 P 24.) Yet the extent of Tuccillo's preparations is in some dispute. In his deposition, Tuccillo testified that he has "played around with the menu" for his planned restaurant and lounge, and that he intends to offer traditional Japanese food as well as "infused-style dishes." (Tuccillo Dep., at 62.) He further identified an exhibit depicting a "design layout" that he [*13] had created in 2002 for the space he had purchased in Baldwin, but had leased for other use in 2003. (*Id.* at 64.) Since leasing that property, he has been "aggressively pursuing" and "very aggressively looking" for other suitable properties, and testified that he is "in the process of finding a location." (*Id.* at 69.) He confirmed that the purpose of this search was to "open up a restaurant/lounge under the name Japonais." (*Id.* at 70.) He explained that he has been looking in areas in and around New York City including Manhattan and Long Island. (*Id.* at 69.) He testified that he is not using a real estate agent, but has "viewed plenty of properties" and has in fact found "suitable locations." (*Id.* at 70.) When pressed for details, Tuccillo stated, "[s]pecific locations I can't give you," but ultimately testified that he was "continually looking in Manhattan," particularly in the meat-packing district in Manhattan's lower west side. [9] (*Id.* at 69, 71.) When asked directly if he had found a property, however, Tuccillo answered, "Well, we have some properties in mind." (*Id.* at 82.) Tuccillo has not explained his use of the word "we."

---

9    Although the parties' attorneys agreed during Tuccillo's [*14] deposition that his testimony concerning locations would be marked "confidential," (Tuccillo Dep., at 67-68), Tuccillo has not sought a protective order despite Geisha's citations to this testimony in its LR 56.1 statement and summary judgment briefs; and in any event, given that Tuccillo's testimony was non-specific as to the location of his planned restaurant, the court finds nothing in that testimony that warrants continued confidentiality.

---

Relying on these portions of Tuccillo's deposition testimony, Geisha asserts that Tuccillo has "made substantial and meaningful preparations" to use the Japonais name and design in connection with "a Japanese-French style restaurant and lounge in or around New York City." (Pl.'s 56.1 P 24.) Tuccillo cites to precisely the same material in denying having made "substantial and meaningful preparations." (Def.'s 56.1 P 24.)

The court declines to adopt either of these characterizations. Regardless of which of them is more accurate, it is undisputed that Tuccillo has refused to abandon his ITU Application for the Japonais design. (Pl.'s 56.1 P 23.) Indeed, shortly after briefing on Geisha's summary judgment motion was complete, Tuccillo on April 10, [*15] 2006 filed with the PTO the second of four requests--all granted--for a six-month extension of time to file a Statement of Use. (*Id.* P 24; Def.'s 56.1 P 24.) The request confirmed Tuccillo's "bona fide intention" to use the registered mark, and stated that his "ongoing efforts to use the mark" included "product or service research development" and "market research." [10] (SOU Extension Request, Pl.'s Ex. 7, at Ex. A.)

---

10    The PTO granted Tuccillo's fourth request for an extension on August 13, 2007. TARR Status for Serial No. 76599761, http://www.uspto.gov/main/trademarks.htm (search performed). The court notes that because the time period during which an applicant must file a Statement of Use may not extend beyond 36 months from the issuance of a notice of allowance, *see* 37 C.F.R. § 2.89(e)(1), Tuccillo must file that statement, verifying that he is using the mark in connection with restaurant and lounge services, before August 23, 2008; a failure to do so would "result in the abandonment of [Tuccillo's] application." *See* 37 C.F.R. § 2.88(h).

---

Finally, Tuccillo testified in his deposition--which was taken before the opening of Geisha's New York Japonais--as to the possibility of Geisha's [*16] opening a restaurant in New York under that name. When asked how he would handle potential customer confusion if both he and Geisha opened competing Japonais restaurants in New York, Tuccillo answered, "It [sic] won't be another restaurant with that name. There will only be one. And throughout the whole United States, too." (Tuccillo Dep., at 75.) When asked why he believed Geisha would not open a New York Japonais, Tuccillo baldly asserted that "if I have a restaurant in New York under the name Japonais, there won't be another one." (*Id.* at 79.)

## D. This Lawsuit and Geisha's Request for a Declaratory Judgment

Geisha brings ten claims against Tuccillo, alleging trademark infringement and false designation of origin under *15 U.S.C. § 1125(a)* (Count I), common law misappropriation (Counts III and IV), conversion (Count V), violation of the Illinois Deceptive Trade Practices Act (Count VI), unfair competition (Count VII), interference with prospective business relations and contractual relationships (Counts VIII and IX), and unjust enrichment (Count X). Count II of Geisha's complaint seeks a declaratory judgment that Tuccillo's "intended use of the Japonais design would constitute infringement [*17] of [Geisha's] national rights in that mark under *Section 1125(a)*." (Compl. P 48.)

Geisha has moved for summary judgment only as to Count II. Elaborating on its prayer for relief in the Complaint, Geisha seeks a declaration that "Geisha's rights in the Japonais Design are superior to those of Tuccillo and that Tuccillo's intended use of the Japonais Design in connection with the provision of restaurant and lounge services would constitute infringement of Geisha's exclusive rights in the Japonais Design." (Memorandum in Support of Geisha's Motion for Summary Judgment ("Pl.'s Mem."), at 15.) Tuccillo argues that a declaratory judgment would be improper: because he has not yet used the Japonais design in connection with a restaurant or lounge, Tuccillo maintains that there exists no "real or immediate controversy" to support declaratory judgment jurisdiction, and urges that Geisha is merely asking the court to render an advisory opinion with respect to the parties' trademark rights. (Tuccillo's Response to Geisha's Motion for Summary Judgment ("Def.'s Resp."), at 1-2.) Tuccillo further argues that Geisha has failed to establish nationwide rights in the Japonais design in any event. (*Id.* at 7.) [*18] The court addresses the issues raised by these arguments below.

## DISCUSSION

### I. Availability of Declaratory Judgment

The Declaratory Judgment Act authorizes a federal court, "[i]n a case of actual controversy within its jurisdiction," to "declare the rights and other legal relations of any interested party seeking such declaration." *28 U.S.C. § 2201*. Because the Act is not in itself a source of federal subject matter jurisdiction, the court must possess an independent basis for jurisdiction. [11] *See GNB Battery Techs., Inc. v. Gould, Inc., 65 F.3d 615, 619 (7th Cir. 1995)* (citing *Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671, 70 S. Ct. 876, 94 L. Ed. 1194 (1950)*). Where such a basis exists, "[t]he sole requirement for jurisdiction under the Act is that the conflict be real and immediate, i.e., that there be a true, actual 'controversy' required by the Act.'" *Cardinal Chem. Co. v. Morton Int'l, Inc., 508 U.S. 83, 96, 113 S. Ct. 1967, 124 L. Ed. 2d*

*1 (1993)* (quoting *Arrowhead Industrial Water, Inc. v. Ecolochem, Inc., 846 F.2d 731, 734-35 (Fed. Cir. 1988)* (citations omitted)). This "actual controversy" requirement is equivalent to Article III's case-or-controversy requirement, *see MedImmune, Inc. v. Genentech, Inc., 127 S. Ct. 764, 771, 166 L. Ed. 2d 604 (2007)*, [*19] and thus incorporates Article III doctrines of ripeness and standing. *See Teva Pharm. USA, Inc. v. Novartis Pharm. Corp., 482 F.3d 1330, 1336-38 (Fed. Cir. 2007)*. The party seeking a declaratory judgment in federal district court bears the burden of establishing the existence of an actual controversy. *Cardinal Chem., 508 U.S. at 95* (citing *Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240-41, 57 S. Ct. 461, 81 L. Ed. 617 (1937)*). Even if declaratory judgment jurisdiction is thereby established, courts have discretion to decline to exercise that jurisdiction. *Tempco Elec. Heater Corp. v. Omega Eng'g, Inc., 819 F.2d 746, 747 (7th Cir. 1987)*.

> 11 Here, Geisha invokes federal question jurisdiction, *28 U.S.C. § 1331*, pursuant to the Lanham Act, *15 U.S.C. § 1121*, as well jurisdiction-enabling statutes relating to trademarks and unfair competition. *28 U.S.C. § 1338(a) & (b)*. These jurisdictional bases are evident from the Complaint, which indeed states claims under the Lanham Act (Count I) and for unfair competition in association with a trademark claim (Count VII). As discussed at the conclusion of this opinion, however, the evidence calls into question the viability of Geisha's trademark infringement claim, which in [*20] turn has implications for the court's continued jurisdiction over this action. As Geisha has not identified its members, it has not established that the parties are diverse in citizenship. *See Cosgrove v. Bartolotta, 150 F.3d 729, 731 (7th Cir. 1998)* ("the citizenship of an LLC for purposes of the diversity jurisdiction is the citizenship of its members.").

### A. Standard for Determining "Actual Controversy"

As a preliminary matter, the court must ascertain the correct legal standard for determining whether the present controversy is "real and immediate," thus satisfying the "actual controversy" requirement for jurisdiction under the Declaratory Judgment Act. As Geisha points out, in declaratory judgment actions relating to trademarks, the Seventh Circuit has looked to patent infringement cases for the requirements for establishing an actual controversy. *See, e.g., G. Heileman Brewing Co. v. Anheuser-Busch, Inc., 873 F.2d 985, 990 (7th Cir. 1989)*. The court follows a similar course here, and thus takes particular note of Federal Circuit authority. In a typical declaratory judgment action in the patent context, a potential infringer sues a patentee, seeking a declaration of



noninfringement, [*21] invalidity of the patent, or both. *Lang v. Pacific Marine and Supply Co., Ltd., 895 F.2d 761, 763 (Fed. Cir. 1990); see, e.g., Microchip Tech Inc. v. Chamberlain Group, Inc., 441 F.3d 936, 939 (Fed. Cir. 2006).* Until quite recently, the Federal Circuit articulated a two-part test for determining the existence of an "actual controversy" in such cases: the declaratory plaintiff (i.e., the potential infringer) must establish both "(1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such an activity." *Teva Pharm., 482 F.3d at 1339; see Microchip Tech., 441 F.3d 936 at 942; see also G. Heileman Brewing Co., 873 F.2d at 990* (adopting similar "reasonable apprehension of suit" standard in trademark case). Tuccillo relies heavily on this test, noting that he has never threatened Geisha with suit. (Def.'s Resp., at 2-3.)

The "reasonable apprehension of suit" test, *see SanDisk Corp. v. STMicroelectronics, Inc., 480 F.3d 1372, 1380 (Fed. Cir. 2007),* however, is [*22] inapplicable here for two reasons. First, as Geisha points out, this case reverses the roles of the parties in a typical, "defensive" declaratory judgment action because the putative owner of the intellectual property (Geisha) is acting "offensively" by suing a potential future infringer (Tuccillo). More significantly, though neither party appears to have noticed, the Federal Circuit has now discarded the test altogether in the wake of the Supreme Court's *MedImmune* decision, which explicitly addressed the question of what constitutes an "actual controversy" for purposes of the Declaratory Judgment Act. [12] *See SanDisk, 480 F.3d at 1380* ("The Supreme Court's opinion in *MedImmune* represents a rejection of our reasonable apprehension of suit test"); *Teva Pharm., 482 F.3d at 1339* (holding that *MedImmune* "overruled" the Federal Circuit's reasonable-apprehension-of-suit test for determining the existence of an "actual controversy").

[12]  *MedImmune* was decided after briefing on the instant motion was complete.

The declaratory judgment plaintiff in *MedImmune,* a drug manufacturer, had entered into a licensing agreement in which it agreed to pay royalties to defendant Genentech on sales of products [*23] covered by Genentech's two patents, one of which was pending at the time of the agreement. *127 S. Ct. at 768.* After the pending application issued as the "Cabilly II" patent, Genentech delivered a letter to plaintiff MedImmune, expressing its belief that MedImmune's drug Synagis, from which MedImmune derived most of its revenue, was covered by Cabilly II and that royalties were thus due. *Id.* MedIm-

mune construed the letter as a threat to terminate the license agreement and sue for patent infringement if MedImmune did not pay the requested royalties. *Id.* MedImmune paid the royalties under a reservation of its rights, and filed a declaratory judgment action that sought, *inter alia,* a declaration that Synagis did not infringe and that the Cabilly II patent was invalid. *Id. at 768-69.* The district court dismissed for lack of subject matter jurisdiction, holding that MedImmune, as a licensee in good standing, could have no reasonable apprehension of suit as long as it continued to pay royalties; the Federal Circuit affirmed. *Id. at 768.*

The Supreme Court reversed. Noting that the actual controversy requirement would have easily been satisfied had MedImmune broken the licensing agreement by [*24] refusing to pay royalties, *id. at 771-72,* the Court held that MedImmune was not required to do so in order to seek a declaratory judgment that the underlying patent was invalid or not infringed. *Id. at 777.* The Court explained that the phrase "actual controversy" in the Declaratory Judgment Act "refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III." *Id. at 771.* Thus, for a court to have jurisdiction over a declaratory judgment action, what is required is that "the dispute be 'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that it be 'real and substantial' and 'admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *Id. at 771* (quoting *Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240-41, 57 S. Ct. 461, 81 L. Ed. 617 (1937)).* In other words, "'the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Id.* (quoting [*25] *Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S. Ct. 510, 85 L. Ed. 826 (1941)).* The Court admitted, however, that these standards "do not draw the brightest of lines between those declaratory-judgment actions that satisfy [Article III's] case-or-controversy requirement and those that do not." *Id.*

In a footnote, the Court noted that the Federal Circuit's reasonable-apprehension-of-suit test conflicted with the Court's precedent; the Court cited non-patent cases in which declaratory judgment jurisdiction obtained even though the plaintiffs either had no indication that the defendant would file suit, or the defendant could not have sued the plaintiff at all. *Id. at 774 n.11* (citing *Maryland Cas. Co., 312 U.S. at 273 & Aetna Life Ins., 300 U.S. at 239.*) As noted above, the Federal Circuit, relying on this footnote and the holding of *MedImmune,* has since concluded that the decision "eliminated" the



2007 U.S. Dist. LEXIS 65348, *

test altogether. *See Honeywell Int'l. Inc. v. Universal Avionics Sys. Corp., 488 F.3d 982, 995 (Fed. Cir. 2007).* Indeed, post-*MedImmune*, it is "clear that a declaratory judgment plaintiff does not need to establish a reasonable apprehension of a lawsuit in order to establish that there is an actual controversy [*26] between the parties." *Sony Elecs., Inc. v. Guardian Media Techs., Ltd., F.3d , 2007 U.S. App. LEXIS 18465, 2007 WL 2215762, at *11 (Fed. Cir. Aug. 3, 2007).*

The above developments in the case law render Tuccillo's proposed legal standard incorrect, and likewise moot any argument based on his assertion that he never threatened Geisha with a lawsuit. Geisha's proposed test for determining the existence of an "actual controversy" fares no better, however. As noted, this case presents the converse of the typical declaratory action in which a potential infringer seeks a declaration that the underlying patent (or trademark) is invalid and/or that the plaintiff's current or planned future activities do not infringe; here, Geisha seeks a declaration of its trademark rights in the Japonais design as opposed to Tuccillo's rights, and a declaration that Tuccillo's planned restaurant would infringe on those rights. In *Lang*, upon which Geisha relies for its proposed legal standard, the Federal Circuit addressed this type of situation and modified the reasonable-apprehension-of-suit test to fit the reversed circumstances. The defendant in *Lang* was in the process of manufacturing a ship's hull that the plaintiff contended [*27] would infringe its patent when finished. *895 F.2d at 763.* Considering the plaintiff's request for a declaratory judgment, the court recognized that declarations of infringement sought by patentees against alleged future infringers are atypical. Nonetheless, as long as there are sufficient allegations of "immediacy and reality," the court found "no reason why a patentee should be unable to seek a declaration of infringement against a future infringer when a future infringer is able to maintain a declaratory judgment action for noninfringement under the same circumstances." *Id. at 764.*

The *Lang* court articulated the following two-part reasonable-apprehension test, which Geisha proposes as the legal standard applicable here: "(1) the defendant must be engaged in an activity directed toward making, selling, or using subject to an infringement charge . . ., or be making meaningful preparation for such activity; and (2) acts of the defendant must indicate a refusal to change the course of its actions in the face of acts by the patentee sufficient to create a reasonable apprehension that a suit will be forthcoming." *Id.* The court explained that the first prong of this test, which looks to [*28] the potential infringer's conduct, is "identical" to the second prong of the test used in the typical situation where the potential infringer is the plaintiff. *Id.* The second prong, according to the court, "is similar to the reasonable ap-

prehension prong in the normal action." *Id.* Having formulated this test, however, the court did not explicitly apply it; rather, the court simply found that because the defendant's hull would not be complete until nine months after the complaint was filed, and given that the defendant had "engaged in [no] activity indicating that the ship would soon be ready for sea," there was "no substantial controversy . . . of sufficient immediacy and reality to warrant consideration of [the plaintiff's] claim for declaratory relief." *Id. at 764-65.*

Given the close similarity between the two-part test articulated in *Lang* and the traditional reasonable-apprehension-of-suit test that has been abandoned after *MedImmune*, the court concludes that the *Lang* test likewise is no longer good law. [13] The court thus disregards the parties' proposed legal standards for determining whether an "actual controversy" exists in this case to provide the court with jurisdiction over [*29] Geisha's request for declaratory relief, and adopts the standard as articulated in *MedImmune* and subsequent Federal Circuit decisions in patent cases. [14] The ultimate test is whether, "under all the circumstances," a "definite and concrete" controversy exists between parties having adverse legal interests; the controversy must be of sufficient "immediacy and reality to warrant the issuance of a declaratory judgment," such that a declaration would not simply amount to "an opinion advising what the law would be upon a hypothetical state of facts." *MedImmune, 127 S. Ct. at 771* (citations omitted); *see Teva Pharm., 482 F.3d at 1338* ("a declaratory judgment plaintiff is only required to satisfy Article III, which includes standing and ripeness, by showing under 'all the circumstances' an actual or imminent injury caused by the defendant that can be redressed by judicial relief and that is of 'sufficient immediacy and reality.'") (quoting *MedImmune, 127 S. Ct. at 771*). The party claiming declaratory judgment jurisdiction must establish that an actual controversy existed at the time of the filing of the complaint. *See Benitec Australia, Ltd. v. Nucleonics, Inc., F.3d , 2007 U.S. App. LEXIS 17299, 2007 WL 2069646, at *3 (Fed. Cir. July 20, 2007).*

13  The [*30] court further notes that the wording of the second prong of the *Lang* test--the defendant's "refusal to change the course of its actions in the face of acts by the patentee sufficient to create a reasonable apprehension that a suit will be forthcoming"--is somewhat confusing in that it is unclear, from this language, from which party a suit would be forthcoming and which party would thus need to have a "reasonable apprehension" of suit.

14  The Seventh Circuit has yet to address the impact of *MedImmune*, and, as noted, has looked

2007 U.S. Dist. LEXIS 65348, *



to patent decisions in ascertaining standards for declaratory judgment actions in trademark cases. The court is thus comfortable in looking to Federal Circuit decisions for the appropriate legal standard.

## B. No "Actual Controversy" Is Present in This Case

Geisha argues that a "real and immediate" controversy exists and is ripe for adjudication because Tuccillo's expressed intention to open a restaurant, under the name "Japonais" and using the Japonais design, and his preparations in this regard, constitute "activity directed towards infringing Geisha's rights in the Japonais design." (Pl.'s Mem., at 8 (citation omitted).) Tuccillo maintains that there is no actionable [*31] controversy here. He notes that he has no trademark rights in the Japonais design because he has not yet used the mark in connection with restaurant and lounge services, and that he therefore would be unable to maintain a cause of action against Geisha; according to Tuccillo, his own inability to bring a cause of action precludes the existence of an "actual" controversy." (Def.'s Resp., at 3-5.) He further argues that his steps towards opening a restaurant, which he now characterizes as merely "driving around looking for a location," are insufficient to create a "real and immediate" controversy. (Tuccillo's Sur-Reply to Geisha's Motion for Summary Judgment, at 3.) The court finds the latter argument persuasive, and concludes, as explained below, that in light of the *MedImmune* standard and subsequent Federal Circuit case law, the present controversy indeed lacks sufficient "immediacy and reality." *See MedImmune, 127 S. Ct. at 771.*

As noted, *MedImmune* itself acknowledged that its articulated standard for determining the existence of an "actual controversy" does not amount to a bright-line rule. *See 127 S. Ct. at 771.* A handful of subsequent Federal Circuit cases, however, have begun to [*32] suggest the contours of declaratory judgment jurisdiction in patent cases--albeit only in the "typical" circumstance where a potential infringer seeks a declaration that the other party's patents are invalid and/or that its own products do not infringe. Of these decisions, the court finds *Benitec Australia* particularly relevant here. In that decision, the court concluded that sufficient immediacy and reality did not exist to support jurisdiction over the defendant's declaratory judgment counterclaim once the plaintiff had voluntarily dismissed its infringement claim. *Benitec Australia, 2007 U.S. App. LEXIS 17299, 2007 WL at *2, 6-7.* Benitec sued Nucleonic for infringing Benitec's gene-therapy patent. *Id. 2007 U.S. App. LEXIS 17299 [WL] at *1.* Nucleonic initially moved to dismiss on the basis that it was years away from introducing any infringing gene-therapy drug products, but eventually amended its answer to include a counterclaim seeking a declaration that the patent was invalid and unenforceable. *Id. 2007 U.S. App. LEXIS 17299 [WL] at *1-2.* After Benitec dismissed its own complaint in light of an unfavorable Supreme Court decision, the district court dismissed Nucleonic's counterclaim for lack of jurisdiction. *Id. 2007 U.S. App. LEXIS 17299 [WL] at *2.* Addressing the jurisdictional issue "strictly under [*33] the framework of *MedImmune*," *id. 2007 U.S. App. LEXIS 17299 [WL] at *5,* the Federal Circuit affirmed. [15] The court discussed Nucleonic's allegedly infringing intentions separately with respect to its plans for human and animal gene-therapy drug treatment. The parties agreed that Nucleonic's activities related to human treatment could not be considered infringing unless and until Nucleonic filed a new drug application ("NDA") with the Food and Drug Administration ("FDA"). *Id. 2007 U.S. App. LEXIS 17299 [WL] at *5.* Nucleonic did not anticipate filing an NDA, however, until "at least 2010-12, if ever," and its current activities consisted entirely of developing and submitting (unidentified) preliminary information to the FDA. *Id.* The court found no actual controversy in such circumstances: "The fact that Nucleonics may file an NDA in a few years does not provide the immediacy and reality required for a declaratory judgment." *Id.* Similarly, Nucleonic's averred intent to expand into the area of animal treatment and veterinary care--which it asserted would not require an NDA for its products to be found infringing--was insufficient to support jurisdiction. *Id. 2007 U.S. App. LEXIS 17299 [WL] at *7.* Nucleonic's activities in this regard consisted only of discussions with an unnamed [*34] potential customer, with whom Nucleonic had executed a confidentiality agreement. *Id.* In short, the court explained, Nucleonic's "vaguely defined potential expansion" to animal and veterinary products did not "meet the immediacy and reality requirement of *MedImmune* necessary to support a justiciable controversy." *Id. 2007 U.S. App. LEXIS 17299 [WL] at *7-8.*

> 15    There was no question that declaratory judgment jurisdiction existed at the time Nucleonic filed its counterclaim requesting such relief, given Benitec's pending infringement claim; because an "actual controversy" must continue even after jurisdiction is first invoked, however, the issue emerged after Benitec dismissed its complaint, leaving the counterclaim for declaratory relief standing alone. *Benitec Australia, 2007 U.S. App. LEXIS 17299, 2007 WL at *3.*

The *Benitec Australia* court, like the court in *Lang,* discussed above, thus focused on whether the potential infringer's proposed future activities were definite enough, or had progressed sufficiently, to create a "real and immediate" threat of infringement. Indeed, this court takes note of the holding in *Lang,* for although that deci-

sion is less persuasive in light of its use of the now-discredited "reasonable apprehension of suit" test, [*35] it did specifically address the reversed-role situation present in this case. *See 895 F.2d at 764.* Moreover, as noted, the court did not explicitly apply that test; indeed, the plaintiff's apprehension of a lawsuit did not factor into the court's analysis at all. Instead, as in *Benitec Australia* and consistent with the *MedImmune* standard, the *Lang* court found that the controversy lacked "sufficient immediacy and reality" because the allegedly infringing product--the ship's hull--was far from complete when the complaint was filed, and the defendant had not engaged in activity indicating that the ship would be "soon be ready for sea," which use would be required for any finding of infringement. *Id. at 764-65.*

Here, too, it does not appear that the event that would allegedly infringe Geisha's asserted trademark rights in the Japonais design--Tuccillo's opening of his own "Japonais" restaurant--was in any imminent danger of occurring when this action was filed. It is undisputed that Tuccillo has a "firm intent" to use the name "Japonais" and the Japonais design in connection with the provision of restaurant and lounge services, (Def.'s 56.1 P 24); indeed, Tuccillo asserted his "bona fide [*36] intention" to do so when he filed his verified ITU Application with the PTO, and it is further undisputed that he has "refused to abandon" that application. (*Id.* P 23.) Yet his actual preparations for opening a restaurant do not appear to have advanced significantly beyond this statement of intent. Pointing to selected statements in Tuccillo's deposition testimony, Geisha contends that he has "taken significant steps toward opening a restaurant." (Plaintiff's Reply Brief in Support of Its Motion for Summary Judgment, at 5.) In the court's view, however, Tuccillo's testimony reveals little in the way of significant activity. Essentially, Tuccillo's preparations for opening his own "Japonais" restaurant, according to his deposition testimony, have consisted entirely of "play[ing] around with" a menu and searching for a suitable location. The former is of little consequence; and the latter activity would carry more significance but for the fact that Tuccillo's search for a property does not appear either serious or advanced. As of the time of his deposition in January 2006, he had not found a location: he testified that he "do[es]n't have specific properties right now," (Tucillo Dep., [*37] at 69), and when asked directly if he had found a property, he answered that he merely "ha[s] some properties in mind." (*Id.* at 82.) He was not using a real estate agent, and when asked to explain what he meant by "aggressively pursuing" a location, he answered, "I am out myself driving around and doing my due diligence." (*Id.* at 69.) Even his testimony that he was searching in Manhattan's meatpacking district is offset by the fact that he also testified to looking in other areas near the city, including Nassau County and

elsewhere on Long Island. (*Id.* at 69.) Nor does the record reveal whether Tuccillo has ever opened a restaurant before, or indeed whether he has any food service experience beyond his frozen seafood business.

Moreover, in addition to lacking in specifics, Tuccillo's testimony fails to establish the necessary time frame. As noted, Geisha must show an actual, "real and immediate" controversy as of the time Geisha filed its complaint requesting declaratory relief--September 26, 2005. *See Benitec Australia, 2007 U.S. App. LEXIS 17299, 2007 WL 2069646, at *3.* Tuccillo's deposition was taken in January 2006. Although he testified that he has been searching for a suitable property "since 2002," (Tuccillo [*38] Dep., at 69), there is no indication in his testimony as to which aspects of that search took place prior to September 2005. Tuccillo does assert that he purchased a Chinese restaurant in 2002 with the intention of converting it into a Japanese-style restaurant, and even created a "design layout"; but the fact that he decided instead to lease out the space in 2003 suggests that he in fact abandoned that plan long before September 2005. Similarly, Geisha's citation to Tuccillo's April 10, 2006 request for an extension of time to file a Statement of Use with the PTO is irrelevant to a determination of whether an actual controversy existed when Geisha filed its complaint.

Tuccillo's activities thus appear akin to those of the counterclaiming defendant in *Benitec Australia,* and the plaintiff in *Lang.* The allegedly infringing activity in this case--Tuccillo's opening of a restaurant using the name "Japonais" and the Japonais design--was far from imminent when this action was filed, and may never happen at all, given the subsequent opening and success of Geisha's New York Japonais. The evidence shows merely Tuccillo's stated intent to open a restaurant--like Nucleonic's avowed intent to expand [*39] into animal treatment in *Benitec Australia*--and some preliminary steps that Tuccillo has taken, lacking much in the way of specific details that might indicate concrete action. Similar to Nucleonic's contract discussions with a potential customer, Tuccillo's description of his search for a suitable location for his restaurant suggests a mere and distant possibility of potentially infringing activity, rather than a real, immediate, or imminent threat.

The case upon which Geisha relies, *Glaxo Group Ltd. v. Apotex, Inc., 130 F. Supp. 2d 1006 (N.D. Ill. 2001),* does not require a contrary conclusion. There, Glaxo marketed and sold an antibiotic, Ceftin, which was covered by a patent that Glaxo owned but which was set to expire in 2003. *Id. at 1007.* In 2000, Apotex, a Canadian generic drug manufacturer, filed an abbreviated new drug application ("ANDA") with the FDA for permission to market a generic version of Ceftin. *Id.* Both parties predicted that the FDA would approve the ANDA before



expiration of Glaxo's patent. *Id.* Following Apotex's filing of the ANDA, Glaxo wrote several letters to Apotex, requesting information regarding Apotex's plans for marketing generic Ceftin in the United States. [*40] *Id. at 1008.* Receiving no response, Glaxo filed a lawsuit seeking a declaratory judgment that Apotex's "threatened acts of manufacture, importation and sale of products covered by [Glaxo's] patent" would infringe that patent, and an injunction preventing Apotex from selling generic Ceftin until after the patent expired. *Id.* Apotex moved to dismiss for lack of a justiciable controversy, arguing that the allegations did not establish that it had "decided whether and when to market" the allegedly infringing generic drug. *Id.*

The district court, finding a sufficient "actual controversy," denied the motion. The court found that Apotex's filing of the ANDA, coupled with its refusal to respond to Glaxo's letters and the "enormous amount of money at stake"--yearly sales of Ceftin exceeded $ 600 million--led to "the inescapable conclusion" that Apotex planned to enter the market "as soon as possible." *Id. at 1008- 09.* [16] Here, Geisha attempts to draw an analogy between Apotex's ANDA and Tuccillo's ITU Application: because the court in *Glaxo* found that the ANDA represented "meaningful preparations to be ready to market the allegedly infringing product," *id. at 1008,* the ITU Application establishes, [*41] according to Geisha, that Tuccillo has engaged in "meaningful preparation directed towards using the Japonais design." (Pl.'s Mem., at 7.)

16    The court in Glaxo utilized the now-obsolete two-part *Lang* test, but did not find Glaxo's reasonable apprehension of suit to be a significant factor.

The court finds that analogy unpersuasive, and *Glaxo* distinguishable from the present circumstances in several respects. First, the parties in that case *agreed* that Apotex's filing of the ANDA "means that [Apotex] is ready to or has at least made meaningful preparations" for selling its allegedly infringing generic drug. *Glaxo, 130 F. Supp.2d at 1008.* Here, of course, Tuccillo explicitly denies that the ITU Application or any of his activities amount to "substantial and meaningful preparations," (Def.'s 56.1 P 24), and, as explained above, Tuccillo does not appear to have taken significant steps towards opening a New York Japonais restaurant in any event. Second, the controversy was imminent in *Glaxo* because Apotex itself acknowledged that the FDA would likely approve the ANDA before the expiration of Glaxo's patent, thus clearing the way for Apotex to market infringing products. Tuccillo's activities [*42] do not similarly suggest that his restaurant is likely to open in the near future. Third, given the circumstances in *Glaxo*--a top-selling drug worth hundreds of millions of dollars, an

expiring patent, and a generic drug manufacturer who had filed an application for approval to sell a generic version, it was indeed "obvious" in that case that the defendant planned to enter the United States market with a potentially infringing product. *130 F. Supp. 2d at 1009.* In contrast, given that Tuccillo, who has never opened any restaurant, has taken few concrete steps towards opening his "Japonais" restaurant, it is not at all obvious that potentially infringing activity will occur in this case.

The court further notes that other post-*MedImmune* Federal Circuit decisions have found declaratory judgment jurisdiction proper by emphasizing the fact that the parties had explicitly articulated their positions with respect to infringement and validity; thus, the controversies had crystallized to the point where any further delay in adjudication of the dispute would be unnecessary. In *SanDisk,* for example, the parties had engaged in cross-licensing negotiations, during which each party presented extensive [*43] detailed analyses of the ways in which the other's products infringed its own patents. *480 F.3d at 1374-75.* The court vacated the district court's dismissal of the plaintiff's request for declaratory relief, which dismissal had been based on the now-irrelevant fact that the defendant had explicitly represented that it would not file an infringement suit. *Id. at 1376, 1383.* Explaining that declaratory judgment jurisdiction depends on "the facts and circumstances of each case," *id. at 1381,* the court found it sufficient that the defendant "had made a studied and determined infringement determination and asserted the right to a royalty based on this determination[,]" and that the plaintiff had explicitly "maintained that it could proceed in its conduct without the payment of royalties" to the defendant. *Id. at 1382; see also Sony Elecs., 2007 U.S. App. LEXIS 18465, 2007 WL 2215762, at *12-15* (declaratory judgment jurisdiction proper where plaintiffs, potential infringers, and defendant patent owner "had taken adverse positions" prior to filing of suit as to whether patents were invalid and whether plaintiffs' products infringed; parties had sufficiently identified the basis for their positions so that the controversy [*44] was "definite and concrete").

In the case before this court, the parties' articulation of their respective positions with regard to trademark rights and potential infringement was less specific. Long's September 9, 2005 letter to Tuccillo's trademark attorney, Bellus, asserted Geisha's rights in the Japonais design through "actual use" in connection with the Chicago restaurant; significantly, Long did not assert that those trademark rights extended nationwide, but merely stated that the restaurant had received "nationwide publicity." (Pl.'s Ex. 5, at Ex. A.) Bellus's response asserted that when the PTO issued a registration of the mark from Tuccillo's application, Tuccillo would have "nationwide rights," except in those areas where Geisha "can establish



2007 U.S. Dist. LEXIS 65348, *

rights that predate [Tuccillo's] filing date." (Pl.'s Ex. 5, at Ex. B.) In the court's view, this represents more of a preliminary exchange of initial positions rather than the explicit analyses of patent validity and infringing products that the *SanDisk* court found sufficient to create a definite and concrete controversy. In any event, there was no question in *SanDisk* that the possibility of infringement was "real and immediate," for [*45] the plaintiff was already producing products that the defendant believed were infringing; rather, the parties' dispute centered on whether the plaintiff should pay royalties. *480 F.3d at 1375-76.*

In light of the court's conclusion that Tuccillo's allegedly infringing future activity lacks sufficient immediacy and reality, the court need not address his argument that no controversy exists because he would be unable to sue Geisha until he actually uses the trademark. The court notes, however, that it is unclear whether the fact that Tuccillo was not using the mark would, in itself, defeat declaratory judgment jurisdiction. Although Tuccillo is correct that "no rights are conferred by the mere filing of a federal trademark application," *see S Indus., Inc. v. Diamond Multimedia Sys., Inc., 991 F. Supp. 1012, 1019 (N.D. Ill. 1998),* Tuccillo cites no authority for the further proposition that his inability to assert enforceable trademark rights in a suit against Geisha would necessarily preclude *Geisha* from invoking declaratory judgment jurisdiction in a suit against *him.* The court in *Benitec Australia* did identify a defendant's ability to maintain a cause of action against a declaratory [*46] judgment plaintiff as a "useful question to ask in determining whether an actual controversy exists[,]" *2007 U.S. App. LEXIS 17299, 2007 WL 2069646, at *3,* but that factor did not enter the court's analysis. Moreover, *MedImmune* suggests a rejection of Tuccillo's proposed rule, for the Court noted that it had previously exercised jurisdiction "even though the declaratory-judgment defendant could not have sued the declaratory-judgment

plaintiff[] . . . ." *127 S. Ct. at 774 n.11* (citing *Maryland Cas. Co., 312 U.S. at 273).*

In sum, no "actual controversy" exists in this case to support the exercise of jurisdiction under the Declaratory Judgment Act. The court thus declines to reach the merits of Geisha's motion for summary judgment, which seeks a declaration that Tuccillo's potential opening of a restaurant using the Japonais name and design would infringe Geisha's trademark rights in the Japonais design as a matter of law. Because Tuccillo's allegedly infringing activity lacks "sufficient immediacy and reality," any such declaration would amount to little more than an improper "opinion advising what the law would be upon a hypothetical state of facts." *Id. at 771* (citations omitted). Geisha's request for declaratory [*47] relief must thus be dismissed for lack of subject matter jurisdiction. *See FED. R. CIV. P. 12(h)(3).*

## CONCLUSION

For the foregoing reasons, Geisha's motion for summary judgment (26) is denied, and Count II of the Complaint is dismissed without prejudice. In light of the evidence demonstrating that Tuccillo has apparently not yet engaged in any infringing activity, Geisha's claim of trademark infringement (Count 1), which serves as the basis for the court's jurisdiction, is of dubious viability. Accordingly, the court will entertain a motion for summary judgment as to Count I. If that motion results in dismissal of Geisha's infringement claim, the court, absent an amended complaint that establishes diversity jurisdiction, will dismiss the remaining claims without prejudice to re-filing in an appropriate state court.

Dated: September 4, 2007

REBECCA R. PALLMEYER

United States District Judge