Gary A. Hecker, Esq. (State Bar No. 099008)
James M. Slominski, Esq. (State Bar No. 166357)
**THE HECKER LAW GROUP, PLC**
1925 Century Park East, Suite 2300
Los Angeles, California 90067
Telephone:   (310) 286-0377
Facsimile:    (310) 286-0488
Email:        ghecker@hh.com
              Jslominski@hh.com

Attorneys for Plaintiff
Network Video Technologies, Inc.

# IN THE UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NETWORK VIDEO TECHNOLOGIES, INC.,<br><br>                     Plaintiff,<br><br>        v.<br><br>NITEK INTERNATIONAL, LLC and DOES 1-10,<br><br>                Defendants. | Civil Action No. C 08 2208 MHP<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION; DECLARATIONS OF DAN NITZAN AND GARY A. HECKER; EXHIBITS 1-10** |

**DATE:**    **September 15, 2008**
**TIME:**    **2:00 P.M.**
**CRTM:**   **15, 18TH Floor**

**Judge:  Honorable Marilyn Hall Patel**

# TABLE OF CONTENTS

**SECTION**                                                                          **PAGE**

I.    INTRODUCTION ………………………………………...    1

II.   THE CONTROVERSY …………………………………...    3

III.  THE CENTRAL DISTRICT OF CALIFORNIA

      ACTION ………………………………………………...    6

IV.   THE LEGAL STANDARD …………………………….…    7

V.    THERE IS SUBJECT MATTER JURISDICTION ……….    8

VI.   THERE ARE NO UNUSUAL CIRCUMSTANCES

      TO SUPPORT A DISCRETIONARY DISMISSAL ……..    11

VII.  CONCLUSION ……………………………………………    11

# TABLE OF AUTHORITIES

<u>**CASE AUTHORITY**</u> <u>**PAGE**</u>

CAT Tech LLC v. Tubemaster, Inc.,
2008 U.S. App. Lexis 11377 (Fed. Cir. May 28, 2008) ........... 1, 11

Commodities Export Co. v. United States Customs Service,
888 F.2d 431 (6th Cir. 1989) ........................................ 8

Jumara v. State Farm Insurance Company,
55 F.3d 873 (3rd Cir. 1995) ........................................ 7

Lopez v. Smith,
203 F.3d 1122 (9th Cir. 2000) ..................................... 12

Luben Industries, Inc. v. United States of America ,
707 F. 2d 1037, 1040 (9th Cir. 1983) ............................. 10

MedImmune, Inc. v. Genentech, Inc.,
127 S. Ct. 764 (2007) ............................................... 1, 2, 6, 8, 9, 10

Micron Technology, Inc. v. Mosaid Technologies, Inc.,
518 F.3d 897 (Fed. Cir. 2008) ...................................... 1, 2, 3, 9, 10, 11

Minn. Mining and Mfg. Co., v. Norton.,
929 F.2d 670 (Fed. Cir. 1991) ...................................... 11

Morongo Band of Mission Indians v. Rose,
893 F.2d 1074 (9th Cir. 1990) .................................... 12

Ochoa et. al. v. J.B. Martin and Sons Farms, Inc.,
287 F.3d 1182 (9th Cir. 2002) .................................... 8

Offshore Sportswear, Inc. v. Vuarnet International B.V.,
114 F.3d 848 (9th Cir. 1997) ..................................... 10

SanDisk v. STMicroelectronics, Inc.,
480 F.3d 1372 (Fed. Cir. 2007) ..................................... 2, 8, 11

Sony Electronics, Inc. et. al. v. Guardian Media Technologies, Ltd.,

497 F.3d 1271 (Fed. Cir. 2007) ………………………………… 1, 2, 6

Teva Pharmaceuticals USA, Inc. v. Novartis Pharmaceuticals Corp.,

482 F.3d 1330 (Fed. Cir. 2007) ………………………………… 1, 7, 8, 9

Trentacosta v. Frontier Pacific Aircraft Industries, Inc. et. al.,

813 F.2d 1553 (9th Cir. 1986) ………………………………….. 7, 8

United States Internal Revenue Serv. v. Palmer (In re Palmer),

207 F.3d 566 (9th Cir. 2000) ………………………………… 10

Van Dusen v. Barrack, et. al.,

84 S. Ct. 805 (1964) ………………………………………… 7

**STATUTES**

28 U.S.C. § 1404 ………………………………………… 6

28 U.S.C. § 1406 ………………………………………… 7

28 U.S.C. § 2201 ………………………………………… 1

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    **INTRODUCTION**

Plaintiff in this action is Network Video Technologies, Inc. ("NVT"). Defendant is Nitek International, LLC ("Nitek"). NVT has sued Nitek under 28 U.S.C. §2201(a) et. seq. (the Declaratory Judgment Act) seeking a judgment of non-infringement, invalidity and/or unenforceability of United States patent no. 7,193,149 ("the '149 patent"). (Exhibit ("Ex.") 1). Nitek has filed a Motion to Dismiss the Complaint for lack of subject matter jurisdiction. Nitek does not present any other challenges to the Complaint.

This Court has subject matter jurisdiction over this dispute under the standard set forth in MedImmune, Inc. v. Genentech, Inc., 127 S. Ct. 764 (2007) and the Federal Circuit cases that follow. Nitek's motion must, therefore, be denied. NVT and Nitek compete for the sale of products embodying the technology discussed in the '149 patent. Nitek has stated in clear and unambiguous terms to NVT, its customers, and its sales force that Nitek owns the intellectual property rights to the competing technology because of the '149 patent, and intends to enforce those rights. Nitek's actions, including Nitek's efforts to obtain both pre and post Complaint patent royalties from NVT, have created uncertainty in the competitive environment. It is the exact uncertainty that the Declaratory Judgment Act is intended to redress. Micron Technology, Inc. v. Mosaid Technologies, Inc., 518 F.3d 897, 902 (Fed. Cir. 2008); see CAT Tech LLC v. Tubemaster, Inc., 2008 U.S. App. Lexis 11377 at *27-*28 (Fed. Cir. May 28, 2008); Teva Pharmaceuticals USA, Inc. v. Novartis Pharmaceuticals Corp., 482 F.3d 1330, 1336 at n. 2 (Fed. Cir. 2007).

Declaratory Judgment Act is to be applied to: (1) "*prevent avoidable damages from being incurred by a person uncertain of his rights and threatened with damage by delayed adjudication*"; (2) "*fix the problem that arises when the other side does not sue*"; and (3) prevent the owner from engaging in "*extra-judicial patent enforcement*" using "*scare-the customer-and-run*" tactics. Micron, 518 F.3d at 902; Sony

1  Electronics, Inc. et. al. v. Guardian Media Technologies, Ltd., 497 F.3d 1271, 1284-
2  1285 (Fed. Cir. 2007). NVT submits an adjudication of this action would serve those
3  fundamental objectives of the Act. When those objectives are served, dismissal is
4  rarely appropriate. Micron, 518 F.3d at 902.

5       Nitek now argues that there is no justiciable controversy, i.e., subject matter
6  jurisdiction, because: (1) it never directly threatened NVT with suit; and (2) has
7  recently stated it has no "present" intention of suing NVT. Nitek is legally incorrect.
8  Nitek made those same arguments in its previously adjudicated motion to dismiss
9  before the Honorable A. Howard Matz in the United States District Court for the
10 Central District of California, Case CV-07-4789 (hereinafter the "Central District
11 Action"). Based on the same facts and arguments Nitek makes before this Court,
12 Judge Matz determined there **was** subject matter jurisdiction. Thus, he correctly
13 stated: **"I assume that I have subject matter jurisdiction. I think that the**
14 **MedImmune decision and Sony Electronics and SanDisk make that the correct**
15 **conclusion."** [1]  (Ex. 10 at 3:17-22).[2]

16      Judge Matz, however, declined to proceed with that the *Central District Action*
17 for other reasons, the primary reason being he believed the action should have been
18 brought in the Northern District of California where NVT has its principle place of
19 business. (Ex. 10 at 3:22-4:18). NVT, therefore, has now filed this action in the
20 Northern District where Judge Matz believed the case belonged when he dismissed
21 that *Central District Action* without prejudice.

22      Nitek's acts created a cloud in the relevant business community over its primary
23 competitor, NVT, concerning the '149 patent. That cloud infects and pervades the
24 business community for Nitek's competitive advantage. Nitek's equivocal statement
25

26 [1]     The District Court's references to MedImmune, Sony Electronics, and SanDisk
27 refer to MedImmune, Inc. v. Genentech, Inc., 127 S. Ct. 764 (2007), Sony Electronics,
   et al, v. Guardian Media Technologies, Ltd., 497 F.3d 1271 (Fed. Cir. 2007), and
28 SanDisk v. STMicroelectronics, Inc., 480 F.3d 1372 (Fed. Cir. 2007), respectively.
   [2]     Docket Entry 39 in the *Central District Action*.

1  about not suing NVT "presently" is consistent with Nitek's intent to keep the cloud in
2  place as long as possible while attempting to foreclose NVT from having the
3  controversy adjudicated.

4      A party, such as NVT, should not be placed in the untenable position of having
5  to choose between incurring a "*growing potential liability for patent infringement and*
6  *the abandonment of [its] enterprise*".  Id.  Nitek's motion should be denied.

## II.    THE CONTROVERSY

8      NVT is a California Corporation founded in 1990.  (Nitzan Declaration "Decl.",
9  ¶ 4).  NVT designs and sells products for transmitting *closed circuit television*
10  ("CCTV") over *unshielded twisted pair* ("UTP") wire in structured cabling networks
11  (i.e., those commonly used in office buildings for telephone systems and computer
12  networks).  (Nitzan Decl., ¶ 4).  NVT's products enable the use of UTP in those
13  structured cabling systems, and otherwise, for video security cameras and systems
14  (which are referred to as CCTV systems).  (Nitzan Decl., ¶ 5).  NVT is considered the
15  premier supplier of power/video/data ("PVD") twisted pair solutions for the CCTV
16  industry, that is, solutions that enable the transmitting of power, video signals and data
17  signals over UTP.   (Nitzan Decl., ¶ 6).

18      NVT and Nitek are direct competitors.  (Polanek Decl., ¶ 13[3]; Nitzan Decl., ¶ 8;
19  Ex. 2 at 51:12-19).  In fact, NVT is Nitek's primary competitor. (Nitzan Decl., ¶ 8).
20  Like NVT, Nitek also sells products for transmitting CCTV over UTP cabling
21  (including its "*UTPLinks*" products).  (Nitzan Decl., ¶ 8).  Nitek claims that the '149
22  patent covers the use of UTP structured cabling for CCTV applications, including the
23  core technology of Nitek's competing *UPTLinks* products. (Ex. 2 (Polanek deposition
24  transcript with deposition exhibit 2) at 12:1-18:2; 88:23-89:22 and 91:1-15; Exs. 3-5).
25  Nitek and NVT compete for sales for the products systems Nitek claims are covered
26  by the '149 patent.   (Nitzan Decl., ¶ 8; Ex. 2 at 75:1-11 and 88:23-89:22; Exs. 3-5).
27      Upon issuance of the '149 patent, Nitek immediately: (1) sent a targeted email

28  ────────────────
[3]      Submitted as Ex. 5 to Nitek's moving papers.

1  including a patent news release (the "Patent News Release" - which was written

2  personally by Nitek's founder, Mr. Polanek) to NVT stating the '149 patent covers the

3  use of structured cabling for CCTV (Polanek Decl., ¶ 17 (Ex. 5 to Nitek's moving

4  papers); Ex. 2 at 12:1-18:2 and 88:23-89:22); (2) sent targeted emails to NVT sales

5  force that included the Patent News Release describing how Nitek claims to hold the

6  intellectual property (i.e., patent) rights that cover the use of UTP structured cabling

7  for CCTV; (Nitzan Decl., ¶ 12; Exs. 3-5); (3) sent the Patent News Release directly to

8  NVT customers (Nitzan Decl., ¶ 13); (4) informed NVT's sales representatives at the

9  industry's most important trade show that Nitek was going to enforce the '149 patent

10  against competitors such as NVT (Nitzan Decl., ¶¶ 14-15);[4] and (5) [■■■■■■■

11  ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

12  ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

13  ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

14  ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

15  ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

16  ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

17  ■■■■].[6] (Ex. 6 at ¶ 3.1).

18  [■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

19  ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

20  ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

21  ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

---

22  [4]    Nitek disputes making this statement. NVT submits that its evidence should be
23  considered true or, at a minimum, an evidentiary hearing should be held to resolve this
   disputed fact.

24  [5]    At the time of the filing of the *Central District Action*, Anixter and Nitek were
25  co-owners of the '149 Patent. After the Complaint was served, Anixter transferred all
   of its rights in the '149 patent to Nitek. (Ex. 8). Shortly thereafter, Anixter was
26  dismissed from that action without prejudice. (Docket Entry # 6 in the *Central District
   Action*).

27  [6]    Information contained in [ ]'s has been designated Highly Confidential-
   Attorney's Eyes Only by the parties and is filed under seal pursuant to the Protective
28  Order in the *Central District Action*.



.] NVT had neither the need nor interest in a patent license, however. From the outset, NVT firmly believed that it did not, and does not, infringe

1    the '149 patent and that it is invalid and unenforceable.

2          On July 25, 2007, NVT filed the *Central District Action* naming both Nitek and

3    Anixter (as a co-owner and necessary party) as defendants to adjudicate the

4    controversy created by Nitek's actions after the '149 patent issued.

5    **III.    THE CENTRAL DISTRICT OF CALIFORNIA ACTION**

6          Nitek and NVT have informed this Court (e.g., Complaint on page 5 at fn. 1)

7    that NVT previously filed a Declaratory Judgment Action in the United States District

8    Court for the Central District of California, Case CV-07-4789 (hereinafter the

9    "*Central District Action*"). Nitek's characterization of the *Central District Action* and

10   its disposition, however, is incorrect and misleading. The following chronology sets

11   forth the actual events.

12         On July 25, 2007, NVT filed the *Central District Action*. NVT contended that

13   the '149 patent was not infringed, is invalid, and is unenforceable. On November 9,

14   2007, Nitek filed a motion to dismiss. In its motion, Nitek argued that the District

15   Court lacked subject matter jurisdiction (alleging there was no controversy) and

16   lacked personal jurisdiction over Nitek (an argument Nitek is no longer asserting). In

17   the alternative, Nitek argued that venue should be transferred to the United States

18   District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1404(a)

19   (i.e., the discretionary transfer statute) (an argument Nitek is no longer asserting).[7]

20         In ruling on Nitek's motion, the Honorable Judge A. Howard Matz determined

21   that there was, in fact, subject matter jurisdiction (i.e., a justiciable controversy). He

22   stated in pertinent part: "*I assume that I have subject matter jurisdiction. I think that*

23   *the MedImmune decision and Sony Electronics and SanDisk make that the correct*

24   *conclusion.*" (Ex. 10 at 3:17-22). Judge Matz, however, then dismissed that *Central*

25   *District Action* without prejudice pursuant to the Court's discretionary power. When

26   announcing his decision, Judge Matz stated that it was his view that the Central

27   _____

[7]   See Docket Entries 1, 12, and 17 in the *Central District Action*, which are
28   subject to judicial notice.

- 6 -

1  District was a "*very dubious*" forum because NVT's headquarters is in Northern
2  California. (Ex. 10 at 3:22-4:18).

3  NVT respectfully disagrees with Judge Matz' characterization and his other
4  stated reasons for declining to adjudicate the controversy. NVT and Nitek both
5  conduct substantial business throughout California, and in the Central District. They
6  have done so for over 15 years. (Ex. 2 at 44:12-45:6 and 49:11-49:22; Nitzan Decl. at
7  ¶ 2). California is one of Nitek's largest sales markets. Nitek employs numerous
8  sales representatives to promote and sell Nitek's products throughout the entire State
9  of California. (Ex. 7 (Nitek Sales Report, Bates No. 35)). Venue is, and was, legally
10 proper in the Central District of California. A dismissal, therefore, was not a legal
11 option for Judge Matz. See Van Dusen v. Barrack, et. al., 84 S. Ct. 805, 818 (1964)
12 (When venue is proper, dismissal on *better* venue grounds is not an option for the
13 District Court); Jumara v. State Farm Insurance Company, 55 F.3d 873, 878 (3rd Cir.
14 1995) (Dismissal is only an option where venue is legally *improper* in the first
15 instance, which was not the case here); see also 28 U.S.C. § 1406(a).

16 NVT has appealed the decision by Judge Matz to the United States Court of
17 Appeals for the Federal Circuit because it believes that a dismissal was not a
18 permissible option for Judge Matz. If this Court denies Nitek's pending motion to
19 dismiss and elects to resolve the controversy created by Nitek, which NVT submits it
20 should, that appeal will be dismissed as being moot. NVT desires, and is entitled, to
21 "*clear the air*" with respect to the '149 patent. Teva Pharmaceuticals, 482 F.3d at
22 1336 at n. 2; see MedImmune, 127 S. Ct. at 772 (Article III *"does not require...that*
23 *the plaintiff bet the farm, so to speak by taking violative action."*).

24 **IV.    THE LEGAL STANDARD**

25 Nitek's Motion to Dismiss is a factual challenge based on extrinsic evidence
26 (e.g., declarations) outside the pleadings, rather than a facial challenge which is
27 limited to the face of the pleadings. See e.g. Trentacosta v. Frontier Pacific Aircraft
28 Industries, Inc. et. al., 813 F.2d 1553, 1558-1559 (9th Cir. 1986). By making such a

- 7 -

1  challenge, Nitek concedes that the factual allegations of the Complaint, if true,

2  establish subject matter jurisdiction.  Id.

3      When a factual challenge is made, the evidence should be viewed in the light

4  most favorable to the opposing party, namely NVT.  See e.g. Ochoa et. al. v. J.B.

5  Martin and Sons Farms, Inc., 287 F.3d 1182, 1187 (9th Cir. 2002).  Further, if the

6  relevant facts are disputed (or the resolution of the issues depends on the credibility of

7  witnesses) the motion should be denied or an evidentiary hearing should be set and

8  discovery allowed so that the matter may be decided on a full and complete record.

9  See e.g. Commodities Export Co. v. United States Customs Service, 888 F.2d 431,

10  436 (6th Cir. 1989).

11  **V.    THERE IS SUBJECT MATTER JURISDICTION**

12      **1.    The Controversy is Real and Substantial**

13      A justiciable controversy exists when the dispute between the parties is real and

14  substantial, as opposed to one based on a "*hypothetical*" set of facts.  MedImmune,

15  127 S. Ct. at 771; see Teva Pharmaceuticals, 482 F.3d at 1338.  For example, where "a

16  patentee asserts rights under a patent based upon certain identified ongoing or planned

17  activity of another party, and where that party contends that it has the right to engage

18  in the accused activity without license, an Article III case or controversy will arise and

19  the party need not risk a suit for infringement by engaging in the identified activity

20  before seeking a declaration of its legal rights."  SanDisk, 480 F.3d at 1381.

21      NVT and Nitek sell competing products for transmitting CCTV over UTP

22  structured cabling using the Nitek alleges is covered by the '149 patent. [8]  Immediately

23  after the '149 patent issued, Nitek sent NVT, its customers, and its sales force the

24  Patent New Release written by Nitek's founder describing Nitek's asserted patent

25

26  _____

    [8]    [(Ex. 2 at 75:1-11 ████████

27  ████████████████████████████████████████████████

28  ████████████████████████████████████████████████

1  rights and what the '149 patent allegedly covered.[9]  Nitek admits that it had never sent
2  such literature, materials or information to NVT in the past.[10]  Nitek also informed
3  NVT's sales representatives about Nitek's intent to enforce the '149 patent against
4  competitors, such as NVT, at the 2007 International Security Conference ("ISC") in
5  Las Vegas (the industry's most important trade show).[11]

6          It is clear that Nitek was informing NVT, its sales force, and its customers that
7  they risked liability if they sold or purchased NVT products that compete with Nitek's
8  products in the relevant technology alleged by Nitek to be covered by the '149 patent.
9  The Declaratory Judgment Act, however, in intended to provide a vehicle for
10 preventing Nitek from using those "*scare tactics*" (e.g., notifying NVT, NVT's sales
11 representatives, and NVT's customers that the '149 patent covers the technology sold
12 by NVT) to "*infect*" the competitive environment and cloud the "*business community*
13 *with uncertainty and insecurity*".  Teva Pharmaceuticals, 482 F.3d at 1336 at n. 2.
14 Under MedImmune, competitors (such as NVT) are not: ""*restricted to [the*
15 *hard]choice between incurrence of a growing potential liability for patent*
16 *infringement and abandonment of their enterprises; they [can] clear the air by suing*
17 *for a [declaratory] judgment*"".  Id.  NVT, cannot be left in the untenable position of
18 having to choose between incurring a "*growing potential liability for patent*
19 *infringement and the abandonment of [its] enterprise*".  Micron, 518 F.3d at 902.

20         Nitek's actions when viewed in their entirety, including the repeated demands
21 for patent royalties, establish a substantial controversy that is both real and ripe for
22 adjudication.  It is not based on hypothetical facts.  That adjudication will resolve the
23 controversy surrounding the '149 patent.  The controversy is of sufficient immediacy

24

25 [9]      (Ex. 2 at 77:13-15 (*Q: "Well who prepared this press release, do you know?
   A[by NITEK's founder]: I believe I prepared it*"); Exs. 3-5; Polanek Decl., ¶ 17
26 (submitted by Nitek as Ex. 5 to the pending motion); Nitzan Decl., ¶¶ 10-15).

   [10]     (Ex. 2 at 85:6-13 ("*Q: Do you send other literature, information or materials to
27 NVT?*" A: No;  Q: Okay.  Why not?  Objection by Nitek's Counsel: ...I instruct you
   not to answer as to your mental thoughts as to why you would or would not send
28 something to a competitor"); (Nitzan Decl., ¶ 9).

   [11]     (Nitzan Decl., ¶¶ 14-15).

                                          - 9 -

1    and reality to warrant the issuance of a declaratory judgment. <u>MedImmune</u>, 127 S. Ct.

2    at 771-774. There is subject matter jurisdiction as Judge Matz already determined.

3    Nitek should not be permitted to re-litigate the same issue that was previously briefed

4    and decided. <u>See</u> e.g., <u>United States Internal Revenue Serv. v. Palmer (In re Palmer)</u>,

5    207 F.3d 566, 568 (9th Cir. 2000); <u>Offshore Sportswear, Inc. v. Vuarnet International</u>

6    <u>B.V.</u>, 114 F.3d 848 (9th Cir. 1997); <u>Luben Industries, Inc. v. United States of America</u>,

7    707 F.2d 1037, 1040 (9th Cir. 1983) (*"To be 'final' for collateral estoppel purposes, a*

8    *decision need not possess 'finality' in the sense of 28 USC §1291. A 'final judgment'*

9    *for purposes of collateral estoppel can be any prior adjudication of an issue in*

10   *another action that is determined to be 'sufficiently firm' to be accorded conclusive*

11   *effect."*)[12]

12           **2.      The Fact that Nitek did Not "Expressly" Threaten to Sue NVT or**

13                  **Claims that it has No "Present" Intention of Suing Does Not Vitiate**

14                  **Subject Matter Jurisdiction**

15           Nitek devotes a substantial portion of its brief arguing there is no subject matter

16   jurisdiction because: (1) it never explicitly threatened to sue NVT for patent

17   infringement; and (2) it has stated that it has no <u>present</u> intention on suing NVT.

18   Those reasons are legally insufficient to negate subject matter jurisdiction. They do

19   not vitiate the uncertainty Nitek has <u>already</u> <u>created</u> through its overt actions.

20           In <u>Micron</u>, the Federal Circuit addressed, and expressly rejected, the argument

21   that subject matter jurisdiction requires an express threat of suit. As the Federal

22   Circuit explained, that argument is founded upon the old "*reasonable apprehension of*

23   *suit*" standard that no longer applies after <u>MedImmune</u>. Nitek's argument is,

24   therefore, entitled to no weight under the current standard. <u>Micron</u>, 518 F.3d at 903-

25   _____

26   [12]     All of those cases discuss that the doctrine of "*collateral estoppel*" bars
     relitgation of the same issue between the same parties where: (1) there was a full and
     fair opportunity to litigate the issue in the previous action; (2) the issue was actually

27   litigated in that action; (3) the issue was lost as a result of a final judgment in that
     action; and (4) the party against whom collateral estoppel is asserted in the present

28   action was a party, or in privity with a party, in the previous action.

1  904.

2      Similarly, Nitek's statement of "no present intention" to sue NVT is not

3  probative. That non-binding statement does not moot or vitiate the actual controversy

4  that has already been created in the competitive environment by the prior actions of

5  the Nitek (e.g., demanding royalties and notifying NVT, its sales force, and its

6  customers that Nitek now owns the at-issue technology). SanDisk, 480 F.3d at 1383.

7      There is an actual controversy. NVT is entitled to adjudicate that controversy.

8  **VI.   THERE ARE NO UNUSUAL CIRCUMSTANCES TO SUPPORT A**

9  **DISCRETIONARY DISMISSAL**

10      Although this Court has discretion to decide whether to entertain a Declaratory

11  Judgment Action, that discretion is not absolute. Minn. Mining and Mfg. Co., v.

12  Norton., 929 F.2d 670, 673 (Fed. Cir. 1991). That discretion must be exercised to

13  further the objectives of the Act. In this case, an adjudication would clarify Nitek's

14  claimed rights, if any, to the technology of the '149 patent. It would also prevent

15  NVT from being in the position of having to accrue potential liability for damages

16  while waiting for Nitek to sue NVT at its own whim. When the objectives of the

17  Declaratory Judgment Act are served, dismissal is "*rarely*" proper. Micron, 518 F.3d

18  at 902; see CAT Tech LLC, 2008 U.S. App. Lexis 11377 at *27-*28.

19      In the moving papers Nitek does not present any unique facts that would make

20  this the "rare" case in which this Court should invoke its discretionary powers to

21  dismiss. Nitek simply re-argues that the Court should dismiss because there is no

22  actual controversy, an argument which is belied by Nitek's own actions and an

23  argument Judge Matz has already rejected.

24      When there are no unusual or extraordinary facts, dismissal under the Court's

25  discretionary powers would not be legally proper. Micron, 518 F.3d at 902

26  **VII.  CONCLUSION**

27      In light of all the relevant circumstances, there is a substantial controversy

28  between NVT and Nitek as to Nitek's rights under the '149 patent, and as to the

1   validity, enforceability, and scope of the '149 patent, and as to whether NVT's

2   products infringe any valid claims of the '149 patent.

3        Subject matter jurisdiction exists.  Venue over Nitek is proper in the Northern

4   District of California.  There are no extraordinary reasons as to why this action should

5   not go forward to resolve the controversy created by Nitek.

6        Nitek's motion to dismiss should, therefore, be denied.[13]

7

8                                          Respectfully submitted,

9   DATED:  August __, 2008              **THE HECKER LAW GROUP, PLC**

10                                         By: _____

11                                         Gary A. Hecker, Esq.
                                           James M. Slominski, Esq.

12                                         Attorneys for Plaintiff
                                           Network Video Technologies, Inc.
13

14

15

16

17

18

19

20

21

22

23

24

25   [13]    To the extent the Court believes there may be a factual deficiency in the
     pleadings, NVT will amend the Complaint to cure any such perceived deficiency and
26   would request leave to do so.  Such leave should be freely granted. FRCP 15(a)(2);
     see Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227 (1962); Lopez v. Smith, 203
27   F.3d 1122, 1133 (9th Cir. 2000); see also Morongo Band of Mission Indians v. Rose,
     893 F.2d 1074, 1079 (9th Cir. 1990) ("*This policy is to be applied with extreme
28   liberality.*").

                                         - 12 -

# NITZAN DECLARATION

1

## DECLARATION OF DAN NITZAN

2     1.    I, Dan Nitzan, make this declaration of my own personal knowledge and
3 am competent to testify to the matters stated herein.

4     2.    I am the President of Network Video Technologies, Inc. ("NVT"). NVT
5 maintains its principal place of business at 4005 Bohannon Drive, Menlo Park,
6 California. NVT maintains its corporate documents in California. Los Angeles is a
7 convenient forum for NVT to maintain the current litigation due to NVT's extensive
8 business activities in Los Angeles County for over 15 years.

9     3.    I have a Bachelor of Science Degree in Electrical Engineering and
10 Computer Science from University of California at Berkeley.

11     4.    NVT is a California Corporation founded in 1990. NVT designs and
12 sells products for transmitting CCTV ("*closed circuit television*") over "*unshielded*
13 *twisted pair*" ("UTP") wire in structured cabling networks commonly used in office
14 buildings for telephone systems and computer networks.

15     5.    NVT's products enable the use of UTP in those structured cabling
16 systems for, among other things, video security cameras and CCTV systems.

17     6.    NVT is considered a premier supplier of power/video/data ("PVD")
18 twisted pair solutions for the CCTV industry, that is, solutions that enable transmitting
19 power, video signals and data signals over UTP. PVD is a trademark of NVT.

20     7.    NVT has done, and continues to do, business in Los Angeles County.

21     8.    NVT is Nitek's primary competitor. Like NVT, Nitek sells products for
22 transmitting CCTV over UTP cabling.

23     9.    In the past, NVT had not received product or patent literature,
24 information or materials from Nitek by direct communication such as email.

25     10.    Nitek claims it is the owner of Patent No. 7,193,149 entitled "System
26 Handling Video, Control Signals and Power" ("the '149 patent"). That '149 patent
27 was issued on March 20, 2007. I personally reviewed that patent. When I did so, I
28 observed that one of the owners was Anixter, Inc. ("Anixter").

1

CONTAINS HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY<br>INFORMATION

11.   Anixter is a customer of NVT and a former customer of Nitek. ▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓]

12.   In March 2007, NVT sales representatives received emails directly from Nitek containing a patent news release concerning the '149 patent.  Examples of emails that were sent by Nitek to NVT sales representatives, Mr. Michael Murray, Mr. Gordy Abbott, and Mr. Paul Walter are attached hereto as Exhibits 3-5, respectively.

▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓[1]

14.   In March 2007, the International Security Conference ("ISC") was held in Las Vegas, Nevada, which is generally considered to be the most important tradeshow in the industry.

▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓]

▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

[1]   The information in "[]" is designated by NVT as Highly Confidential - Attorney's Eyes Only under the protective order.

2
CONTAINS HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY
INFORMATION



1
2
3
4
5
6
7
8
9
10
11
12          ]
13
14
15
16
17
18
19
20
21
22
23
24  I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE
25  UNITED STATES OF AMERICA THAT THE FOREOING IS TRUE AND
    CORRECT.  EXECUTED THIS 4th DAY OF JANUARY 2008 AT MENLO PARK,
26  CA.
27          Dan Nitzan
28

                                    3
          CONTAINS HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY
                              INFORMATION

# HECKER DECLARATION

1

## DECLARATION OF GARY A. HECKER

2    1.    I, GARY A. HECKER of The Hecker Law Group, make this declaration

3 of my own personal knowledge and am competent to testify to the matters stated

4 herein.

5    2.    I am the attorney of record for Network Video Technologies, Inc.

6 ("NVT"), Civil Action No. CV-07-4789 AHM (RZx). My offices are located at 1925

7 Century Park East, Suite 2300, Los Angeles, California 90067.

8    3.    On July 25, 2007, The Hecker Law Group filed this action for

9 Declaratory Judgment on behalf of Plaintiff, NVT.

10    4.    Attached as Exhibit 1 is a true and correct copy of the '149 patent.

11    5.    Attached as Exhibit 2 are true and correct copies of pages from the

12 deposition transcript of Mr. Polanek, an FRCP 30(b)(6) witness for Nitek.

13    6.    Attached as Exhibit 6 is a true and correct copy of a license agreement

14 for the '149 patent that Nitek sent to NVT.

15    7.    Attached as Exhibit 7 is a true and correct copy of the Nitek's sales report

16 produced as part of the personal jurisdiction discovery in this case.

17    8.    Attached as Exhibit 8 is a true and correct copy of the assignment of

18 rights in and to the '149 patent from Anixter to Nitek. It was executed after this action

19 was commenced.

20    9.    Attached as Exhibit 9 is a true and correct copy of the confidential

21 agreement between Nitek and Anixter regarding the rights in and to the '149 patent

22 that was in existence prior to the filing of this action. This was produced to me by

23 Anixter with the approval of Nitek.

24    [continued on the next page]

25

26

27

28

1

1    10.    During discussions between the parties in an attempt to resolve this

2    matter, Nitek's counsel, Mr. Gerstman, stated repeatedly that Nitek is not willing to

3    provide NVT with a covenant not to sue for products currently made and sold by or

4    for NVT.

5    11.    On November 29, 2007, I took the deposition of Mr. Polanek of Nitek.

6    At that deposition, Mr. Polanek was instructed repeatedly to not answer any questions

7    about subject matter jurisdiction, even if those questions also related to personal

8    jurisdiction.

9

10   I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE
     UNITED STATES OF AMERICA THAT THE FOREOING IS TRUE AND
11   CORRECT.  EXECUTED THIS 4 DAY OF JANUARY 2008 AT LOS ANGELES,
     CA.
12

13

14                            Gary A. Hecker

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                            2

# EXHIBIT 1



US007193149B2

(12) **United States Patent**
Polanek et al.

(10) Patent No.: **US 7,193,149 B2**
(45) Date of Patent: **Mar. 20, 2007**

(54) SYSTEM HANDLING VIDEO, CONTROL SIGNALS AND POWER

(75) Inventors: Edward L. Polanek, Richmond, IL (US); James P. Bertrich, Arlington Heights, IL (US); Peter D. Lockhart, Third Lake, IL (US); Andrew C. Jimenez, Chicago, IL (US); Lawrence J. Roberts, Hammond, IN (US)

(73) Assignees: Northern Information Technology, Inc., Rolling Meadows, IL (US); Anixter, Inc., Glenview, IL (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 588 days.

(21) Appl. No.: 10/438,712

(22) Filed: May 15, 2003

(65) **Prior Publication Data**
US 2003/0217364 A1    Nov. 20, 2003

**Related U.S. Application Data**

(60) Provisional application No. 60/381,906, filed on May 17, 2002.

(51) Int. Cl.
H01B 7/34    (2006.01)

(52) U.S. Cl. .................................... 174/36

(58) Field of Classification Search .......... 174/36, 174/110 R, 113 R, 74 R, 77 R, 88 R
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,992,774 A * 2/1991 McCullough ............. 345/204

| | | | | |
|---|---|---|---|---|
| 5,268,676 A * | 12/1993 | Asprey et al | ...... | 345/169 |
| 5,353,409 A * | 10/1994 | Asprey et al | ...... | 375/296 |
| 5,528,286 A * | 6/1996 | Goolcharan | ...... | 348/14.15 |
| 5,828,293 A * | 10/1998 | Rickard | ...... | 375/257 |
| 5,684,086 A * | 3/1999 | Amoni et al | ...... | 713/300 |
| 6,111,595 A | 8/2000 | Hertrich | | |
| 6,115,468 A * | 9/2000 | De Nicolo | ...... | 379/413 |
| 6,310,286 B1 * | 10/2001 | Troxel et al | ...... | 174/36 |
| 6,473,608 B1 * | 10/2002 | Lehr et al | ...... | 455/402 |
| 2002/0007432 A1 * | 1/2002 | Ahern | ...... | 710/305 |
| 2002/0049879 A1 * | 4/2002 | Eyer | ...... | 710/305 |
| 2002/0177357 A1 * | 11/2002 | Inui | ...... | 439/502 |

FOREIGN PATENT DOCUMENTS

EP    0 736 673 A    *    2/1996

OTHER PUBLICATIONS

Network Video Technologies, Inc., CCTV Applications Booklet (1997)

(Continued)

*Primary Examiner*—William H Mayo, III
(74) *Attorney, Agent, or Firm*—George H Gerstman; Seyfarth Shaw LLP

(57) **ABSTRACT**

The system integrates a CCTV system including one or more video source units into the structured cabling system ("SCS") of a building by combining video signals, control signals and power for each video source unit over a single multipair cable made up of plural twisted pairs of insulated copper conductors, so that one twisted pair of the cable carries the video signals, one pair carries the control signals and one or two pairs carry the power. The system includes combiners and distributors which can interface with the SCS cable through standard modular, multi-pin plug and jack connectors

11 Claims, 4 Drawing Sheets



**Exhibit 1**

US 7,193,149 B2

Page 2

OTHER PUBLICATIONS

Network Video Technologies, Inc brochure on NVT transceivers (prior to May 2002).

Network Video Technologies, Inc brochure on Campus Wide UTP/CCTV Solutions (prior to May 2000)

PI Manufacturing Corp flyer for Perfect Security Solution ( prior to May 2002)

PI Manufacturing Corp catalog for Security Solutions   Video Balun (2000)

NITEK brochure for Twisted Pair Video and Data (prior to May 2002)

* cited by examiner

**Exhibit 1**



FIG. 1

Exhibit 1



FIG. 2

Exhibit 1



FIG. 3

Exhibit 1

U.S. Patent        Mar. 20, 2007        Sheet 4 of 4        US 7,193,149 B2



FIG. 4

FIG. 5

FIG. 6

Exhibit 1

US 7,193,149 B2

1

SYSTEM HANDLING VIDEO, CONTROL
SIGNALS AND POWER

RELATED APPLICATION

This application claims the benefit of the filing date of
co-pending U.S. Provisional Application No. 60/381,906,
filed May 17, 2002.

BACKGROUND

This application relates to communications systems, par-
ticularly video systems. The application relates in particular
to interconnection apparatus and methods for handling all of
the electrical requirements for video systems, such as Closed
Circuit TV ("CCTV") systems, including those of the types
used in video security systems.

In the past, buildings would have several cabling systems,
respectively for different types of communications systems.
For example, telephone wiring was used for voice, coaxial
cable for data networks, multipair cabling for RS232/RS422
control data, etc. With all of the separate costs involved, this
became a very inefficient and costly way to install these
systems. A solution was to install a standard cable and
connector system throughout a building which could, with
some additional equipment, be used to support all or most of
the different types of communication systems in use in the
building. This standard cable and connector system is called
a "Structured Cabling System" ("SCS")

The SCS is a set of cabling and connectivity products that
integrates voice, data, video and various building manage-
ment systems ("BMS"), such as safety alarms, security
access, energy systems, etc. Characteristics of an SCS
include an open architecture, standardized media and layout,
standard connection interfaces, adherence to national and
international standards, and total system design and instal-
lation. Typically, SCS cable is a multipair cable made up of
unshielded twisted pairs ("UTP") of insulated copper con-
ductors. A typical SCS cable includes four such twisted
pairs. A typical building has a plurality of SCS cables,
perhaps dozens or even hundreds, extending throughout the
building. Apart from the SCS, the voice, data, video and
BMS have nothing in common, except for similar transmis-
sion characteristics (analog or digital data signals) and
delivery methods (conduit, cable, tray, raceway, etc.) that
support and protect the cabling.

Although it has existed in the SCS in various configura-
tions, CCTV has not been integrated as a complete system
into the SCS, since system equipment has not existed that
would provide the means to conveniently interface all of the
various types of CCTV cameras, Pan/Tilt/Zoom ("PTZ")
systems, monitoring equipment and switching equipment
into the SCS. A CCTV system typically has three different
types of electrical requirements, viz., control signals which
must be sent to each camera and/or PTZ device to control its
operation, video data which is sent from each camera to a
receiver, and AC power for powering the camera and asso-
ciated equipment, such as a PTZ unit. The control signals,
which are typically in accordance with the RS422 standard,
but could also be RS232 or RS485 (bidirectional), have
historically been handled over a cabling system distinct from
the SCS, and have not been transmitted over UTP cables.

Sending video over UTP cable has been done using the
unbalanced-to-balanced line technique (video baluns) for 20
years or more. Baluns are typically passive devices that
match impedance and provide common mode rejection.
Northern International Technology ("NITEK") has

2

improved on this basic technology by introducing unique,
adjustable, active receivers that provide improved common
mode rejection and longer distances for transmission of
video while maintaining signal integrity and video quality
Previously, transmitting video signals over one twisted pair
of SCS cable required the user to provide his own connector
and interface equipment. NITEK provides an integrated
system for transmitting video signals over one pair of an
SCS cable, but the AC power and control signals must still
be separately provided. In the security industry, UTP for
transmission of video has become increasingly popular over
the past five years, as more dealers have been willing to use
it in CCTV installations. Problems with earlier systems
using technology that was prone to drifting and, in some
cases, susceptible to voltage surges, made dealers wary of
the technology. Greater acceptance of this technique has
come about recently due to lower cost balun devices and the
convenience and size advantages of using UTP cable, as
opposed to coax cable, for multiple cameras. This has
resulted in larger camera projects (hundreds of cameras)
using UTP. In response to these larger system requirements,
NITEK introduced rack mounted systems that could accept
as many as 40 inputs per rack. Such systems are currently
primarily targeted for sale through the security system
installer/dealer. The systems are typically stand-alone
CCTV systems, either connected to existing communication
cables or using new UTP cables (mostly CAT 5) installed
specifically for the CCTV System.

Some CCTV cameras are provided with local power, i.e.,
a power supply adapted to be plugged into the 120-volt AC
system at the camera location. But many multi-camera video
systems power the cameras from a central fused power
supply, power from which has, heretofore, been provided
independently of the SCS.

SUMMARY

This application discloses a system for handling all the
electrical requirements of a video system, which avoids the
disadvantages of prior arrangements while affording addi-
tional structural and operating advantages

Applicants have developed a complete CCTV interface
system which combines video, control signals (data) and
power (hereinafter "Combined Video system"), that is
designed to easily integrate into an SCS. The Combined
Video system provides the delivery of twisted pair video and
RS422 signals for control functions. In addition, the Com-
bined Video system delivers 24 VAC power for all video
cameras and PTZ and focus systems, as well as other remote
controlled CCTV equipment throughout the SCS. The Com-
bined Video system is designed to operate within SCS
standards and coexists within the SCS using cables, con-
nectors and patch panels that are dedicated to the CCTV
system. The Combined Video system is not a part of, nor
does it connect to, the data network

The Combined Video system is a unique system that
provides a complete solution for integrating CCTV into an
SCS. The CCTV system becomes a "self-contained" system
within the SCS in that every piece of equipment is powered
by the Combined Video system, either from a telecommu-
nication closet (TC) or from the equipment room. In addi-
tion, all of the RS422 control signals are distributed to
equipment in the CCTV system throughout the SCS, either
from a TC or from the equipment room. In this way, the
Combined Video system provides the means to connect
closed circuit video data, control (RS422) signals, and
power to the SCS. Using the SCS, the Combined Video

**Exhibit 1**

US 7,193,149 B2

3

system acts as a distribution interface, providing all of the equipment needed to connect video security cameras and PTZ equipment to the security head-end equipment (located in the equipment room). Modular multi-pin plug and jack connectors, such as RJ-45 connectors, are used throughout. The four twisted pairs of each Category 5 SCS cable are dedicated to a given camera: 1 pair for video, 1 pair for RS422 control and 2 pairs for 24 VAC supply voltage (connected in parallel) In this way a single CAT 5 cable provides power to the cameras (and domes) and distributes RS422 control signals to any PTZ domes or other remote control equipment in the system

An aspect is the provision of a system to interconnect all of the equipment of a video system over copper cabling.

Another aspect is the provision of a system of the type set forth, which is a self-contained system, but can easily be integrated in an SCS.

A still further aspect is the use of a single UTP cable for delivering fused power to a video camera and associated equipment and delivering video signals from the video camera.

A still further aspect is the use of a single UTP cable for delivering control signals to a video camera and associated equipment and delivering video signals from the video camera.

Another aspect is the use of a single UTP cable for delivering fused power and control signals to a video camera and associated equipment using modular multi-pin plug and jack connectors.

Another aspect is the use of a single multi-pair cable for delivering power and control signals to a camera and associated equipment and delivering video signals from the camera.

A still further aspect is the provision of unique equipment for interfacing a multi-camera video systems with an SCS

Yet another aspect is the provision of a video system which can be incorporated in an SCS utilizing standard connectors.

Certain ones of these and other aspects may be attained by providing a system for operating a video source unit having a video data signal output adapted for coupling to a video receiving unit and a control signal input adapted for coupling to a control unit, the system comprising: a cable, including plural unshielded twisted pairs of conductors, first coupling means at a first end of the cable for coupling a first twisted pair to the video data signal output and a second twisted pair to the control signal input, and second coupling means at a second end of the cable for coupling the first twisted pair to an associated video receiving unit and the second twisted pair to an associated control unit.

Other aspects may be attained by providing a system for operating a video source unit having a video data signal output of the type set forth and a power input adapted for coupling to a fused power source, the first coupling means coupling a selected twisted pair to the power input, and second coupling means at a second end of the cable for coupling the selected twisted pair to an associated fused power source, each of the first and second coupling means including, for each coupled twisted pair, a modular multi-pin plug and jack connector.

## BRIEF DESCRIPTION OF THE DRAWINGS

For the purpose of facilitating an understanding of the subject matter sought to be protected, there are illustrated in the accompanying drawings embodiments thereof, from an inspection of which, when considered in connection with the

4

following description and claims, the subject matter sought to be protected, its construction and operation, and many of its advantages should be readily understood and appreciated.

FIG. 1 is a simplified functional, block diagrammatic illustration of a single-camera application of a Combined Video system;

FIG. 2 is a block diagrammatic illustration of incorporation of a Combined Video system including multiple cameras into an SCS of a building;

FIG 3 is a block diagrammatic illustration of a combiner device of the systems of FIGS 1 and 2;

FIG. 4 is a block diagrammatic illustration of one type of distributor unit used in the system of FIG. 2;

FIG. 5 is a block diagrammatic illustration of another type of distributor unit in the system of FIG. 2; and

FIG. 6 is a diagrammatic illustration of the pin arrangement in a standard RJ-45 connector.

## DETAILED DESCRIPTION

Referring to FIG 1, there is illustrated a simplified Combined Video system, generally designated by the numeral 10, illustrating the concepts of the system as applied to a single video source unit, such as a video camera. The system utilizes a copper, multipair communication cable 11, which is Category 3 or better, and will typically be an existing 4-pair SCS cable at the site where the system is to be installed. While the cable 11 typically includes four unshielded twisted pairs, all of the pairs may or may not be used, depending upon the particular application. At one end of the cable 11, which may be at a central location, such as a telecommunications closet, the cable 11 is connected, by a single multi-circuit connector, to one end of a combiner device 12, the other end of which may be connected to a suitable fused power supply 13, a differential video receiver 14 and a control unit 15. The power supply 13 will, in turn, be connected to a suitable primary power source, the output of the differential video receiver 14 will be a composite video signal connected to the input of apparatus, such as monitoring or recording equipment, and the input of the control unit 15 will be connected to a source of data signals, which may be in accordance with RS232, RS422 or other suitable standards

The other end of the cable 11, which may be at a remote location, is connected by a suitable multi-circuit connector to one end of a distributor device 16, the other end of which is connected to a video source unit which includes a fused power input 17, a composite (NTSC or baseband) video output 18 of a live source, such as a CCTV camera, and a data input 19 of a controlled device, such as a PTZ unit, associated with the video source.

Significantly, the system 10 delivers power, control signals and video signals simultaneously over a single SCS multipair cable, and connects to that cable with standard connectors. In this arrangement, the video signal will be transmitted over one twisted pair of the cable 11, the control signals will be transmitted over another twisted pair, and one or two twisted pairs will be used for power, depending upon the power requirements

While, in the illustrated embodiment, the combiner device 12 is connected to only a single multi-pair cable 11 for connecting a single video source with a single video receiver, it is an aspect of the system, as will be explained more fully below, that the combiner device 12 could be connected to multiple cables 11 for connecting multiple video sources at a plurality of remote sites to plural video receivers at a central location

Exhibit 1

US 7,193,149 B2

5

Referring now to FIG. 2, there is illustrated a typical building installation 20 incorporating specific embodiments of the combined video system 10 in an overall arrangement incorporating multiple video sources and multiple receivers. The video system 10, in all of its various application modes, may incorporate a number of different types of components, some of which are specially designed for the system and some of which have been pre-existing, descriptions of such components being set forth in Appendix 1. While not all of these component variations are incorporated in the installation of FIG. 2, that figure will illustrate the underlying principles.

The building installation 20 will typically include a central equipment room 21, which may be connected, as via cabling 22, to the copper campus backbone, if the building is one of a number of buildings in a campus arrangement, and is also connected, as by a copper riser backbone cabling 23, to one or more telecommunications closets 30, 30A, 30B etc. These telecommunications closets may be located on different floors of a multi-story building, or a single floor of a building may have multiple telecommunications closets, depending upon the size of the floor. Disposed in the equipment room 21 may be one or more video receivers 24, which may be in the nature of receiver module cards, two types of which, respectively designated VM562 and VM564, are described in Appendix 1, and a plurality of which may be mounted in a single multi-module powered rack of the type designated RK500 and described in Appendix 1. The equipment room 21 could house receivers simply for the building in which it is located, or could house receivers associated with video sources in other buildings of a campus arrangement. Also disposed in the equipment room 21 is a control module 25, which may also be in the form of a rack-mounted module card, of the type designated DM424 and described in Appendix 1. In the event the facility is provided with a fiber network, the equipment room 21 may also include a fiber receiver 26, which may be coupled by cabling 27, to a fiber campus backbone, and also to a fiber riser backbone 28 of the local building, which backbone may, in turn, may be connected to one or more telecommunication closets.

Disposed in each of the telecommunications closets is a combiner device (see 12 in FIG. 1), two general types of which, 40 and 40A, are shown in FIG. 2 and described in Appendix 1. Thus, the telecommunications closet 30 is shown as housing a combiner 40 (designated CX522 in Appendix 1). The combiner 40 is connected by a control cable 31 to the control module 25, and is also connected by video cables 32 to one or more of the video receivers 24, only one such connection being illustrated in FIG. 2. The cables 31 and 32 may terminate at a patch panel or the like in the telecommunications closet 30. Also connected to the combiner 40 is a power supply 33, which may be of the type designated PS510 in Appendix 1, which is a 10-amp supply providing 24 VAC power for up to eight video sources and associated PTZ units. The combiner 40 is also connected, via horizontal cabling 35, to one or more of the video sources described in connection with FIG. 1, two such sources being illustrated in FIG. 2, each being in the nature of a moveable camera 36 and associated PTZ unit 37. The illustrated horizontal cabling 35 includes two cables, each of which is a multi-pair cable, which may be a 4-pair SCS cable 11, each

6

of which is connected to its associated video source through a suitable interface corresponding to the distributor device 16 of FIG. 1. Two different types of such distributor devices, respectively designated WM101 and CM103, are described in Appendix 1 and are, respectively, designated 50 and 60 in FIG. 2.

Referring now also to FIG. 3, the combiner 40 includes a multi-pin connector 41, such as a 50-pin Telco connector, which is adapted to be connected to the copper riser backbone 23. The pins of the connector are arranged in pairs, respectively connected to output jacks 42 by video lines 43. Each of the jacks 42 may be a standard RJ-45 jack adapted for connecting to a standard 4-pair cable. One pair of pins of the connector 41 is reserved for control signals and is connected by a line 44 to a control signal (RS422) distribution unit 45, which is in turn connected to each of the jacks 42. AC input power from the power supply 33 is applied to a fuse block 46, which includes multiple fuses respectively connected in parallel to the output jacks 42. Thus, it can be seen, that each of the jacks 42 has one pair of its terminals connected by a video line 43 to the connector 41, one pair connected to the control signal distribution unit 45, and at least one pair connected to AC power through a fuse of the fuse block 46. Each jack 42 may have two of its terminal pairs connected to the fuse block 46, depending upon the power needs. It will be appreciated that FIG. 3 is functional diagram and the combiner 40 may be embodied in a PC board.

It will be appreciated that the control module 25 is connected through the connector 41 to the data line 44, one or more video receivers 24 are connected through the connector 41, respectively to video lines 43, and AC power is connected to all of the fuses of the fuse block 46. Each of the jacks 42 is connectable to a multi-pair cable 11 (see FIG. 1), which may be a 4-pair SCS cable, the other end of which is connected to a distributor device. The connector 41 may be connected by suitable jumper cable to the patch panel at which the cables 31 and 32 are terminated. Also, it will be appreciated that the horizontal cabling 35 on the building floor will, in accordance with applicable telecommunications cabling standards, typically be terminated at suitable jacks. Thus, a short jumper cable, terminated with compatible plugs, may be utilized to connect each of the jacks 42 of the combiner 40 with the associated multi-pair cable 11.

Referring also to FIG. 4, a distributor device, in the nature of a camera interface 50 (of the type designated WM 101 in Appendix 1), is illustrated. The distributor unit or camera interface 50 has a jack connector 51, which may be a standard RJ-45 connector, and is connected to the remote end of a multi-pair cable 11 (FIG. 1). It will be appreciated that there will be one distributor unit or camera interface for each of the jacks 42 of the combiner 40 which is being used in the system. One pair of terminals of the jack 51 is connected to a video balun device 52, which is in turn connected to a composite video jack 53, which may be a standard coaxial BNC connector, adapted to receive a plug from the associated camera 36 (FIG. 1). A second pair of terminals of the jack 51 are connected to a control (RS422) jack 54, which may be in turn connected to the PTZ device 37 for the video camera. The final two pairs of terminals of the jack 51 are connected to a power jack 55, which is

**Exhibit 1**

7

connected to the PTZ device 37, which is in turn connected to the camera 36. The camera interface 50 is a wall-mountable unit adapted to be mounted at the location of the camera 36. It will be appreciated that the camera interface 50 may be embodied in a printed circuit board. Also, it will be understood that a suitable plug-terminated jumper cable may be utilized to connect the jack 51 to a wall jack in which the associated multi-pair cable 11 is terminated.

Referring to FIG. 5, there is illustrated an alternative form of camera interface 60 (of the type designated CM 103 in Appendix 1), which may be embodied in a cable. The interface 60 includes a plug connector 61, which may be an RJ-45 connector and is adapted to plug into a counterpart jack, which could be a wall-mounted jack terminating one of the multi-pair SCS cables 11 of the building horizontal cabling 35. The jack 61 is, in turn, connected to a single multi-pair cable 62, which may be an SCS 4-pair cable, which has built therein a PCB 63 in which one twisted pair of the cable 62 is connected to a video balun device 64, which is in turn connected to a composite video jack 65. The remaining twisted pairs of the cable 62 are "passed through" the PCB 63 for connecting directly to control input terminals of a PTZ unit 37, and power input terminals of the associated camera 36 and/or PTZ unit 37, as at screw terminals.

The telecommunications closet 30A is similar to the closet 30, except that it includes a combiner device 40A, which is of the type designated CX 516 in Appendix 1, and is essentially the same as the combiner 40 illustrated in FIG. 3, except that it does not include the control signal distribution unit 45. Thus, this type of combiner combines only video and power and is adapted for handling video sources, such as fixed cameras 66, which do not have an associated PTZ unit and, therefore, do not require the associated control signals. In this case, the power to the combiner 40A is provided by a power supply 33A, which may be of the type designated PS 505 in Appendix 1, providing a 5-amp, 24 VAC supply for up to 16 fixed cameras.

The telecommunications closet 30B is similar to the closet 30, described above, except that in this case the combiner 40 is connected, via video and control signal lines, to a video balun hub 67, such as that designated VH160 in Appendix 1, which is, in turn, connected through a fiber multiplexer 68 to the fiber riser backbone 28.

Because the video system 10 is completely separate from any data network on the associated building, it is unconstrained by the typical "100 meter rule" applied to horizontal runs of computer cabling in SCS installations.

In connecting the circuitry to the standard RJ-45 connectors, the system 10 and the building installation 20 utilize a unique pin assignment arrangement. FIG. 6 illustrates the pin designations for a standard RJ-45 connector. As can be seen, the connector includes eight pins, respectively designated 1 through 8. Certain connectors of the system 10 and the building installation 20, such as the wall plate-type distributor devices WM101, may be difficult to distinguish from a standard wall plate for a common computer jack. Also, the systems disclosed herein may commonly be used in association with network arrangements, such as Ethernet, in a building SCS and, therefore, it is possible that Ethernet devices might accidentally be plugged into a jack of the Combined Video system. Certain pin assignment arrange-

8

ments of the RJ-45 connectors could result in damage to certain Ethernet devices which were accidentally plugged into the Combined Video system. Accordingly, applicants have devised a unique pin assignment for their connectors. Ethernet networks typically use a common pin assignment arrangement, designated "T-568B." This arrangement is set forth in Table 1. In this arrangement, two of the pairs of terminals in the connector are typically unused, but could be used for a second Ethernet line or for other purposes. Also set forth in Table 1 are applicants' pin assignments for the same type of connector. It has been found that these pin assignments will not harm Ethernet devices which are connected thereto.

TABLE 1

| Pin | T568B Assignment | Applicants' Assignment |
|-----|------------------|------------------------|
| 1 | TxData + | Video + |
| 2 | TxData − | Video − |
| 3 | RcvvData+ | 24 VAC Common |
| 4 | | RS422 − |
| 5 | | RS422 + |
| 6 | RcvvData − | 24VAC Live |
| 7 | | 24VAC Common |
| 8 | | 24VAC Live |

In the illustrated embodiments, the combiners and distributor devices utilize standard RJ-45 connectors for convenience in connecting and disconnecting the Combined Video system to a building SCS. However, it will be appreciated that other types of connectors could be utilized. For example, insulation displacement connectors, such as the type commonly referred to as "punch down blocks," could be utilized. While this would not offer the same convenience and ease of installation as the use of plug-and-socket connectors, it may be desirable in connection with certain cabling codes or standards.

While the disclosed embodiments are in the context of a CCTV system, it will be appreciated that the principles of the system would also be applicable to "IP" or digital, computer-based cameras, in which digital data is communicated to and from the camera. In such an application, one pair of a multi-pair cable would be used for data in one direction and another pair for data in the direction. Also, while the distributor device 16 has been disclosed as a separate interface device 50 or 60, it will be appreciated that it would also be possible to build it into the associated video source.

While particular embodiments have been shown and described, it will be apparent to those skilled in the art that changes and modifications may be made without departing from the principles of the Combined Video system in its broader aspects. The matter set forth in the foregoing description and accompanying drawings is offered by way of illustration only and not as a limitation.

Exhibit 1

US 7,193,149 B2

9                                                                        10

## APPENDIX I

**Combined Video System Components**

Eleven basic components (building blocks) can be used to complete a Combined Video system All eleven components will not be used in smaller systems, but it is possible to use all of the basic components in a larger system  The components are listed by their location in the SCS system:

Equipment Room - Head End Equipment. The Combined Video head-end equipment consists of a multi-channel rack mounted receiver system for receiving video over a copper riser backbone, from within a facility or a copper campus backbone, from other facilities

- •      RK500 Powered Rack – accepts up to 10 in any combination of VM564, VM562, DM424

- •      VM564 Quad Active Receiver Module Card - Inserts into the RK500 card cage - Receives video from WM101 or CM103.  Operates up to 3,000 feet over Category 3 or better cable. With 8 cards, provides up to 32 video inputs

- •      VM562 Dual Active Receiver Module Card - Inserts into the RK500 card cage - Receives video from WM101 or CM103   Operates up to 3,000 feet over Category 3 or better cable. With 8 cards, provides up to 16 video inputs

- •      DM424 Data Module Card - Distributes RS422 to up to 16 Pan/Tilt/Zoom units  RK500 will accept 2 DM424 cards for a total of 32 Pan/Tilt/Zoom units

Telecommunication Closet (TC) Equipment

- •   CX522 Crossover Interface-with RS422 capability

    - •      Provides means to connect horizontal runs to the copper backbone directly or to a VH160 video hub which provides an interface to a fiber transmitter for connection to a fiber backbone.

    - •      RJ-45 connectors (one for each camera) connect to the WM101 or CM103 to deliver video to the copper backbone or VH160, RS422 to the PTZ receiver/driver and power to the camera, receiver/driver and PTZ unit

- •      CX516 Crossover Interface - Same as CX522, except does not provide RS422 distribution

- •   VH160 Video Balun Hub

    - •      Passive 16 port unit, receives video from WM101 or CM103; base band video output interfaces with fiber transmission equipment for connection to a fiber riser backbone

**Exhibit 1**

US 7,193,149 B2

11                                                                    12

• • PS505 Power Supply - 5 Amp; provides 24VAC power for 16 cameras; connects to the CX516 for distribution of power by means of RJ-45 connectors

• • PS510 Power Supply - 10 Amp; provides 24VAC power for 4 cameras and P/T/Z units; connects to the CX522 for distribution of power by means of RJ-45 connectors.

Camera Interface Equipment

• • WM101 Camera Interface - Wall Module; connects to the CX516 or CX522, contains a video balun transceiver that transmits to the VH160, VM164 or VM162; connects power to the camera, receiver/driver and P/T/Z unit and RS422 to the receiver/driver via RJ-45 connector

• • CM103 Camera Interface - In-Line Cable Module, features same as VM101, except does not connect via RJ-45 connector.

**Exhibit 1**

US 7,193,149 B2

13

What is claimed is:

1. A CCTV system for interfacing with a structured cabling system (SCS) of a building, which comprises:
   a plurality of video cameras, each having an analog video signal output;
   a video receiver, for receiving video from each of said video cameras;
   a control device for movement of each of said video cameras;
   a control unit for providing signals for each control device whereby movement of one or more of the video cameras as determined;
   each of said video cameras having a power input;
   a fused power supply for providing power to each power input;
   a multipair cable for each of said video cameras;
   a combiner with connectors for coupling the multipair cables; said connectors compatible with a structured cabling system of the building;
   for each of said multipair cables, a first twisted pair coupled from said combiner to the analog video signal of said video camera;
   said combiner for coupling said analog video signals from the first twisted pairs of said multipair cables to said video receivers;
   for each of said multipair cables, a second twisted pair coupled from said combiner to said control device;
   said combiner including a control signal distribution unit having a data input and multiple data outputs for feeding data, from said control unit coupled to the data input, to a plurality of control devices coupled to the multiple data outputs via said multipair cables;
   for each of said multipair cables, a third twisted pair coupled from said combiner to said power input;
   said combiner for coupling a plurality of said third twisted pairs from said multipair cables to said fused power supply.

2. A CCTV system for interfacing with a structured cabling system of a building, as defined by claim 1, in which said fused power supply includes AC power from an external power supply located outside of said combiner.

3. A CCTV system for interfacing with a structured cabling system (SCS) of a building, which comprises:
   a plurality of video cameras, each having an analog video signal output;
   a video receiver for receiving video from each of said video cameras;
   each of said video cameras having a power input;
   a fused AC power supply for providing power to each power input;
   a multipair cable for each of said video cameras;
   a combiner with connectors for coupling the multipair cables; said connectors compatible with a structured cabling system of the building;
   for each of said multipair cables, a first twisted pair coupled from said combiner to the analog video signal of said video camera;
   said combiner for coupling said analog video signals from the first twisted pairs of said multipair cables to said video receivers;
   for each of said multipair cables, a second twisted pair coupled from said combiner to said power input; and
   said combiner for coupling a plurality of said second twisted pairs from said multipair cables to said fused AC power supply.

14

4. A CCTV system for interfacing with a structured cabling system of a building as defined by claim 3, in which said fused AC power supply is located outside of said combiner.

5. A CCTV system for interfacing with a structured cabling system (SCS) of a building, which comprises:
   a plurality of video cameras, each having an analog video signal output;
   a video receiver, for receiving video from each of said video cameras;
   a control device for movement of each of said video cameras;
   a control unit for providing signals for each control device whereby movement of one or more of the video cameras is determined;
   each of said video cameras having a power input;
   a fused power supply for providing power to each power input;
   a multipair cable for each of said video cameras;
   each of said multipair cables having a modular connector usable in a structured cabling system of building;
   for each of said multipair cables, a first twisted pair coupled from a combiner to the video signal of said video camera;
   said combiner including at least one multi-pin connector, said multi-pin connector having pins for receiving a twisted pair from each of said video receivers, said combiner adapted for coupling said video receivers via said multi-pin connector to said analog video signals from the first twisted pairs of said multipair cables;
   for each of said multipair cables, a second twisted pair coupled from said combiner to said control device;
   said combiner including a control signal distribution unit having a data input and multiple data outputs for feeding data, from said control unit coupled to the input, to a plurality of control devices coupled to the multiple data outputs via said multipair cables;
   for each of said multipair cables, a third twisted pair coupled from said combiner to said power input;
   said combiner for coupling a plurality of said third twisted pairs from said multipair cables to said fused power supply.

6. A CCTV system for interfacing with a structured cabling system of a building, as defined by claim 5, in which said fused power supply includes AC power from an external power supply located outside of said combiner.

7. A CCTV system for interfacing with a structured cabling system (SCS) of a building, which comprises:
   a plurality of video cameras, each having an analog video signal output;
   a video receiver for receiving video from each of said video cameras;
   each of said video cameras having a power input;
   a fused AC power supply for providing power to each power input;
   a multipair cable for each of said video cameras;
   each of said multipair cables having a modular connector usable in a structured cabling system of the building;
   for each of said multipair cables, a first twisted pair coupled from a combiner to the analog video signal of said video camera;
   for each of said multipair cables, a second twisted pair coupled from said combiner to said power input;
   said combiner including at least one multipin connector, said multipin connector having pins for receiving a twisted pair from each of said video receivers, said combiner adapted for coupling said video receivers via

**Exhibit 1**

US 7,193,149 B2

15

said multipin connector to said analog video signals from the first twisted pairs of said multipair cables; and said combiner for coupling a plurality of said second twisted pairs from said multipair cables said fused AC power supply

8. A CCTV system for interfacing with a structured cabling system of a building as defined by claim 7, in which said fused AC power supply is located outside of said combiner.

9. A CCTV system for interfacing with a structured cabling system (SCS) of a building, which comprises:
a video camera, having an analog video signal output;
a video receiver, for receiving video from said video camera;
a control device for movement of said video camera;
a control unit for providing signals for said control device, whereby movement of the video camera is determined;
said video camera having a power input;
a fused power supply for providing power to said power input;
a multipair cable for said video camera, said multipair cable having a first end and a second end;
a distributor with a connector for coupling to the multipair cable, located at the first end of the multipair cable;
said connector compatible with a structured cabling system of the building;
said analog video signal from said video camera coupled to said distributor;
said distributor having a balun for coupling said analog video signal to a first wire pair of said multipair cable via said connector;
said distributor coupling said control device to a second wire pair of said multipair cable via said connector;
said distributor coupling said power input of said video camera to a third wire pair of said multipair cable via said connector;
said first pair of multipair wire coupled to said video receiver located at the second end of the multipair cable;

16

said second pair of the multipair cable coupled to said control unit located at the second end of the multipair cable;
said third pair of multipair cable coupled to said fused power supply located at the second end of the multipair cable.

10. A CCTV system for interfacing with a structured cabling system of a building, as defined by claim 9, in which said fused power supply is an AC power supply

11. A CCTV system for interfacing with a structured cabling system (SCS) of a building, which comprises:
a video camera, having an analog video signal output;
a video receiver for receiving video from said video camera;
said video camera having a power input;
a fused AC power supply for providing power to said power input;
a multipair cable for said video camera, said multipair cable having a first end and a second end;
a distributor with a connector for coupling to the multipair cable, located at the first end of the multipair cable;
said connector compatible with a structured cabling system of the building;
said analog video signal from said video camera coupled to said distributor;
said distributor having a balun for coupling said analog video signal to a first wire pair of said multipair cable via said connector;
said distributor coupling said power input of said video camera to a second wire pair of said multipair cable via said connector;
said first pair of multipair wire coupled to said video receiver located at the second end of the multipair cable;
said second pair of the multipair cable coupled to said fused AC power supply located at the second end of the multipair cable.

* * * * *

Exhibit 1

# EXHIBIT 2

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA


NETWORK VIDEO TECHNOLOGY,            )
             Plaintiff,              )
                                     )
        vs.                          ) CV-07-4789 AHM (RZx)
                                     )
NITEK INTERNATIONAL, LLC and         )
DOES 1-10                            )
             Defendants.             )


30(b)(6) videotaped deposition of Nitek

International, LLC, by and through its representative,

EDWARD L. POLANEK, taken before NADINE J. WATTS, CSR,

RPR, and Notary Public, pursuant to the Federal Rules of

Civil Procedure for the United States District Courts

pertaining to the taking of depositions, at Suite 2400,

131 South Dearborn Street, in the City of Chicago, Cook

County, Illinois, at 10:05 o'clock a.m. on the 29th day

of November, A.D., 2007.

MERRILL    LEGAL    SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com
d10b5543-3e83-47f8-ab1d-122001946e35

**Exhibit 2**

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Page 12

| | | |
|---|---|---|
| 10:16:14 | 1 | MR. HECKER:  It's foundational. |
| 10:16:15 | 2 | MR. GERSTMAN:  Okay. |
| 10:16:17 | 3 | THE WITNESS:  Well, it would be easier possibly if I |
| 10:16:20 | 4 | just went through the document -- the catalog that we |
| 10:16:23 | 5 | have. |
| 10:16:23 | 6 | MR. HECKER:  Q   Sure, that's fine. |
| 10:16:23 | 7 | A   Do you want a general description of what they |
| 10:16:25 | 8 | are? |
| 10:16:25 | 9 | Q   The catalog is fine.  That would be fine.  I |
| 10:16:27 | 10 | have no objection to that. |
| 10:16:31 | 11 | THE WITNESS:  Is that all right? |
| 10:16:32 | 12 | MR. GERSTMAN:  That's fine. |
| 10:16:41 | 13 | THE WITNESS:  There are a number of products that |
| 10:16:45 | 14 | are covered by it, but these are some of the primary |
| 10:16:49 | 15 | products.  There's plug-in modules for a system that |
| 10:16:53 | 16 | inserts video and power and data into a structured |
| 10:16:59 | 17 | cabling system.  It includes a power supply and the |
| 10:17:04 | 18 | plug-in monitors for the system. |
| 10:17:06 | 19 | MR. HECKER:  Q   Okay.  And so that's page 17 of |
| 10:17:08 | 20 | your catalog? |
| 10:17:09 | 21 | A   That's correct. |
| 10:17:09 | 22 | Q   And so those are -- those are products that |
| 10:17:13 | 23 | relate to the patent, Exhibit 1? |
| 10:17:16 | 24 | MR. GERSTMAN:  Well, objection.  The term relates |
| 10:17:17 | 25 | to, it's a little unclear. |

MERRILL   LEGAL   SOLUTIONS
800-826-0277    818-593-2300    Fax 818-593-2301    www.merrillcorp.com
d10b5543-3e83-47f8-ab1d-122001946e35

**Exhibit 2**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 10:17:19 | 1 | MR. HECKER:  Q   I can be more specific.  Do you |
| 10:17:22 | 2 | mark any of your products with the Patent No. 7,193,149? |
| 10:17:28 | 3 | A   Yes. |
| 10:17:28 | 4 | Q   Okay.  Can you tell me from the catalog or from |
| 10:17:33 | 5 | your memory what products you mark with that number? |
| 10:17:35 | 6 | A   Well, I believe all of the products on this |
| 10:17:38 | 7 | page.  These are all part of the overall system. |
| 10:17:40 | 8 | Q   Are there other products in the catalog as well |
| 10:17:43 | 9 | that are also marked with that patent number? |
| 10:17:47 | 10 | A   Yes, because they are other components that are |
| 10:17:51 | 11 | not shown on this page.  These products are also on page |
| 10:17:57 | 12 | 15. |
| 10:17:58 | 13 | Q   Okay. |
| 10:18:23 | 14 | A   And this product would be one of them on page 5, |
| 10:18:27 | 15 | the VB43ATF. |
| 10:18:29 | 16 | MR. HECKER:  Great.  I wonder, is it okay if I mark |
| 10:18:32 | 17 | the catalog with an exhibit number? |
| 10:18:34 | 18 | MR. GERSTMAN:  Well, do you have a copy that you can |
| 10:18:35 | 19 | mark of your own? |
| 10:18:36 | 20 | MR. HECKER:  Let me see if we do.  Sure enough.  Let |
| 10:18:41 | 21 | me provide you with Exhibit No. 2. |
| 10:19:02 | 22 | (Document marked as Deposition |
| 10:19:02 | 23 | Exhibit 2 for identification.) |
| 10:19:03 | 24 | MR. HECKER:  Q   And if you would, we'll provide you |
| 10:19:06 | 25 | with a pen, if you could just circle the product numbers |

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com
d10b5543-3e83-47f8-ab1d-122001946e35

Exhibit 2

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 14

| | | |
|---|---|---|
| 10:19:10 | 1 | that are marked with the patent number, that would be |
| 10:19:12 | 2 | helpful for the -- |
| 10:19:14 | 3 | MR. GERSTMAN:  These are the ones with the patent |
| 10:19:15 | 4 | number -- |
| 10:19:16 | 5 | THE WITNESS:  I'm not sure if that one product is |
| 10:19:18 | 6 | marked with the patent number or not, this one.  The |
| 10:19:21 | 7 | others -- |
| 10:19:21 | 8 | MR. HECKER:  Q   Let's start with the ones that you |
| 10:19:23 | 9 | know are marked with the patent number of Exhibit 1. |
| 10:19:45 | 10 | A   I missed page 16 also, those products, the |
| 10:19:47 | 11 | products on page 16.  We mentioned page 17.  There are |
| 10:20:04 | 12 | some products on page 18, too. |
| 10:20:07 | 13 | Q   Okay.  So if you would just -- let's just circle |
| 10:20:10 | 14 | the numbers of the products if you can that you believe |
| 10:20:13 | 15 | would be marked with the patent number. |
| 10:20:15 | 16 | A   The patent number would most likely be on the |
| 10:20:18 | 17 | cabinet.  It's not necessarily on these modules.  Okay? |
| 10:20:21 | 18 | Q   Okay.  When you say -- |
| 10:20:23 | 19 | A   I don't know how you want me to do that.  This |
| 10:20:25 | 20 | is an enclosure that these modules plug into. |
| 10:20:28 | 21 | Q   And you're looking at which page now? |
| 10:20:30 | 22 | A   On page 16. |
| 10:20:31 | 23 | Q   Okay.  Let's start with page 16. |
| 10:20:33 | 24 | A   All right. |
| 10:20:34 | 25 | Q   There are products that -- for which the |

MERRILL    LEGAL    SOLUTIONS
800-826-0277    818-593-2300    Fax 818-593-2301    www.merrillcorp.com
d10b5543-3e83-47f8-ab1d-122001946e35

Exhibit 2

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 15

| | | |
|---|---|---|
| 10:20:37 | 1 | cabinets on page 16 are marked with the patent number? |
| 10:20:41 | 2 | A   Yes. |
| 10:20:41 | 3 | Q   Okay.  And can you circle for me the product |
| 10:20:44 | 4 | numbers whose cabinets or who -- would be marked with |
| 10:20:47 | 5 | the patent number? |
| 10:20:54 | 6 | A   Okay.  This is basically just another picture of |
| 10:20:56 | 7 | the same cabinet. |
| 10:20:58 | 8 | Q   Sure, right. |
| 10:20:59 | 9 | A   I believe this one has the marking, too.  And |
| 10:21:01 | 10 | then down here, you know, we're just looking at the same |
| 10:21:08 | 11 | items again.  You want those circled too? |
| 10:21:10 | 12 | Q   Yes.  The idea isn't necessarily that they're |
| 10:21:12 | 13 | all different.  I just want to circle on the pages to |
| 10:21:15 | 14 | start the process here. |
| 10:21:16 | 15 | A   All right.  Page 17 would be the same idea up |
| 10:21:22 | 16 | above.  We have the cabinet that has the modules in it, |
| 10:21:26 | 17 | the empty cabinet, the power supply, and then we have |
| 10:21:35 | 18 | the same items in a system down below.  These are all |
| 10:21:40 | 19 | items that would be -- that I believe are marked with |
| 10:21:42 | 20 | the number.  Is that what you're -- |
| 10:21:45 | 21 | Q   That's right. |
| 10:21:52 | 22 | A   Okay.  And then on page 18, that's the same |
| 10:21:55 | 23 | idea; the cabinet at the top, the empty cabinet, and the |
| 10:22:01 | 24 | power supply.  And down in the system below the same |
| 10:22:08 | 25 | items.  Okay? |

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com
d10b5543-3e83-47f8-ab1d-122001946e35

Exhibit 2

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 16

| | | |
|---|---|---|
| 10:22:11 | 1 | Q    Anything else in the catalog that you believe is |
| 10:22:15 | 2 | marked with the patent number of Exhibit No. 1? |
| 10:22:20 | 3 | A    Well, I'm not sure, but -- |
| 10:22:22 | 4 | Q    Okay.  Take a moment. |
| 10:22:23 | 5 | A    -- I believe -- What was that page number?  On |
| 10:22:56 | 6 | page 14.  Page 14 -- No, 15, page 15. |
| 10:23:13 | 7 | Q    Okay. |
| 10:23:13 | 8 | A    I'm not sure that these items are. |
| 10:23:15 | 9 | Q    All right.  So they may -- |
| 10:23:17 | 10 | A    Okay, yes |
| 10:23:17 | 11 | Q    So they may or may not be? |
| 10:23:18 | 12 | A    They may or may not be, right. |
| 10:23:19 | 13 | Q    You're not sure of that.  Any others that you |
| 10:23:21 | 14 | are sure of other than the ones you've circled? |
| 10:23:27 | 15 | A    No. |
| 10:23:27 | 16 | Q    Okay.  So that's with respect to products that |
| 10:23:32 | 17 | are marked with the patent number.  Do you mark -- Well, |
| 10:23:38 | 18 | let's put it this way.  Are there any products covered |
| 10:23:40 | 19 | by the patent that you don't put the patent number on? |
| 10:23:44 | 20 | A    Well, it's possible we don't put it on the -- |
| 10:23:48 | 21 | that balun unit, the VB43ATF. |
| 10:23:51 | 22 | Q    Okay. |
| 10:23:51 | 23 | MR. GERSTMAN:  Let me object to that, covered by the |
| 10:23:54 | 24 | patent.  The issue is what is he putting the patent |
| 10:23:59 | 25 | numbers on, and it's a system patent.  So, you know, |

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com
d10b5543-3e83-47f8-ab1d-122001946e35

**Exhibit 2**

# EXHIBIT 2

# DEPOSITION PAGES 17, 18, 34-36, 38-41, 44, 45, AND 49

# FILED UNDER SEAL

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 51

| | | |
|---|---|---|
| 11:41:20 | 1 | Q   Does Nitek provide copies of its catalog to its |
| 11:41:25 | 2 | distributors in California? |
| 11:41:30 | 3 | A   Yes. |
| 11:41:41 | 4 | Q   Do you know the volume of copies that are |
| 11:41:44 | 5 | provided? |
| 11:41:45 | 6 | A   No. |
| 11:41:50 | 7 | Q   And then the distributors in California, when |
| 11:41:53 | 8 | they distribute to customers or prospective customers, |
| 11:42:00 | 9 | would use the label to identify themselves in the |
| 11:42:05 | 10 | distributor by box? |
| 11:42:05 | 11 | A   Yes. |
| 11:42:17 | 12 | Q   Does Nitek have competitors in California? |
| 11:42:24 | 13 | A   Yes. |
| 11:42:26 | 14 | Q   Do you know how many competitors Nitek has in |
| 11:42:28 | 15 | California? |
| 11:42:33 | 16 | A   Well, I only know of two offhand. |
| 11:42:35 | 17 | Q   And who are the two competitors that Nitek has |
| 11:42:37 | 18 | that are located in California? |
| 11:42:40 | 19 | A   NVT and Vigitron. |
| 11:42:46 | 20 | Q   And what products does NVT compete with in |
| 11:42:58 | 21 | California with Nitek? |
| 11:43:10 | 22 | A   Well, I think probably many of the products that |
| 11:43:17 | 23 | we have.  That's all I can say.  I mean, I'm not real |
| 11:43:21 | 24 | familiar with them. |
| 11:43:24 | 25 | Q   Okay.  Does NVT have products or systems that |

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com
d10b5543-3e83-47f8-ab1d-122001946e35

**Exhibit 2**

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Page 72

| | | |
|---|---|---|
| 12:24:01 | 1 | does. And it sells its security products in California; |
| 12:24:04 | 2 | isn't that true? |
| 12:24:07 | 3 | A    Well, when we put this together, I knew what I |
| 12:24:10 | 4 | had in mind, and what I just told you is what I had in |
| 12:24:14 | 5 | mind. I mean, it was a matter of the business -- |
| 12:24:16 | 6 | conducting business is operating a operation, have an |
| 12:24:20 | 7 | operation. That, in my mind, would be conducting the |
| 12:24:22 | 8 | business. |
| 12:24:23 | 9 | Q    So all you meant in the declaration was not -- |
| 12:24:28 | 10 | you didn't mean -- by your declaration, when you said |
| 12:24:33 | 11 | Nitek does not conduct its business in California, you |
| 12:24:36 | 12 | didn't mean by that that Nitek doesn't have sales in |
| 12:24:40 | 13 | California, correct? |
| 12:24:41 | 14 | A    Correct, because further down we say that. |
| 12:24:43 | 15 | Q    I understand. I'm just -- |
| 12:24:44 | 16 | A    Okay. |
| 12:24:45 | 17 | Q    And you didn't mean that Nitek doesn't have |
| 12:24:50 | 18 | sales reps in California, right? |
| 12:24:52 | 19 | A    That's correct. |
| 12:24:52 | 20 | Q    And you didn't mean that Nitek doesn't have |
| 12:24:55 | 21 | customers in California, correct? |
| 12:24:56 | 22 | A    That's correct. |
| 12:24:57 | 23 | Q    And you didn't mean that Nitek doesn't provide |
| 12:25:01 | 24 | literature in California, correct? |
| 12:25:03 | 25 | A    That's correct. |

MERRILL    LEGAL    SOLUTIONS
800-826-0277    818-593-2300    Fax 818-593-2301    www.merrillcorp.com
d10b5543-3e83-47f8-ab1d-122001946e35

Exhibit 2

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 73

| 12:25:04 | 1 | Q   And you didn't mean that Nitek doesn't have end |
| 12:25:08 | 2 | users in California, correct? |
| 12:25:10 | 3 | A   That's correct. |
| 12:25:12 | 4 | Q   All you meant was that its local facilities and |
| 12:25:17 | 5 | employees are in Illinois; that's what you meant? |
| 12:25:20 | 6 | A   All of our operations. |
| 12:25:21 | 7 | Q   When you say all of your operations, what do you |
| 12:25:23 | 8 | mean by operations? |
| 12:25:24 | 9 | A   Okay.  All of our manufacturing, all of our |
| 12:25:28 | 10 | headquarters are -- you know, administration, all of our |
| 12:25:31 | 11 | sales administration.  The company is operated in |
| 12:25:34 | 12 | Illinois, conducts its business in Illinois.  And that's |
| 12:25:43 | 13 | what I meant. |
| 12:25:51 | 14 | Q   California is an important market for Nitek, |
| 12:25:54 | 15 | correct? |
| 12:25:54 | 16 | A   Yes. |
| 12:26:23 | 17 | MR. HECKER:  It's about 12:25.  I know you wanted to |
| 12:26:26 | 18 | break for lunch.  Since I'm -- I don't want to be cut |
| 12:26:30 | 19 | off in the middle of a line of questioning, maybe now |
| 12:26:33 | 20 | would be a good time. |
| 12:26:34 | 21 | MR. GERSTMAN:  Oh, okay. |
| 12:26:35 | 22 | MR. HECKER:  How long would you like? |
| 12:26:37 | 23 | MR. GERSTMAN:  45 minutes. |
| 12:26:38 | 24 | MR. HECKER:  That sounds fine. |
| 12:26:39 | 25 | THE VIDEOGRAPHER:  We are going off the video record |

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com
d10b5543-3e83-47f8-ab1d-122001946e35

Exhibit 2

# EXHIBIT 2

# DEPOSITION PAGE 75

# FILED UNDER SEAL

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 77

| | | |
|---|---|---|
| 13:34:07 | 1 | Q   Okay.  Would you -- |
| 13:34:08 | 2 | A   If that's true, then I believe it was, but I |
| 13:34:12 | 3 | don't recall. |
| 13:34:12 | 4 | Q   Okay.  Let's take a look at the declaration that |
| 13:34:15 | 5 | you submitted and there's an exhibit attached to it. |
| 13:34:19 | 6 | A   Okay. |
| 13:34:21 | 7 | Q   And it says -- on the bottom of that page that |
| 13:34:25 | 8 | I'm referring to, it says both Exhibit 2, page 15, and |
| 13:34:29 | 9 | Exhibit D, page 8. |
| 13:34:30 | 10 | A   Okay. |
| 13:34:41 | 11 | Q   Okay. |
| 13:34:41 | 12 | A   Well, then maybe it is, if that's when it was. |
| 13:34:44 | 13 | Q   Well, who prepared this press release, do you |
| 13:34:49 | 14 | know? |
| 13:34:49 | 15 | A   I believe I prepared it. |
| 13:34:54 | 16 | Q   Okay.  And why did you prepare it? |
| 13:34:58 | 17 | A   We were pretty happy about having a patent |
| 13:35:02 | 18 | issued and we just kind of, you know, sent the press |
| 13:35:04 | 19 | release out to the whole world. |
| 13:35:07 | 20 | MR. GERSTMAN:  This seems to be getting off the |
| 13:35:09 | 21 | topic of the deposition, but I'll let you go ahead.  I |
| 13:35:13 | 22 | just don't see how it's related. |
| 13:35:15 | 23 | MR. HECKER:  Well, it goes directly to your argument |
| 13:35:18 | 24 | on jurisdiction.  It's directly on point.  You argued a |
| 13:35:21 | 25 | whole section on this, and so I'm directing it to that. |

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com
d10b5543-3e83-47f8-ab1d-122001946e35

**Exhibit 2**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 85

| | | |
|---|---|---|
| 13:48:40 | 1 | I -- that you're not able to tell me today, but, rather, |
| 13:48:43 | 2 | it would be something I would need to determine by |
| 13:48:46 | 3 | actually looking at the list of recipients that you have |
| 13:48:54 | 4 | with respect to any given press release, correct? |
| 13:48:58 | 5 | A    Yes. |
| 13:49:10 | 6 | Q    Do you send other literature, information or |
| 13:49:16 | 7 | materials to NVT? |
| 13:49:19 | 8 | A    No. |
| 13:49:20 | 9 | Q    Okay.  Why not? |
| 13:49:23 | 10 | MR. GERSTMAN:  Again, it's a business thing.  It has |
| 13:49:26 | 11 | nothing to do with jurisdiction.  And I instruct you not |
| 13:49:29 | 12 | to answer as to your mental thoughts as to why you would |
| 13:49:33 | 13 | or would not send something to a competitor. |
| 13:49:37 | 14 | MR. HECKER:  I just want to refer counsel to page 12 |
| 13:49:40 | 15 | and 13 of his brief.  I do believe these questions are |
| 13:49:45 | 16 | proper, and I'm not understanding the basis for your |
| 13:49:48 | 17 | instruction not to answer on these questions, but |
| 13:49:50 | 18 | obviously you're entitled to make whatever instructions |
| 13:49:53 | 19 | you would like. |
| 13:49:56 | 20 | I don't agree with them, and I don't believe |
| 13:49:58 | 21 | they're proper under the Federal rules, but you can |
| 13:50:02 | 22 | certainly make them.  We'll address them in due course. |
| 13:50:06 | 23 | In the brief that was filed in the case there's |
| 13:50:25 | 24 | a section on specific jurisdiction on page 12, beginning |
| 13:50:30 | 25 | at page 12, and it refers to activities concerning the |

MERRILL    LEGAL    SOLUTIONS
800-826-0277    818-593-2300    Fax 818-593-2301    www.merrillcorp.com
d10b5543-3e83-47f8-ab1d-122001946e35

Exhibit 2

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 88

| 13:53:50 | 1 | but at the same time not allowing me to ask questions |
| 13:53:54 | 2 | that are proper under the Federal rules in order to |
| 13:53:57 | 3 | explore the motivation for sending the press release. |
| 13:54:00 | 4 | MR. GERSTMAN:  I'm sorry, the letter speaks for |
| 13:54:01 | 5 | itself and the theory of a person's mind is not required |
| 13:54:05 | 6 | to be stated on this deposition.  So I'll stick with my |
| 13:54:10 | 7 | objection and my instruction. |
| 13:54:12 | 8 | MR. HECKER:  Do you accept your attorney's |
| 13:54:13 | 9 | instruction not to answer? |
| 13:54:14 | 10 | THE WITNESS:  Yes. |
| 13:54:37 | 11 | MR. HECKER:  Q  Other than your personal knowledge |
| 13:54:41 | 12 | about having sent Nitek -- Sorry, strike that. |
| 13:54:49 | 13 | Other than your personal knowledge of having |
| 13:54:52 | 14 | sent NVT the press release that's attached to your |
| 13:55:00 | 15 | declaration concerning the patent of Exhibit No. 1, as |
| 13:55:08 | 16 | you sit here today, do you have any personal knowledge |
| 13:55:12 | 17 | about any other specific press releases of Nitek that |
| 13:55:19 | 18 | have ever been sent to NVT? |
| 13:55:23 | 19 | A  No, I don't.  I can't recall. |
| 13:55:28 | 20 | Q  So you're not able to testify about any other |
| 13:55:33 | 21 | press releases having been sent to NVT today, correct? |
| 13:55:37 | 22 | A  That's correct. |
| 13:55:59 | 23 | Q  Now, in the press release that you wrote |
| 13:56:19 | 24 | attached to your declaration it quotes James Hertrich, |
| 13:56:32 | 25 | correct? |

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com
d10b5543-3e83-47f8-ab1d-122001946e35

**Exhibit 2**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 89

| | | |
|---|---|---|
| 13:56:33 | 1 | A    That's correct. |
| 13:56:37 | 2 | Q    And in that quote it states that the patent |
| 13:56:44 | 3 | protects Nitek's intellectual property, correct? |
| 13:56:50 | 4 | A    That's what it says, yes. |
| 13:56:53 | 5 | Q    What intellectual property are you referring to |
| 13:57:00 | 6 | there? |
| 13:57:00 | 7 | A    Well, that was James Hertrich that made that |
| 13:57:03 | 8 | comment. |
| 13:57:03 | 9 | Q    Right.  You wrote the press release though, |
| 13:57:06 | 10 | correct? |
| 13:57:06 | 11 | A    Right. |
| 13:57:08 | 12 | Q    So you wrote that quote, correct? |
| 13:57:11 | 13 | A    Correct. |
| 13:57:15 | 14 | Q    Do you understand what it means? |
| 13:57:18 | 15 | A    I believe it's referring -- it would be |
| 13:57:20 | 16 | referring to our patented system. |
| 13:57:27 | 17 | Q    The patented system meaning UTPLinks? |
| 13:57:31 | 18 | A    UTPLinks is not in and of itself the patented |
| 13:57:34 | 19 | system. |
| 13:57:35 | 20 | Q    Okay.  The patent covers the core technology of |
| 13:57:50 | 21 | the UTPLinks system? |
| 13:57:53 | 22 | A    That's what -- that's what I wrote, yes. |
| 13:57:57 | 23 | Q    That's correct, am I right? |
| 13:58:00 | 24 | A    Let me read this again. |
| 13:58:01 | 25 | MR. HECKER:  The term covers -- |

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com
d10b5543-3e83-47f8-ab1d-122001946e35

Exhibit 2

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 91

| | | |
|---|---|---|
| 13:59:01 | 1 | Okay. So let me read that again so we have a |
| 13:59:03 | 2 | clear record. Nitek, a world leader in the design, |
| 13:59:06 | 3 | manufacture and marketing of video and data transmission |
| 13:59:09 | 4 | systems has been awarded a U.S. patent for its, quote, |
| 13:59:12 | 5 | system for handling video, control signals and power, |
| 13:59:17 | 6 | the core technology of its UTPLinks structured cabling |
| 13:59:22 | 7 | compliant CCTV system and other proprietary Nitek |
| 13:59:27 | 8 | products, correct? |
| 13:59:29 | 9 | A    Correct. |
| 13:59:30 | 10 | Q    And then the next sentence says, Nitek U.S. |
| 13:59:33 | 11 | Patent No. 7,193,149 covers the use of structured |
| 13:59:39 | 12 | cabling networks to deliver power, video and data for |
| 13:59:46 | 13 | control (PVD) to cameras and PTZ units in a CCTV system. |
| 13:59:54 | 14 | Is that correct? |
| 13:59:55 | 15 | A    That's correct. |
| 13:59:56 | 16 | Q    Okay. Are both of those statements true? |
| 14:00:01 | 17 | MR. GERSTMAN:  Objection, and I instruct you not to |
| 14:00:02 | 18 | answer.  Whether they're true or not is totally |
| 14:00:05 | 19 | irrelevant to this deposition and to the issue of |
| 14:00:08 | 20 | personal jurisdiction.  And I'm not implying that |
| 14:00:13 | 21 | they're not a thousand percent true.  I just think it's |
| 14:00:16 | 22 | completely improper to be asking him details about the |
| 14:00:19 | 23 | specific words in the press release.  It has nothing |
| 14:00:22 | 24 | whatsoever to do with personal jurisdiction, and I |
| 14:00:28 | 25 | instruct you not to answer. |

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com
d10b5543-3e83-47f8-ab1d-122001946e35

**Exhibit 2**



# NITEK®

## Twisted Pair Video Network Solutions













# Product Catalog



EXHIBIT
# 2
11 29 07

Exhibit 2



# Welcome

Nitek is a Rolling Meadows, Illinois based company with a primary focus on design, development and manufacturing of high performance, reliable CCTV transmission systems. Customers in virtually every segment of commerce, industry and government have come to depend and rely upon Nitek products for their CCTV transmission requirements.

Over twenty years ago, Nitek made a commitment to find and fill vital needs with useful, cost-effective products in the area of video security. The result of that commitment has been a continually developing, diverse line of products for the transmission of video, power and data over unshielded twisted pair cables, structured cabling networks and leased telephone lines. Nitek products have become an integral part of the "security backbone"; typically transparent to the system user, but critical to the system performance and the end result.

Examples of Nitek's commitment and capabilities are exhibited in the unique and useful products developed by the company. They range from high noise immunity, heavy duty passive balun products currently being used in thousands of applications to long range high quality transmission products, capable of live video transmission over UTP cables in excess of two miles in length.

Recently, Nitek introduced a complete structured cabling compliant CCTV system, the first of its kind, named "UTPLinks". UTPLinks is a scalable infrastructure designed to support any CCTV application today and to accommodate the anticipated migration to digital technology in the future. The UTPLinks system delivers power, video and camera positioning control signals over new or existing network cabling. The system is self-contained and can be viewed from anywhere in the world with the use of a Digital Video Recorder (DVR), requiring less then 3% of the bandwidth of an IP camera system.

Nitek systems currently enable safety and security in a wide range of applications, such as government installations, casinos, schools, hospitals, sports complexes, transportation facilities, warehouses, large distribution facilities, retail stores, industrial complexes, shopping malls, corporate campuses and numerous other applications throughout the world.

Nitek products are UL listed and meet CE requirements; they are developed and manufactured in the United States of America.

## NITEK Inc.

**Main office:**
5410 Newport Drive
Rolling Meadows, IL 60008
Web: http://www.nitek.net
Email: info@nitek.net

Phone: (800) 528-4343
Local Phone: (847) 259-8900
Fax: (847) 259-1300

**Europe Office:**
De Schans 19-21 2a
8231 KA Lelystad

Phone: +31(0)320-230005
Fax +31(0)320-282186



Exhibit 2

# Index

## Products:

Single Channel Units............................3
Single Channel Systems......................6
Multi Channel Systems.........................7
Multi Channel Modular Systems..........11
Modular Rack Systems.........................13
XP Series Units.....................................14
UTPLinks...............................................15
V-Link Systems.....................................18
Surge Protection...................................19
Data Transmission Systems.................20
Audio/Video Systems...........................21
Accessories..........................................21



VB37
Page 3



TS510M
Page 7

## Features:

Lincoln College of Technology - Case Study.................22
The Palace of Auburn Hills - Case Study.......................23
Distance Guide..............................................................25



VH1651M
Page 9

## Live Technical Support Available!!

Any questions about the installation and performance of Nitek and twisted pair products can be answered by one of our engineers or technical support staff.

**Monday through Friday - 6:30 am to 5:00 pm CST**

Read up on company news, new products, more information, view full product specifications, A&E specifications and instruction manuals by visiting our web site at http://www.nitek.net.

*NITEK / 3*

**Exhibit 2**

# NITEK.
### Twisted Pair Video Network Solutions

## Video Balun Transceivers - up to 3,000 feet



### Features:
- Up to 3,000 feet with active receivers
- Up to 750 feet with passive transceivers
- Superior noise rejection
- Rugged casings
- Wire strip gage
- Weatherproof design
- UL listed
- CE approved
- Lifetime warranty

### VB37F

Video Balun Transceiver
Distance: 3,000 feet w/ active
750 feet w/ passive

### VB39F

Video Balun Transceiver
Distance: 3,000 feet w/ active
750 feet w/ passive
Features: Surge Protection



### VB37M

Video Balun Transceiver
Distance: 3,000 feet w/ active
750 feet w/ passive

### VB39M

Video Balun Transceiver
Distance: 3,000 feet w/ active
750 feet w/ passive
Features: Surge Protection

## Installation
Sample installations using Passive to Passive devices and using Passive to Active devices



750 ft

3,000 ft

Receiver
TR515 or TR520

4 / Single Channel Units

**Exhibit 2**

# *Video Balun Transceivers* - up to 3,000 feet



## Features:

- Up to 3,000 feet with active receivers
- Up to 750 feet with passive transceivers
- Mini-coax pigtail for in-camera or dome mounting
- Superior noise rejection
- Connects directly to video
- Rugged casings
- Lifetime warranty



### VB31PT
Video Balun Transceiver
Features:
- Screwless terminals
- Transmits video



### VB31M
Video Balun Transceiver
Features:
- RJ45 jack
- Transmits video



### VB31ATF
Video Balun Combiner
Features:
- RJ45 jack
- Transmits video and power



### VB43ATF
Video Balun Combiner
Features:
- RJ45 jack
- Screwless terminals
- Light link indicators
- Transmits video, power and data

## *Close Up*
Take a closer look at the features that set NITEK above the rest.

### Screwless Terminals

Screwless terminals featured on the VB31PT and VB43ATF units provide quick, confident and secure connections

### RJ45 Jack Connector

The RJ45 jack allows for video, power and data to be connected through a single cable.

### Intelligent Link Indicators

LED lights on the VB43ATF indicate the presence of power and data transmissions.

### Mini Coax Pig-tail
Mini-coax on the units allow for direct connections to the video source.

*NITEK / 5*

**Exhibit 2**



# NITEK®
### Twisted Pair Video Network Solutions

## Active Receivers and Transmitters



### Features:

- Up to 6,000 feet
- Intelligent link indicators - detect video & power
- Digital dip switches - set video distances
- Superior noise rejection
- Rugged ABS housing
- Wire strip gage
- Weatherproof design
- UL listed
- CE approved

### TR515

Active Video Receiver
Distance: 1,500 feet
Power: 12/24 VAC/DC

### TR560

Active Video Receiver
Distance: 6,000 feet w/ active
3,000 feet w/ passive
Power: 12/24 VAC/DC

### TT560

Active Video Transmitter
Distance: 6,000 feet w/ active
Power: 12/24 VAC/DC

## Installation
### Sample installations using Active Transmitters, Receivers, and Transmission Systems



**6 / Single Channel Units**

Exhibit 2

# Transmission Systems - up to 12,000 feet



## Features:

- Up to 12,000 feet
- Complete video transmission systems
- Intelligent link indicators - detect video & power
- Digital dip switches - set video distances
- Weatherproof design
- Superior noise rejection
- Rugged casings
- Lifetime warranty

### TS510M

Video Transmission System
Distance: 1,000 feet
Features: Transmits Video and Power
Includes: 1 - VB43ATF
1 - TR510M

### TS515

Video Transmission System
Distance: 1,500 feet
Includes: 1 - TR515
1 - VB37F

### TS560

Video Transmission System
Distance: 3,000 feet
Includes: 1 - TR560
1 - VB37F

### EX560
Video Transmission System
Distance: 6,000 feet
Includes: 1 - TR560
1 - TT560

### EX1120

Video Transmission System
Distance: 12,000 feet
Includes: 1 - TR1120
1 - TT1120

## Close Up
*Take a closer look at the features that set NITEK above the rest.*

### Dip Switches and Intelligent Link Indicators

Nitek's method of video compensation is very unique. The integrated amplification circuits are digitally activated through the use of dip switches which allow for a 1 volt peak to peak video signal to be set without any guess work. Key features of the dip switches include: digital fine tuning; ability to make quick adjustments; never need to be readjusted; no unintentional setting changes.

Nitek active transmitters and receivers also boast Intelligent Link Indicators that light up to display the presence of video and power.

*NITEK / 7*

**Exhibit 2**



**NITEK**
*Twisted Pair Video Network Solutions*

## 4 Channel Video Hubs - up to 6,000 feet



### Features:
- Up to 6,000 feet with active transmitters
- Up to 3,000 feet with passive transmitters
- Built-in protection from power surges and transients
- High immunity to noise and interference

**VH439**
4 Channel Passive Hub
Distance: 3,000 feet w/active
750 feet w/passive

**Features:**
- Screw terminals or RJ45 jack
- No power required



**VH451**
4 Channel Active Hub
Distance: 1,500 feet
**Features:**
- Screwless terminals or RJ45 jack
- Intelligent link indicators



**VH456**
4 Channel Active Hub
Distance: 6,000 feet w/active
3,000 feet w/passive
**Features:**
- Screwless terminals or RJ45 jack
- Intelligent link indicators



## Installation
Sample system hook up featuring 4 channel hubs.



**8 / Multi Channel Units**

**Exhibit 2**

# 8 / 16 Channel Passive

## Features:

- Up to 750 feet
- One rack unit high
- Built-in protection from power surges and transients
- High immunity to noise and interference
- Passive unit - requires no power
- UL listed
- CE approved
- Lifetime warranty



**VH839**
8 Channel Passive Receiver Hub
Connection Type: Screw terminals

**VH839M**
8 Channel Passive Receiver Hub
Connection Type: RJ45 jack

**VH1639**
16 Channel Passive Receiver Hub
Connection Type: Screw terminals

**VH1639M**
16 Channel Passive Receiver Hub
Connection Type: RJ45 jack

## Close Up

*Get a closer look at new features of the passive hubs*

Standard models like the VH839 and the VH1639 feature the traditional screw terminals for twisted pair connections.

M models of our passive and active hubs now feature RJ45 jacks. This makes for quick and efficient connections. Each RJ45 jack can contain up to 4 twisted pairs of video.



*NITEK / 9*

**Exhibit 2**



# 8 / 16 Channel Active Hubs

## Features:

- Up to 1,500 feet
- Digital dip switches - set video distances
- Dual output video distribution
- Intelligent link indicators
- Built-in surge suppression
- Built-in ground loop isolation
- Superior noise rejection
- One rack unit high





**VH851**
8 Channel Active Receiver Hub
Distance: Up to 1,500 feet
Connection Type: Screw terminals



**VH851M**
8 Channel Active Receiver Hub
Distance: Up to 1,500 feet
Connection Type: RJ45 jack



**VH1561**
16 Channel Active Receiver Hub
Distance: Up to 1,500 feet
Connection Type: Screw terminals



**VH1651M**
16 Channel Active Receiver Hub
Distance: Up to 1,500 feet
Connection Type: RJ45 jack

## Installation
*Sample installation using active multi channel hubs*



**10 / Multi Channel Units**

**Exhibit 2**

# 8 / 16 Channel Active Hubs

## Features:
- Up to 6,000 feet w/ active transmitters
- Up to 3,000 feet w/ passive transceivers
- Digital dip switches - set video distances
- Dual output video distribution
- Intelligent link indicators
- Built-in surge suppression
- Built-in ground loop isolation
- Superior noise rejection
- One rack unit high



### VH856
8 Channel Active Receiver Hub
**Distance:** Up to 6,000 feet w/ active
Up to 3,000 w/ passive
**Connection Type:** Screw terminals





### VH856M
8 Channel Active Receiver Hub
**Distance:** Up to 6,000 feet w/ active
Up to 3,000 feet w/ passive
**Connection Type:** RJ45 jack





### VH1656
16 Channel Active Receiver Hub
**Distance:** Up to 6,000 feet w/ active
Up to 3,000 w/ passive
**Connection Type:** Screw terminals

### VH1656M
16 Channel Active Receiver Hub
**Distance:** Up to 6,000 feet w/ active
Up to 3,000 feet w/ passive
**Connection Type:** RJ45 jack

## Close Up
*Take a closer look at some of the features that set NITEK above the rest.*

**Screw Terminals**
Standard units feature the traditional screw terminals for twisted pair connections.

**RJ45 Jacks**
'M' units offer an alternative of RJ45 jacks for quick and confident connections.

**Dual Video Outputs**
All active hubs provide dual video outputs to make recording and monitoring easy.



*NITEK / 11*

**Exhibit 2**



## 32 Channel Modular Hubs

### Features:

- Up to 6,000 feet with active receivers
- Up to 3,000 feet with passive transceivers
- Modular design allows for video at various distances
- Intelligent link indicators
- Built-in surge suppression
- Built-in ground loop isolation
- Superior noise rejection
- UL listed
- CE approved



**VH3239**
32 Channel Receiver Hub
Distance: 750 feet
Includes: 4 - VB41x8 cards

**VH3251**
32 Channel Receiver Hub
Distance: 1,500 feet
Includes: 4 - TR515x8 cards

**VH3256**
32 Channel Receiver Hub
Distance: 6,000 feet w/ active
3,000 feet w/ passive
Includes: 4 - TR560x8 cards

### Installation

Samples installation using 32 channel modular hubs.

750 feet — VH3239 — VB97
1,500 feet — VH3251 — VB37
3,000 feet — VH3256 — VB37
6,000 feet — VH3256 — TT560

*12 / Multi Channel Units*

**Exhibit 2**

# 32 Channel Modular Hubs



## Features:

- Up to 6,000 feet with active receivers
- Up to 3,000 feet with passive transceivers
- Modular design
- Allows mixing passive and active cards
- Intelligent link indicators
- Built-in surge suppression
- Built-in ground loop isolation
- Superior noise rejection



**VH3200**
32 Port Powered Modular Video Hub



**VB41x8**
Video Balun Transceiver Card
Distance: 750 feet



**TR515x8**
Video Receiver Card
Distance: 1,500 feet



**TR560x8**
Active Video Receiver Card
Distance: 6,000 feet w/ active
3,000 feet w/ passive

## Close Up
Take a closer look at the features of the 32 channel hubs

**Hot Swappable Modular Cards**
Video cards can be inserted, removed and interchanged while the unit is active.

**Accommodates Different Distances**
With different modular cards in each slot of the card cage the VH3200 series can effectively receive video up to 6,000 feet.

**Front Panel Access to Modular Cards**
Gain access to the modular cards without the need to disconnect the unit from the CCTV system.



*NITEK / 13*

**Exhibit 2**


**NITEK**®
Twisted Pair Video Network Solutions

# Video Balun Transceivers - up to 3,000 feet

## Features:

- Up to 3,000 feet with active receivers
- Up to 750 feet with passive transceivers
- Superior noise rejection
- Rugged casings
- Wire strip gage
- Weatherproof design
- UL listed
- CE approved
- Lifetime warranty

**RK400**
Powered Modular Card Cage
Features: Holds up to 10 cards




**DA422**
Modular RS422 Distribution Amp
Distance: 6,000 feet
Features: Transmits data

**VB41x4**
Video Balun Transceiver Card
Distance: 3,000 feet w/ active
750 feet w/ passive




**TR515x4**
Active Receiver Card
Distance: 1,500 feet




**TR560x4**
Active Receiver Card
Distance: 6,000 feet w/ active
3,000 feet w/ passive



**EX1120RR**
Active Transmission System
Distance: 12,000 feet
Includes: TR1120RR card
TT1120 transmitter



## Close Up
### Find out more about the Modular Systems

Compact and expandable; these systems are designed for use over point-to-point copper wire of 18 AWG to 26 AWG. Plug-in modules make it possible for the system designer to mix and match modules for cables of varying distances from 100 to 12,000 feet. DIP switch distance settings on active video modules allow the installer to "fine tune" each module to the exact cable length. A fully populated modular rack can handle up to 40 video signals. The RK400 can hold up to 4 RS422 data distribution cards. Twisted pair connections are by RJ45 jack or screwless terminals. The Nitek modular rack system allows you to "pay as you grow".

14 / Modular Rack Systems

**Exhibit 2**

# XP Series Units



## Features:

- Self contained cabinet
- Wall mounted
- Provides crossover connection and power insertion
- Optional RS422 distribution (on D units)
- Each camera individually fused
- Secure hinged door cabinet with keyed lock

*Products protected by US Patent No. 7,193,149



### XP4, XP4D
4 Channel Crossover Panel

**Also Available-**
**XP4D:** RS422 distribution



### XP4/439, XP4D/439
4 Channel Crossover Panel
Includes: 1 - VH439

**Also Available-**
**XP4D/439:** RS422 distribution



### XP8, XP8D
8 Channel Crossover Panel

**Also Available-**
**XP8D:** RS422 distribution



### XP8/439
8 Channel Crossover Panel
Includes: 2 - VH439



## Installation
Sample installation featuring the XP series units.



**NITEK / 15**

**Exhibit 2**



# NITEK®
### Twisted Pair Video Network Solutions

## Video Balun Transceivers - up to 3,000 feet

### Features:
- Transmits video, power and data in one Cat 5 cable
- For short range cameras
- Superior noise rejection
- RJ45 jack connections
- Intelligent link indicators
- Built-in surge suppression

**CHM12A**
Crossover Insertion Card
Features:
- Powers 12 volt cameras

**CHM16**
Crossover Insertion Card
Features:
- Powers 24 volt cameras

**CHM22**
Crossover Insertion Card
Features:
- Powers 24 volt cameras
- RS422 distribution

**CX452**
Powered Card Cage
Features:
- Holds up to 5 cards

**PS110**
Power Supply for UTPLinks
Features: Rack mounted
28VAC 10 Amp

*Products protected by
US Patent No. 7,193,149

## Installation
### Sample installation using UTPLinks in a local solution

Local solutions provide a method of providing power and data out to camera distances under 1,000 feet from the head end. Video from the camera travels directly from the UTPLinks products and into the DVR or monitors located at the head end.

Head End

Video

Power
Video
VB43ATF
CX452 with CHM 16
PS105/PS110
Power

Power & Data
Video
VB43ATF
CX452 with CHM22
PS105/PS110
Power

**16 / UTPLinks**

**Exhibit 2**



Exhibit 2



**Twisted Pair Video Network Solutions**

# Video Balun Transceivers - up to 3,000 feet

## Features:
- Up to 3,000 feet with active receivers
- Up to 750 feet with passive transceivers
- Superior noise rejection
- Rugged casings
- Wire strip gage
- Weatherproof design
- UL listed
- CE approved
- Lifetime warranty



**CX452**
Powered Card Cage
Features:
- Holds up to 5 cards

**CIP16**
Crossover Insertion Card
Features:
- Powers IP cameras
- Requires VB43IP

**VB43IP**
Video Combiner for IP Cameras
Features:
- Designed for IP
- For use with CIP16 only

**PS110**
Power Supply for UTPLinks
Features:
- Rack mounted
- 28VAC 10 Amp

## Installation
Sample Installation using UTPLinks for an IP Camera Solution

*18 / UTPLinks*

**Exhibit 2**

# V-Link Video Transmission



## Features:

- Transmits video up to 4, 7 or 10 miles
- For use over leased telephone wire
- High resolution video images
- Quality and update rate unaffected by Pan/Tilt/Zoom



### VL6022
Color Dedicated Line Video System
Distance: 4 miles



### VL6024
Color Dedicated Line Video System
Distance: 7 miles



### VL6028
Color Dedicated Line Video System
Distance: 10 miles

## Close Up
### Take a closer look at the V-Link Series

Dedicated telephone line video link system for color video transmission up to distances of 10 miles.

V-Link is a "full motion" video transmission system designed for operation over leased local area metallic telephone circuits or twisted pair point-to-point wire. The V-Link uses a unique patented unconditional refresh method to provide transmission of high quality color video images. This update technique is made possible by the latest in custom integrated circuitry.

The V-Link update is unaffected by scene changes, making it ideal for use in P/T/Z systems or scenes with a lot of activity. The V-Link operates as a stand-alone unit (no PC required) and integrates directly into any existing CCTV sys-

## Applications:
- Traffic intersections - monitoring
- Police department surveillance of public facilities
- Remote parking lots
- ATM's - remote transaction monitoring
- Military and government installations
- Large campuses and off campus facility monitoring
- Large industrial and manufacturing facilities
- Public transportation
- Airport terminals, remote areas

tem, including a matrix, multiplexer or switcher. The system is designed to provide fast, high quality video at a low cost. The leased line circuit (type LADA) needed for a V-Link is typically the lowest cost line available from a local telephone company. The color V-Link system is capable of handling either monochrome or color video inputs. This dual mode of operation makes it possible to upgrade a system from monochrome to color.

**NITEK / 19**

**Exhibit 2**

# NITEK®
Twisted Pair Video Network Solutions

## Surge Protection Devices



### Features:
- Up to 3,000 feet with active receivers
- Up to 750 feet with passive transceivers
- Superior noise rejection
- Rugged casings
- Wire strip gage
- Weatherproof design
- UL listed
- CE approved
- Lifetime warranty



**CAMPVC24** Video Balun Transceiver
Distance: 3,000 feet w/ active
750 feet w/ passive



**CAMUTP24** Video Balun Transceiver
Distance: 3,000 feet w/ active
750 feet w/ passive



**CAMPTR1** Video Balun Transceiver
Distance: 3,000 feet w/ active
750 feet w/ passive



**DVRPTR1** Video Balun Transceiver
Distance: 3,000 feet w/ active
750 feet w/ passive

## Installation
Sample installations using Surge Protection



*20  /  Surge Protection Devices*

**Exhibit 2**

# Data Transmission Products



## Features:
- Data transmission for distances up to 4 miles
- EIA standard input and output
- Data speeds of up to 64 K
- Built-in surge supression

### CDX440

Converter for Pelco Coaxitron
to Pelco 422D Protocol
Features:
- Interfaces with coaxitron systems
- Perfect for the Genex system
- Immunity to ground loop

### DL1142

RS422 Line Driver
Distance: 12,000 feet
Features:
- Provides RS422 data

### DL2105

RS232 Extender System
Distance: 12,000 feet
Features:
- Provides RS232 data

### DL2120

Dedicated Telephone Line Data Trans-
mission System
Distance: 4 miles
Features:
- Provides RS232, RS422
  or 4 wire RS485 data

## Close Up

Take a closer look at the NITEK data systems

Nitek data transmission products are designed for use over either point-to-point unshielded twisted pair wire of 18 AWG to 26 AWG or leased metallic telephone lines; can be either direct or through a central telephone office. Individually shielded twisted pairs should not be used. Connections through splices and punch-down blocks are acceptable. Nitek data transmission products are designed to extend operation of control and signalling circuits for P/T/Z, remote equipment control and access control equipment for security applications, among other uses.

Distance specifications are based upon 24 AWG wire and may vary with other gages of wire. To determine which system best fits a particular application, it is important to first determine the correct cable length



*NITEK / 21*

**Exhibit 2**



# NITEK.
Twisted Pair Video Network Solutions

## Audio/Video and Accessories



Nitek offers a selection of audio/video equipment and accessories to extend and complete any CCTV application.

### AS1000
Audio Balun Transceiver
Distance: Up to 2 miles
Features:
- Transmits audio
- Does not require power

### MMB1

S-Video and Audio Balun Transceiver
Features:
- Transmits S-video
- Transmits 2-channel audio

### RK115
Rack Panel
Features:
- Holds 10 VB37M or VB39M
- Fits standard 19" cabinets

### RB102/104
19" Rack Panel Wall Bracket
RB102: Mounting for two RK115
RB104: Mounting for four RK115

### CXJ20, CXJ30

Coax Jumper Assembly
CXJ20: 2 ft long - kit of 15
CXJ30: 3 ft long - kit of 15



Exhibit 2

# *Video Balun Transceivers* - up to 3,000 feet

MELROSE PARK, IL -- Lincoln College of Technology and Nitek have partnered in the delivery of unshielded twisted pair (UTP) video solutions into the new curriculum for the CCTV section of the Electronic Systems Technician program.

Everyone and everything is connected. Commercial and residential establishments need to be plugged in, whether it is cabling, audio/video circuits, computer networks, fiber-optic or telecommunications and satellite systems. Lincoln College of Technology provides the Electronic Systems Technician (EST) program to prepare their students in this field. Lincoln College campuses are equipped with a "smart house" -- a real-world, in-house construction facility where students can practice, learn and gain valuable hands-on experience in a residential and commercial stick house. Nitek adds to the experience by providing some of the latest technology that is used in the field every day.

Providing CCTV customers with a UTP infrastructure today will promote future technologies and easy transitions. Lincoln College is constantly looking to improve the marketability of their graduates by providing knowledge and installation methods for the latest technologies. The assistance that Nitek and Lincoln College provides students is the hands-on approach that employers are looking for. Students install UTP video systems using the Nitek products, such as the XP4/439, VB43ATF and the UTPLinks system. The students perform installations for familiarization, and then a final install for a graded installation. Lincoln College instructor, Dan Drufke, notes, "The students enjoyed wiring the Nitek XP4/439 to the stick house and gave it a thumbs up!"

Companies are constantly looking for the best trained employees. CCTV installation companies, such as ADT and SimplexGrinnell can look at a Lincoln College graduate with confidence that they can immediately apply the real-



The "Smart House" located in the Lincoln College of Technology Melrose Park campus allows students to train hands-on with CCTV, audio, and other electrical installations.

world training they received on the Nitek equipment from the installations in the "smart house". Melrose Park Lincoln College Education Supervisor, Mark Barzyk, explains, "Incorporating UTP into the EST CCTV curriculum adds the infrastructure for implementing future technologies. When employers review the graduates they now have a potential employee with the installation knowledge and hands-on to do both the traditional and future infrastructure. Now the graduates are exposed to the technologies that increase their value and marketability!"

Instructors, students and installation companies all find the ease of installation using Nitek UTP video solutions. UTP offers the ability to distribute video, power, and data in one Category 5E or 6 cable; as opposed to three types of wire to every camera as required in traditional coax installations. Student, Jose Villalpando agrees, "Installing UTP for CCTV is easy, quicker, has room for expansion, and is not susceptible to noise...Nitek products were 'plug and play'."

The Nitek twisted pair technologies also provide noise rejection to maintain a consistent clear video image, as well as other valuable features that has made the Nitek product the preferred technology in installations ranging from schools, airports, casinos, and many others. Students experienced with this technology will become versatile installers who can tackle any project that they may be faced with in the real world.

Lincoln College of Technology has remained a widely known and respected job skill training source since its founding in 1946. Lincoln College has consistently responded to employer needs and the changing times. Nitek adds over 20 years of UTP video transmission experience and products to this quality institution to give the students their greatest chance of employment following their experiences at Lincoln College.



Student installed camera using UTP with the Nitek VB43ATF transmitter powering the camera and sending video back to the UTPLinks system in the "smart house"

**NITEK / 23**

**Exhibit 2**



# NITEK Case Study - The Palace

AUBURN HILLS, MI – The Palace of Auburn Hills Michigan, home to the 2003 NBA Champion Detroit Pistons is renowned for superb acoustics and excellent unobstructed viewing. It is a "World Class" sports and entertainment venue. Built in August 1988 by the current owner, Bill Davidson, the Palace is winner of numerous "Arena of the Year" awards.

## CCTV System Upgrade

Tom Meier, Security Director for the Palace, has the responsibility of providing for the safety and protection of all personnel and patrons of this 20,000 seat venue. Closed Circuit Video (CCTV) plays a major role in security at the Palace. Tom, who regularly monitors technological advances in the area of CCTV, recently decided to investigate upgrading the Palace system. He called upon the expertise of local security equipment experts to accomplish this task and ultimately awarded the contract for upgrading CCTV to Guardian Alarm of Southfield, Michigan, an established, diversified, full line security company.

## From Analog to Digital Video Recording

One of the primary objectives of the CCTV system upgrade was to convert from an analog recording system to digital. In the Palace facility, the advantages would be far-reaching. Changing over to digital recording however, proved more difficult than anticipated. The analog recorders are more tolerant of low video signal levels. The replacement Digital Video Recorders, on the other hand, proved to be much more selective than the analog units. Input signals attenuated due to long coax runs, resulted in diminished video, faded or lost color signals and video sync problems. Guard-





ian Alarm was not the installer of the original CCTV system and documentation relating to cable routing details was either missing or non-existent. As a result, Jim Sandberg, Project Manager for Guardian was having difficulty identifying and following cable runs for 168 cameras. In addition, coax trays were full, with no room to add more runs, making cable tracing difficult to impossible.

## From Coax to UTP

Jim Sandberg weighed the alternatives and decided his best solution was to convert video transmission from coax cable to unshielded twisted pair (UTP). From his experience, Jim was convinced that this would correct the video quality problems, simplify the system and drastically reduce the amount of cable in the trays, freeing up sufficient space for future system expansion. Jim contacted Nitek.

## Nitek for UTP Transmission

To solve the problem of tracing the coax cables from each of the cameras through eight IDF closets and back to the Head-end, Jim designed a hybrid system combining the existing coax and a UTP solution from Nitek. The coax was left in place from the cameras to the IDF closets. From there, using Nitek short and long range transmitter and receiver hubs, he transitioned to 25 and 50 pair UTP cables, which were routed to the Equipment Room at the Head-end. He wasn't sure what UTP transmission equipment he would require for the various cable runs, so he called Nitek and discussed the project with their engineers. Jim requested on-location assistance to verify the UTP design and to determine the correct equipment for UTP transmission at each of the IDF closets and at the Head-end. Carl Palash, Regional Sales Manager for Nitek, flew to Auburn Hills and met with Jim Sandberg at the Palace. They walked the facility and Carl assisted with the selection of the best and

Exhibit 2



most cost-effective Nitek solution for the project.

he Nitek Equipment Solution

Cable runs covered a range from short lengths up to several thousand feet. It was decided that 4 channel UTP mini-hub passive transmitters were the best choice for the IDF closets. They operate with any of the Nitek UTP receiver products for cable lengths up to 3,000 feet and provide easy mounting and connection. Cameras were powered over 16 gauge wires from the IDF, using conventional multi-channel 24V power supplies.

At the Headend; Nitek 32 channel UTP active and passive receivers were used, depending upon the cable length. Model VH3251 active hub receivers were used for the majority of runs, which were 750 to 1,500 feet. The Model VH3200 rack chassis, which accepts up to 4 of the 8 channel cards, was configured with 2 passive 750 foot (VB41x8), 1 active 1,500 foot (TR515x8) and 1 active 3,000 foot (TR560x8) card to cover short, medium and long range runs. Video outputs from the Nitek receivers were connected via coax directly into the DVR inputs. This combination of equipment proved effective not only from a cost standpoint, but most importantly from an operational standpoint. The problems with diminished quality video displays, faded or lost color and video sync problems were eliminated.



A Successful Installation

Jim Sandberg says, "Since we were uncertain of the cable distance from camera to IDF, the Nitek DIP switch technology afforded us the flexibility to compensate for the total unknown distance of coax plus UTP to the Headend." Tom Meier now has an upgraded CCTV system for the Palace with better video quality, detail and color from all cameras, future expansion capability, improved serviceability and a well documented cable infrastructure.

## Dip Switch Technology

The ease of installation and set-up for the Palace project was made possible by the unique Digital Adjustment Technology (DAT) of the Nitek active receivers. This technology is utilized in all of Nitek's active receivers. DAT circuitry is exclusive to Nitek and provides digital accuracy when ad-



justing for video loss. This technology is what allows Nitek to guarantee 1 Volt P/P video. This is especially important when the receiver outputs are connected to Digital Video Recorders, as they were in the Palace project.

Dip switches are adjusted according to the distance between the camera and the receiver and DAT does the rest. The adjustment corrects and restores the video signal providing a virtually lossless video signal into your monitors or digital video recorder (DVR).

Without DAT, active signal correction can under or over compensate. Either one can cause noise and distortion which may not be visible on a monitor, but is fed into the DVR. This overfeed into the DVR wastes disk space causing the DVR to reach its limit much sooner than should be expected.

Exhibit 2



Exhibit 2

**Exhibit 2**



**Distributed by:**

**NITEK**
5410 Newport Drive
Rolling Meadows, IL 60008
Copyright 2007  NITEK
All Rights Reserved.
http://www.nitek.net

Send to:

**Exhibit 2**

# EXHIBIT 3

**From:** Bert [mailto:bert@nitek.nl]
**Sent:** Friday, March 23, 2007 5:59 PM
**To:** michael.murray@fixcom.co.uk
**Subject:** Patent Nitek



Invisted Your Systems - Video Network Solutions

*building bridges in transmission*🔵

NITEK Europe
De Schans 19-21 2a
8231 KA LELYSTAD
The Netherlands

www.nitek.nl
info@nitek.nl
Tel. +31 (0)320-230005
Fax +31 (0)320-282186

Rolling Meadows, IL - Nitek, a world leader in the design, manufacture and marketing of video and data transmission systems, has been awarded a U.S. Patent for its "System for Handling Video, Control Signals and Power", the core technology of its UTPLinks®. structured cabling compliant CCTV system and other proprietary Nitek products. Nitek U.S. patent Number 7,193,149 covers the use of structured cabling networks to deliver power, video and data for control (PVD) to cameras and PTZ units in a CCTV system.

According to Jim Hertrich, one of the principals of Nitek and an inventor of the system, "The granting of this patent not only protects our intellectual property, but validates the technological leadership and product innovation that Nitek has continually



demonstrated in the area of video transmission            and control. The Nitek UTP transmission system for delivery of video, power and data within a structured cabling network enables a transition from traditional Closed Circuit Video that requires three separate, home-run cables for video, power and control, to a convergence of CCTV into the network cabling environment. The same cabling infrastructure used by the data and telecommunication systems. UTPLinks is a complete, comprehensive system that combines all of these CCTV functions into a single integrated solution".

The UTPLinks system for video, control and power is designed as a fully scalable, true hybrid infrastructure which supports any analog CCTV application and allows for upgrades to IP cameras utilizing the same cabling infrastructure.

Nitek, a Rolling Meadows, Illinois company has been developing and marketing unique, high performance products in the area of video security for over twenty years. The Company markets a complete line of equipment for UTP transmission of video, data and power. All Nitek products are manufactured in the U.S.A.

For more information contact Nitek Europe, De Schans 19-21 2a 8231KA LELYSTAD- The Netherlands; web site information:
www.nitek.nl

We value your interest in our products. If you no longer want to be made aware of special email offers and announcements from Nitek simply click to unsubscribe.

Postal Unsubscribe Request:
Nitek
Attn: Marketing Coordinator
De Schans 19-21 2a 8231 KA LELYSTAD- The Netherlands

**Exhibit 3**

# EXHIBIT 4

From: Nitek [mailto:marketing@nitek.net]
Sent: Tuesday, March 20, 2007 7:57 PM
To: gordy@ismrep.com
Subject: Nitek UTP Patent Issued

<http://www.nitek.net/>
14a3c5.gif

NITEK AWARDED PATENT FOR SYSTEM HANDLING VIDEO, CONTROL
SIGNALS & POWER
March 20, 2007

Rolling Meadows, IL - Nitek, a world leader in the design, manufacture and marketing of
video and data transmission systems, has been awarded a U.S. Patent for its "System for
Handling Video, Control Signals and Power", the core technology of its UTPLinks®.
structured cabling compliant CCTV system and other proprietary Nitek products. Nitek
U.S. patent Number 7,193,149 covers the use of structured cabling networks to deliver
power, video and data for control (PVD) to cameras and PTZ units in a CCTV system.

14a3d9.jpg
According to James Hertrich, one of the principals of Nitek and an inventor of the
system, "The granting of this patent not only protects our intellectual property, but
validates the technological leadership and product innovation that Nitek has continually
demonstrated in the area of video transmission and control  The Nitek UTP transmission
system for delivery of video, power and data within a structured cabling network enables
a transition from traditional Closed Circuit Video that requires three separate, home-run
cables for video, power and control, to a convergence of CCTV into the network cabling
environment. The same cabling infrastructure used by the data and telecommunication
systems. UTPLinks is a complete, comprehensive system that combines all of these
CCTV functions into a single integrated solution".

The UTPLinks system for video, control and power is designed as a fully scalable, true
hybrid infrastructure which supports any analog CCTV application and allows for
upgrades to IP cameras utilizing the same cabling infrastructure.

Nitek, a Rolling Meadows, Illinois company has been developing and marketing unique,
high performance products in the area of video security for over twenty years. The
Company markets a complete line of equipment for UTP transmission of video, data and
power. All Nitek products are manufactured in the U.S.A.

For more information contact Nitek, 5410 Newport Drive, Suite 24, Rolling Meadows, IL
60008 (800) 528-4343, Fax (847) 259-1300; web site information: www.nitek.net
<http://www.nitek.net/>
14a45b.gif

**Exhibit 4**

We value your interest in our products. If you no longer want to be made aware of special email offers and announcements from Nitek simply <mailto:marketing@nitek.net?subject=Please%20remove%20me%20from%20your%20mailing%20list>click to unsubscribe.

Postal Unsubscribe Request:
Nitek
Attn: Marketing Coordinator
5410 Newport Drive
Rolling Meadows, IL 60008

**Exhibit 4**

# EXHIBIT 5

**From:** Nitek [mailto:marketing@nitek.net]
**Sent:** Tuesday, March 20, 2007 11:03 PM
**To:** paul@klmmarketing.net
**Subject:** Nitek UTP Patent Issued


Twisted Pair Video & Data Systems



## NITEK AWARDED PATENT FOR SYSTEM HANDLING VIDEO, CONTROL SIGNALS & POWER
### March 20, 2007

**Rolling Meadows, IL** - Nitek, a world leader in the design, manufacture and marketing of video and data transmission systems, has been awarded a U.S. Patent for its "System for Handling Video, Control Signals and Power", the core technology of its UTPLinks®. structured cabling compliant CCTV system and other proprietary Nitek products. Nitek U.S. patent Number 7,193,149 covers the use of structured cabling networks to deliver power, video and data for control (PVD) to cameras and PTZ units in a CCTV system.





According to James Hertrich, one of the principals of Nitek and an inventor of the system, "The granting of this patent not only protects our intellectual property, but validates the technological leadership and product innovation that Nitek has continually demonstrated in the area of video transmission and control. The Nitek UTP transmission system for delivery of video, power and data within a structured cabling network enables a transition from traditional Closed Circuit Video that requires three separate, home-run cables for video, power and control, to a convergence of CCTV into the network cabling environment. The same cabling infrastructure used by the data and telecommunication systems. UTPLinks is a complete, comprehensive system that combines all of these CCTV functions into a single integrated solution"

The UTPLinks system for video, control and power is designed as a fully scalable, true hybrid infrastructure which supports any analog CCTV application and allows for upgrades to IP cameras utilizing the same cabling infrastructure.

Nitek, a Rolling Meadows, Illinois company has been developing and marketing unique, high performance products in the area of video security for over twenty years. The Company markets a complete line of equipment for UTP transmission of video, data and power. All Nitek products are manufactured in the U.S.A.

For more information contact Nitek, 5410 Newport Drive, Suite 24, Rolling Meadows, IL 60008 (800) 528-4343, Fax (847) 259-1300; web site information: www.nitek.net

NITEK                                                                    http://www.nitek.net

**Exhibit 5**

We value your interest in our products  If you no longer want to be made aware of special email offers and announcements from Nitek simply <u>click to unsubscribe</u>

Postal Unsubscribe Request:
Nitek
Attn: Marketing Coordinator
5410 Newport Drive
Rolling Meadows, IL 60008

**Exhibit 5**

# EXHIBIT 6

# FILED UNDER SEAL

# EXHIBIT 7

# FILED UNDER SEAL

# EXHIBIT 8

# FILED UNDER SEAL

# EXHIBIT 9

# FILED UNDER SEAL

# EXHIBIT 10

1              UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3         HONORABLE A. HOWARD MATZ, U.S. DISTRICT JUDGE

4                    - - - -

5                                              COPY

6

7                              )

       NETWORK VIDEO TECHNOLOGIES, INC.,  )

8                              )

                         PLAINTIFF,   )

9                              )

            VS.                )  No. CV07-4789-AHM(RZx)

10                             )

       NITEK INTERNATIONAL, LLC, ET AL.,  )

11                             )

                         DEFENDANTS.   )

12     _____)

13

14

15         REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              LOS ANGELES, CALIFORNIA

17           MONDAY, FEBRUARY 25, 2008

18

19

20

21

22     _____

23            CINDY L. NIRENBERG, CSR 5059
              U.S. Official Court Reporter
24            312 North Spring Street, #438
              Los Angeles, California 90012
25            www.cindynirenberg.com

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**Exhibit 10**

```
 1          LOS ANGELES, CALIFORNIA; MONDAY, FEBRUARY 25, 2008

 2                          10:27 A.M.

 3                          - - - - -

 4          THE CLERK:  Calling Item Number 2, CV07-4789, Network

 5   Video Technologies, Inc. versus Nitek International, LLC, et

 6   al.

 7          Counsel, state your appearances, please.

 8          MR. GERSTMAN:  Good morning, Your Honor.  George

 9   Gerstman representing Nitek.  With me is my partner Ken Wilton

10   also representing Nitek.

11          THE COURT:  Okay.  Good morning.

12          MR. GERSTMAN:  Good morning.

13          MR. HECKER:  Good morning, Your Honor.  Gary Hecker,

14   Jim Slominski and Andrea Mast representing NVI.

15          THE COURT:  Okay.  Please be seated everyone.  Good

16   morning to all of you.

17          We have a motion to dismiss for lack of jurisdiction

18   subject matter or personal jurisdiction or in the alternative

19   to transfer venue.

20          I assume that I have subject matter jurisdiction.  I

21   think that the MedImmune decision and Sony Electronics and

22   SanDisk make that the correct conclusion.  But I intend, unless

23   I am talked out of it at this hearing, to exercise my

24   discretion under the Declaratory Judgment Act to dismiss

25   without prejudice, the Declaratory Judgment Action that the
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**Exhibit 10**

```
 1    plaintiffs have filed.

 2             I'm applying the principles in EMC Corp., Wilton and

 3    in Sony Electronics as to what standards should govern a

 4    court's determination as to whether or not in the exercise of

 5    discretion it would be appropriate to dismiss without prejudice

 6    the complaint, and here are my reasons for doing so.  I do not

 7    intend to issue a written order, but the -- and these are not

 8    necessarily in the order of weight or importance, but there is

 9    a basis to start with to think that the filing of this action

10    was a measure designed to achieve a tactical advantage.

11             I don't say that in a way that's meant to slap

12    anyone's wrist or suggest that there was misconduct because I

13    don't find that there was.  But filing the suit in this forum,

14    which is a very dubious forum, very attractive to the

15    plaintiffs because that's where their skillful lawyers are, and

16    quite iffy as to whether or not venue lies here.  I suggest

17    that there was a forum shopping motive that was at least part

18    of what was going on.

19             Shortly after the suit was filed, the plaintiffs

20    sought a covenant not to sue.  That's consistent with the claim

21    that there is some perceived exposure, some actual conflict,

22    some risk of functioning in limbo while you're still in

23    business.  But it also is consistent with the view that we will

24    go to court, we'll slap the defendant with a complaint, we'll

25    get our forum that we want, we'll get the tactical advantage of
```

**Exhibit 10**